**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ROSENBAUM CAPITAL LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BOSTON COMMUNICATIONS GROUP, INC., KAREN A WALKER and EDWARD Y. SNOWDEN,<br><br>Defendants. | CIVIL ACTION NO. 05-11165 (WGY) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**GILMAN AND PASTOR, LLP**
David Pastor, Esq. (BBO#391000)
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 742-9700
Facsimile: (617) 742-9701

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ, LLP**
Peter C. Harrar, Esq.
Paulette S. Fox, Esq.
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

**LAW OFFICES OF MARC HENZEL**
Marc S. Henzel
273 Montgomery Avenue, Suite 202
Bala Cynwyd, Pennsylvania 19004
Tel: (610) 660-8000
Fax: (610) 660-8080

*PLAINTIFF'S COUNSEL*

# TABLE OF CONTENTS

Page No.

I.    PRELIMINARY STATEMENT ........................................................................... 1

II.   FACTUAL SUMMARY ................................................................................... 1

  A.  The Parties ............................................................................................... 2

  B.  The Patents Infringed ................................................................................. 2

  C.  BCGI's Willful Infringement of the Patents........................................................ 4

  D.  Defendants' Misstatements About The Patents .................................................. 5

III.  ARGUMENT ............................................................................................... 6

  A.  The Complaint States A Claim For Federal Securities Law Violations ............................ 6

  B.  Defendants' Statements About The Freedom Litigation Were  Materially Incomplete
      And Insufficiently Cautionary .......................................................................... 8

    1.  Defendants Statements Understated Their Exposure To The Freedom
        Litigation................................................................................................ 9

    2.  Neither the PSLRA Safe Harbor Provisions Nor the  Bespeaks Caution
        Doctrine Immunizes Defendants......................................................... 12

  C.  The Complaint Alleges A Strong Inference Of Scienter ................................................ 16

    1.  Scienter Pleading Standard ....................................................................... 16

    2.  The Complaint Adequately Pleads Defendants' Actual Knowledge................... 17

    3.  The Complaint's Motive and Opportunity Allegations Add to the Strong
        Inference of Scienter ............................................................................. 18

IV.   CONCLUSION........................................................................................... 20

Table of Authorities

**CASES**                                                                    **PAGE(S)**

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ........................................................................ *passim*

*In re Allaire Corp. Securities Litigation*,
    224 F. Supp. 2d 319 (D. Mass. 2002) ...........................................6, 8, 11, 15

*Arnlund v. Deloitte & Touche LLP*,
    199 F. Supp. 2d 461 (E.D. Va. 2002) .......................................................20n

*In re Amylin Pharmaceuticals, Inc. Securities Litigation*,
    No. 01-1455,
    2002 U.S. Dist. LEXIS 19481 (S.D. Cal. Oct. 9, 2002) ...........................14n

*In re Amylin Pharmaceuticals, Inc. Securities Litigation*,
    No. 01-1455,
    2003 WL 21500525 (S.D. Cal. May 1, 2003) .................................10, 13, 15

*Ansin v. River Oaks Furniture, Inc.*,
    105 F.3d 745 (1st Cir. 1997) ..........................................................................9

*Backman v. Polaroid Corp.*,
    910 F.2d 10 (1st Cir. 1990) .........................................................................11

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .............................................................................9n, 10

*Brumbaugh v. Wave Systems Corp.*,
    No. 04-30022,
    2006 U.S. Dist. LEXIS 725 (D. Mass. Jan. 11, 2006) ........................ *passim*

*Burstein v. Applied Extrusion Technologies*,
    150 F.R.D. 433 (D. Mass. 1993) ..........................................................6n, 11

*In re Cabletron Systems, Inc.*,
    311 F.3d 11 (1st Cir. 2002) ................................................................. *passim*

*In re Campbell Soup Co. Securities Litigation*,
    145 F. Supp. 2d 574 (D.N.J. 2001) .........................................................10n

*In re Cendant Corp. Securities Litigation*,
    76 F. Supp. 2d 531 (D.N.J. 1999) ...........................................................18n

*Cooperman v. Individual, Inc.*,
    171 F.3d 43 (1st Cir. 1999).......................................................................6, 8

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)...................................................................................16

*Florida State Board of Administration v. Green Tree Financial Corp.*,
    270 F.3d 645 (8th Cir. 2001) ...................................................................17n

*Freedom Wireless, Inc. v. BCGI, et al.*,
    No 1:00-CV-12234-EFH (D. Mass. May 20, 2005) ........................... *passim*

*Geffon v. Micrion Corp.*,
    249 F.3d 29 (1st Cir. 2001)....................................................................6, 18

*Gelfer v. Pegasystems, Inc.*,
    96 F. Supp. 2d 10 (D. Mass. 2000) ..........................................................16n

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999)..............................................................16, 17n

*Gross v. Summa Four, Inc.*,
    93 F.3d 987 (1st Cir. 1996)......................................................................11

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) ............................................................14n, 15

*In re Independent Energy Holdings PLC Securities Litigation*,
    154 F. Supp. 2d 741 (S.D.N.Y. 2001).......................................................14n

*Maldonado v. Dominguez*,
    137 F.3d 1 (1st Cir. 1998)..........................................................................8

*In re MobileMedia Securities Litigation*,
    28 F. Supp. 2d 901 (D.N.J. 1998) ............................................................13n

*In re Nortel Networks Corp. Securities Litigation*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003)........................................................13n

*In re Number Nine Visual Technology Corp Securities Litigation*,
    51 F. Supp. 2d. 1 (D. Mass. 1999) ...........................................................13n

*Orton v. Parametric Technology Corp.*,
    344 F. Supp. 2d 290 (D. Mass. 2004)................................................11n, 12n

*In re PLC Systems, Inc. Securities Litigation*,
   41 F. Supp. 2d 106 (D. Mass. 1999) ............................................................9

*PR Diamonds, Inc. v. Chandler*,
   No. 02-3921,
   2004 WL 422726 (6th Cir. Mar. 3, 2004)................................................20n

*In re PerkinElmer, Inc. Securities Litigation*,
   286 F.Supp.2d 46 (D. Mass. 2003) ..........................................................20n

*In re Prudential Securities Inc. Limited Partnerships Litigation*,
   930 F. Supp. 68 (S.D.N.Y. 1996)...............................................................15

*Roeder v. Alpha Industries, Inc.*,
   814 F.2d 22 (1st Cir. 1987)...................................................................6, 11

*SEC. v. Healthsouth Corp.*,
   261 F. Supp. 2d 1298 (N.D. Ala. 2003)....................................................20n

*In re SeaChange International, Inc.*,
   No. 02-16116,
   2004 WL 240317 (D. Mass. Feb. 6, 2004) ....................................11, 17, 18

*In re Sepracor, Inc. Securities Litigation*,
   308 F. Supp. 2d 20 (D. Mass. 2004) ............................................12, 13, 16

*Shaw v. Digital Equipment Corp.*,
   82 F.3d 1194 (1st Cir. 1996)........................................................ *passim*

*In re Stone & Webster, Inc., Securities Litigation*,
   414 F.3d 187 (1st Cir. 2005)......................................................................6

*In re Time Warner Inc. Securities Litigation*,
   9 F.3d 259 (2d Cir. 1993) .........................................................................19

*Vartanian v. Monsanto Co.*,
   14 F.3d 697 (1st Cir. 1994).........................................................................6

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991)................................................................................14

*Wortley v. Camplin*,
   333 F.3d 284 (1st Cir. 2003).......................................................................6

## I.    PRELIMINARY STATEMENT

Plaintiff Rosenbaum Capital LLC respectfully submits this memorandum of law in opposition to the motion of defendants Boston Communications Group, Inc. ("BCGI" or the "Company"), Karen A. Walker and Edward H. Snowden to dismiss the amended class action complaint (the "Complaint" or "Compl."). As shown below, defendants' motion, based entirely on inapposite boilerplate arguments about materiality, the "bespeaks caution" doctrine and scienter, is without merit and should be denied.

## II.    FACTUAL SUMMARY

This is a class action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of all persons, other than defendants, who purchased, converted, exchanged or otherwise acquired BCGI securities during the period from June 6, 2002 to May 20, 2005, inclusive (the "Class Period") to recover damages caused by defendants' dissemination to the investing public of false and misleading statements concerning a patent infringement litigation against BCGI and others, *Freedom Wireless, Inc. v. BCGI, et al.*, No 1:00-CV-12234-EFH (D. Mass. May 20, 2005) (the "Freedom Litigation"). Defendants falsely represented to the investing public that BCGI was confident that it was not infringing on the patents at issue, that the patents were invalid and that BCGI had meritorious defenses to the Freedom Litigation.

However, despite defendants' representations and reassurances to the investing public, on May 20, 2005, the Company announced that the jury in the Freedom Litigation, after a 51-day trial, had issued a verdict against BCGI, finding that the Company *willfully infringed* on the patents at issue, and awarded plaintiff Freedom Wireless, Inc. ("Freedom") approximately $128 million in damages. On this news, the Company's stock price dropped from $4.81 to $1.75 on

volume of 12,499,900 shares traded.  In the 90-day period subsequent to May 20, 2005, the average price of BCGI common stock was approximately $2.  Compl., ¶¶ 2-3.

On September 1, 2005, U.S. District Judge Edward F. Harrington denied BCGI's request to reduce the Freedom Litigation jury's May 20th damages award, and upheld the $128 million patent infringement verdict against BCGI, which had obtained over $1.5 billion in revenue by infringing Freedom's patents.  The verdict broke down as follows:  (i) $122 million against BCGI and defendant Cingular Wireless, Inc.; (ii) $4.9 million against BCGI and AT & T Wireless PCS; (iii) $925,000 against BCGI and CMT Partners; (iv) $200,000 against BCGI and Western Wireless Corp.; and (v) interests and costs.  BCGI was substantially on the hook for each and every one of these individual jury awards.  This news caused the Company's stock price to drop again, from a closing price of $1.72 on September 1st to a $1.11 closing price on September 2nd, on volume of 3,516,000 shares traded.  Compl., ¶¶ 4-5, 51.

### A.    The Parties

Plaintiff Rosenbaum Capital LLC, a purchaser of BCGI common stock, was appointed Lead Plaintiff pursuant to this Court's Order dated August 16, 2005.  Compl., ¶ 11.

BCGI is a Massachusetts corporation that maintains its principal executive offices in Bedford.  Incorporated in 1988, BCGI provides real-time subscriber management services to the wireless industry. Compl., ¶ 12.  Defendant Karen A. Walker is the Vice President of Finance and Administration and Chief Financial Officer of BCGI.  Compl., ¶ 13.  Defendant Edward Y. Snowden is the President and Chief Executive Officer of BCGI.  Compl., ¶ 14.

### B.    The Patents Infringed

As described in the Complaint, the Freedom Litigation was commenced on March 30, 2000 in the Northern District of California against BCGI, as well as other wireless service carrier defendants, for willful infringement of patents relating to prepaid cellular communication

systems.  Compl., ¶ 1.  The case was transferred to the District of Massachusetts in October

2000.  At issue in the Freedom Litigation were Patent Nos. 5,722,067 (the "'067 Patent") and

6,157,823 (the "'823 Patent"), which concerned a system to allow wireless telephone users to

pay in advance for their service.  The system was first conceived and developed in 1994 by a

cellular telephone marketer, Douglas Fougnies, and an engineer, Dan Harned.  Compl., ¶¶ 27-28.

Fougnies's and Harned's invention had achieved a number of unique advantages never

before available in one wireless system that made it patentable, including: (a) the ability of

prepaid subscribers to initiate telephone calls, as well as receive them, in the same way as

postpaid subscribers, without needing to enter PIN numbers, dial 1-800 numbers, repeat

destination numbers or use authorization codes; (b) the system could not be hacked; (c) it used a

switching system to enable subscribers to use any ordinary wireless telephone, but still be

identified as prepaid; (d) calls could be made both to and from prepaid subscribers even in areas

where the recipient of a call needed to pay for the call; and (e) the system could disconnect an

ongoing call as soon as the prepaid funds were exhausted.  Compl., ¶¶ 33-34.

Fougnies and Harned applied for a patent on their invention in December 1994, and were

granted the first patent in February 1998, the '067 Patent.  They then filed a follow-on patent or

"continuation patent," which is a patent on the same basic invention, but with slightly different

claims, in January 1998, and were granted the second patent in December 2000, the '823 Patent.

Throughout the mid-to-late-1990s, Fougnies and Harned sold their prepaid wireless service

through their Arizona-based company, Cellular Express, Inc. ("Cellular," also known as Cellexis

International, Inc.), ultimately assigning their individual rights in the '067 and '823 Patents to a

new company they had formed, Freedom.  Compl., ¶¶ 34-35.

C.      **BCGI's Willful Infringement of the Patents**

In January 1995, Fougnies and Harned went "live" with their service through a private connection to Bell Atlantic Mobile.  Compl., ¶¶ 38-39.  At first Cellular prospered, but by 1996 Fougnies and Harned were no longer able to obtain the required private connections from wireless providers.  Compl., ¶¶ 40-41.  Not coincidently, sometime in 1996, Verizon Wireless, Inc. and BCGI began offering a prepaid cellular service.  This service was virtually identical to that used by Cellular and Harned, but with one major difference: while Cellular's model looked to purchase and resell minutes from the wireless phone companies, the wireless providers were now selling their own minutes directly to the customer, using BCGI and its wireless prepaid system merely as a service company.  As a result, Cellular's business model became useless; Fougnies and Harned were now being shut out of the very prepaid service industry that they had created.  Compl., ¶ 42.  In violating patent law's doctrine of equivalence, BCGI's "c2c system" was virtually indistinguishable from Freedom's, with substantially the same function, done in substantially the same way and with substantially the same results.  Compl., ¶¶ 43-44. [1]

BCGI's actions when learning of the '067 Patent betrayed a guilty conscience.  In 1998, after Freedom had officially been awarded the first patent, Freedom sent a letter to defendant Snowden giving notice of Freedom's patent approval and warning that BCGI's system was infringing on Freedom's patent and that BCGI would now need to license this prepaid cellular technology from Freedom.  Upon receiving the notice letter, BCGI hastily hired experts to draft a variation of its c2c system, with additional unnecessary components, merely so that it would facially appear to be different from Freedom's now patented system.  Compl., ¶ 46.

---

[1]  That the c2c system was substantially identical to the '067 Patent system was not a complete surprise. In January 1995, Larry Rybar, then an engineer with Bell Atlantic Mobile, who had concluded that the invention of Fougnies and Harned was a "great idea" that "no one else had," had extensive contacts with BCGI.  Mr. Rybar, though subject to a confidentiality agreement with Fougnies and Harned, suspiciously shuffled back and forth from informational meetings with them to meetings with BCGI.  Compl., ¶ 45.

Also upon receiving the notice letter from Freedom, BCGI contacted Orbital Sciences, Harned's former employer, hoping that Orbital might be the rightful owner of the Freedom patents, since Harned had worked on them while an employee at Orbital. Ultimately, in May 2002, BCGI entered into an agreement with Orbital to pay Orbital $750,000 for a license to any rights Orbital may eventually realize it had in the Freedom patents. Compl., ¶ 47.

BCGI and its co-infringers also sought legal opinions from patent law firms to enable them to mount a defense that they could not have acted willfully because they obtained opinion letters that defended their actions. As the Complaint alleges, BCGI knew that these legal opinions were neither thorough nor based on an analysis of Freedom's actual patents, defendants' systems, the prosecution history, the applicable law, or other relevant factors, but instead were obtained for the use as a shield against claims of willful infringement. Compl., ¶ 48.

### D.    Defendants' Misstatements About The Patents

Despite these manifold indicia of a guilty conscience, defendants steadfastly proclaimed that the Company had not infringed the Freedom patents and had no reason to believe it would lose the case. For example, immediately before the Class Period began, defendant Snowden made the following comments to analysts:

> *We feel very confident with our position that we do not infringe on the patent and that we have sufficient prior art and other arguments that invalidate the patent. Our case is strong and we anticipate a favorable summary judgment.* However, patent litigation is expensive and we need to incur these costs to defend our case and prevail.
>
> *You know as I said we feel very confident about our position. Unfortunately, it's costing us a lot to defend it but we feel that we are in a very strong position and that we'll prevail.*
>
> *[W]e absolutely remain confident in our success on the basis of non-infringement, on the basis of the fact that we believe that the patent is invalid.*

Compl., ¶ 56.

These bold statements were never corrected during the Class Period. Instead, BCGI repeated the substance of the following mantra:

> *We remain confident that we do not infringe on the Freedom Wireless patent. And that the patents are invalid in light of prior art.*
>
> *Again, I can't reiterate enough our counsel and we feel very strongly about our case. Our position has not changed one bit, in that regard.*

Compl., ¶ 60. *See also* substantially similar language at paragraphs 58, 59, 61-79.

## III.    ARGUMENT

### A.    The Complaint States A Claim For Federal Securities Law Violations

On a motion to dismiss, the Court "must accept the allegations of the complaint as true," *Vartanian v. Monsanto Co.,* 14 F.3d 697, 700 (1st Cir. 1994), and "must draw all reasonable inferences from the particular allegations in the plaintiff's favor." *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 78 (1st Cir. 2002); *In re Allaire Corp. Securities Litigation,* 224 F. Supp. 2d 319, 323 (D. Mass. 2002). A court may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 25 (1st Cir. 1987) (citations omitted); *Cooperman v. Individual, Inc.,* 171 F.3d 43, 46 (1st Cir. 1999).[2]

To state a claim under §10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must allege: (1) "a material misrepresentation (or omission)"; (2) "scienter, *i.e.,* a wrongful state of mind"; (3) "a connection with the purchase or sale of a security"; (4) "reliance"; (5) "economic loss"; and (6) "loss causation." *E.g., In re Stone & Webster, Inc., Sec. Litig.,* 414 F.3d 187, 193 (1st Cir. 2005); *Wortley v. Camplin,* 333 F.3d 284, 294 (1st Cir. 2003); *Geffon v. Micrion Corp.,*

---

[2]  If, however, the Court finds that the Complaint, or any part thereof, fails to meet the requirements of the latter rule, plaintiff should be allowed to replead. *See, e.g., Burstein v. Applied Extrusion Techs.,* 150 F.R.D. 433, 448-49 (D. Mass. 1993).

249 F.3d 29, 34 (1st Cir. 2001). Defendants only challenge plaintiff's claims as to the elements of materiality and scienter.[3]

Under Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), plaintiff must identify "each statement alleged to have been misleading," "the reason or reasons why the statement is misleading," and state "with particularity all facts on which [plaintiff's information and belief] is based." 15 U.S.C. §78u-4(b)(1)(B); *see Aldridge*, 284 F.3d at 78.

It cannot be seriously disputed that the Complaint pleads fraud with requisite particularity under these standards. It identifies the precise time, place and content of each statement about the Company's expectations that it would prevail in the Freedom Litigation (Compl., ¶¶ 56, 58-79) and sets forth particularized facts showing defendants' conscious knowledge of their own patent-infringing activities (Compl., ¶¶ 42-28) that rendered their Class Period statements false when made. These indicia of BCGI's knowing infringement include BCGI's development of a pre-paid cellular system virtually identical to Freedom's (Compl., ¶¶ 43-44) soon after a Bell Atlantic engineer with access to Freedom's then unique system met concurrently and extensively with BCGI (Compl., ¶ 45); BCGI's belated and hasty efforts, after defendant Snowden received a notice of infringement letter from Freedom, to make superficial and technically unnecessary changes to its c2c system to mask the similarities between the two systems (Compl., ¶ 46); defendants' scramble, after receiving the infringement letter, to buy up the rights to the technology in dispute from one of the investors' prior employers (Compl., ¶ 47); and BCGI's and its co-infringers' purchase of blatantly superficial, conclusory and poorly researched legal opinions to provide them with a shield against later claims of willfulness (Compl., ¶ 48).

---

[3] Defendants do not challenge plaintiff's § 20(a) "control person" claim except insofar as they depend on the existence of a primary or "underlying" violation. Defs. Mem. at 20 n.18. Because plaintiff has stated a claim under § 10(b), the control person claim should be upheld as well.

Defendants' attacks on these particularized facts veer impermissibly far into the realm of the trier of fact, well beyond the proper scope of a motion to dismiss.  For example, defendants offer their own self-serving gloss on their guilty activities, after receiving the notice of infringement letter, insisting that they were merely "refining" the technology and buying "insurance" against an adverse infringement verdict.  Defs. Mem. at 13.  Defendants, however, are not entitled to draw factual inferences in their own favor on their own motion to dismiss. *Allaire*, 224 F. Supp. 2d at 323.

Defendants otherwise quibble with the level of detail pled about the indicia of willful infringement, caviling that the Complaint does not provide specific times, places and attendees of meetings between the Bell Atlantic engineer and BCGI, or quote chapter and verse from the legal opinions BCGI relied on or internal reports and memoranda confessing to defendants' willful infringement of Freedom's patents. Defs. Mem. at 13.  But the pleading rules do not require pleading evidence or demonstrating conclusive proof of defendants' fraudulent conduct. Plaintiff cannot be held to "a standard that would effectively require [it], pre-discovery, to plead evidence."  *Cooperman*, 171 F.3d at 48-49 (citing *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996)).  *See also Aldridge*, 284 F.3d at 81; *Maldonado v. Dominguez,* 137 F.3d 1, 9 (1st Cir. 1998).  *Brumbaugh v. Wave Sys. Corp.*, No. 04-30022-MAP, 2006 U.S. Dist. LEXIS 725, at *22-24 (D. Mass. Jan. 11, 2006).

Accordingly, the Complaint is sufficiently particularized under applicable standards.

**B.    Defendants' Statements About The Freedom Litigation Were
        Materially Incomplete And Insufficiently Cautionary**

In addition to arguing fruitlessly that the Complaint does not adequately allege that their statements about the Freedom Litigation were false when made, defendants also argue that their statements were mere "general statements of defendants' subjective belief" that are "immaterial

as a matter of law," or otherwise "forward-looking statements" that come within the protection of the "safe harbor" provisions of the PSLRA and the "bespeaks caution" doctrine.  Defs. Mem. at 9-12.  Both of these arguments are without merit.

### 1.    Defendants Statements Understated Their Exposure In The Freedom Litigation

Information is material if "there is a reasonable likelihood that a reasonable investor would consider it important" to the investment decision.  *Ansin v. River Oaks Furniture, Inc.,* 105 F.3d 745, 754 (1st Cir. 1997).  The First Circuit has ruled that "the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss."  *In re Cabletron Sys., Inc.*, 311 F.3d 11, 34 (1st Cir. 2002).  "Only if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)."  *In re PLC Sys., Inc. Sec. Litig.*, 41 F. Supp. 2d 106, 116 (D. Mass. 1999) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).[4]

Defendants insist that their statements about the Freedom Litigation were immaterial as a matter of law because they "do not reflect any guarantee that BCGI would prevail at trial" and were mere public utterances of "a point of view which was consistent with their position in the courtroom."  Defs. Mem. at 11.  That might be a colorable defense at trial if defendants' statements about the Freedom Litigation were neutral and/or qualified as litigation positions rather than independent assertions.  But defendants' statements were not neutral or thus qualified; instead, they went out on a limb as follows:

- "Our case is strong and we anticipate a favorable summary judgment." (Compl., ¶ 56)

---

[4]  Defendants' attack on materiality is improper at this juncture.  Materiality is a mixed question of law and fact, and the Complaint *cannot* be dismissed for immateriality unless the Court finds that *no* reasonable investor could consider the disclosure of the false and misleading material statements or omitted material facts "as having significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

- "We absolutely remain confident in our success on the basis of non-infringement, on the basis of the fact that we believe that the patent is invalid." (*Id.*)

- "We remain confident that we do not infringe on the Freedom Wireless patent. And that the patents are invalid in light of prior art." (Compl., ¶ 60; *see also* ¶¶ 61-79.)

- "I can't reiterate enough our counsel and we feel very strongly about our case. Our position has not changed one bit." (Compl., ¶ 60.)

In essence, these statements are affirmations that BCGI had no reason to believe that a jury would find it willfully infringed, when, in fact, given all it had done to cover its tracks after receiving the notice letter, it was apparently quite nervous about the outcome. The omitted information was clearly material in light of these bold affirmations. *See Amylin Pharm., Inc. Sec. Litig.,* No. 01-1455, 2003 WL 21500525, at *8 n.3 (S.D. Cal. May 1, 2003) ("If a defendant states that it believes or expects that the FDA will approve its drug but has information tending to seriously undermine the accuracy of its statement, the statement is actionable") ("*Amylin II*"). Defendants' statements were affirmatively misleading in that BCGI had previously acted as though its own c2c system infringed the Freedom patents by hiring engineers to make trivial changes in the system to mask its own system's substantial similarity and by making a payment to Orbital in the desperate hope that Orbital might be deemed the rightful owner of its former employee's patents. Compl., ¶¶ 87-88. To the reasonable investor, had defendants disclosed the "real" facts and created a more balanced picture of its exposure, that would have "altered the total mix of information available." *Basic*, 485 U.S. at 231-32.[5]

---

[5] In fact, when BCGI ultimately disclosed the outcome of the Freedom Litigation, BCGI's stock price plummeted from $4.81 to $1.75, on volume of 12,499,900 shares traded. Compl., ¶ 83. When the jury's $128 million patent infringement verdict was upheld on appeal, the Company's stock price took yet another hit, dropping from $1.72 to a $1.11, on volume of 3,516,000 shares traded. *See In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 584 (D.N.J. 2001) (stating that "when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period following the disclosure, of the price of the firm's stock") (citations omitted).

A case relied on by defendants in their opening brief, *In re SeaChange Int'l, Inc.,* No. 02-16116, 2004 WL 240317 (D. Mass. Feb. 6, 2004), is illustrative in this regard.  Like this case, *SeaChange* involved securities fraud claims concerning a company's statements about a pending patent infringement case against it.  These claims failed in *SeaChange* because the company remained entirely neutral in its public comments on the patent litigation, making "no statements suggesting that [the company] would prevail in the litigation."  2004 WL 240317, at *8.  Here, by contrast, BCGI has made affirmative statements about its expectations for the Freedom Litigation's outcome; having done so, it was required to make a complete disclosure that would enable prospective investors to have a complete picture of the Company's exposure to a willful infringement claim.  *See also Burstein v. Applied Extrusion Tech, Inc*., 150 F.R.D. 433 (D. Mass. 1993) (affirmative statement that management did not believe pending lawsuit would have a material, adverse effect on the operation of the company was actionable).

Furthermore, "[w]hen a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate."  *Roeder*, 814 F.2d at 26; *accord Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir. 1996); *Allaire,* 224 F. Supp. 2d at 327; *Brumbaugh*, 2006 U.S. Dist. LEXIS 725, at *16-17.  This requires the disclosure of facts "that are needed so that what was revealed would not be 'so incomplete as to mislead.'"  *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir. 1990); *accord Gross*, 93 F.3d at 992; *SeaChange*, 2004 WL 240317, at *8.  Here, regardless of whether the Company could "give no assurance about the outcome of the Freedom Litigation" (Defs. Mem. at 11), having put its expectation of success in play, defendants had an affirmative duty to disclose adverse information about the steps BCGI took to conceal its willful infringement of the Freedom patents.[6]

---

[6]  The principal cases relied on by defendants to excuse their statements as "vague," "general statements of subjective belief" are inapposite.  *Orton v. Parametric Tech. Corp*., 344 F. Supp. 2d 290 (D. Mass.

### 2.    Neither the PSLRA Safe Harbor Provisions Nor the Bespeaks Caution Doctrine Immunizes Defendants

Equally unavailing is defendants' assertion that BCGI's statements regarding the Freedom Litigation were forward looking statements accompanied by appropriate cautionary language, and therefore within the statutory "safe harbor" provisions and are not actionable as a matter of law under the "bespeaks caution" doctrine. Defs. Mem. at 12.

The PSLRA provides that an identified "forward-looking statement" may be non-actionable under the "bespeaks caution" doctrine or the PSLRA's "safe harbor" provision if accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or if plaintiff fails to plead it was made with "actual knowledge ... that the statement was false and misleading." 15 U.S.C. §§77z-2(c)(1), 78u-5(c)(1); *see also In re Sepracor, Inc. Sec. Litig.,* 308 F. Supp. 2d 20, 27 (D. Mass. 2004) (finding defendants' statements material and not forward-looking). Contrary to defendants' argument, the alleged misstatements were in fact not accompanied by sufficient cautionary language for "safe harbor" protection and were disseminated by defendants with actual knowledge that the statements and omissions were false or misleading when made.

Defendants' statements about non-infringement (Compl., ¶¶ 60, 61-79) are clearly

---

2004), simply reiterated the rule that "courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace – loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Orton,* 344 F. Supp. 2d at 299-300 (quoting *Shaw,* 82 F.3d at 1217). Here, the affirmative statements about BCGI's expectations about the Freedom Litigation go well beyond the category of language describable as "rosy," "loose," "vague" or "lacking in specificity," and thus, cannot be classified as immaterial. Likewise, in *Shaw,* 82 F.3d at 1219, general statements such as that the company was "basically on track", "a very healthy company" and "pursuing the right strategy" and that the CEO was "pretty optimistic" that the company would "be able to stabilize [its] revenue" in the first half of calendar year 1994 and "start to grow revenue" in the second half were found to be too vague and/or general to be actionable.

statements of current information "rather than conjecture." "Thus, the statements cannot be characterized as forward-looking, and the safe harbor provision of the PSLRA does not apply." *Sepracor*, 308 F. Supp. 2d at 28. *Brumbaugh*, 2006 U.S. Dist. LEXIS 725, at *19-20.

Plaintiff alleges that defendants misrepresented the anticipated outcome of the Freedom Litigation by failing to disclose their own infringing activities, and, in particular, the steps defendants took to disguise and deny any involvement in such activity. These statements were false or misleading *when made*.[7] Because defendants omitted then-existing material facts, they are not protected by the safe harbor. Moreover, to the extent any of the misstatements can be deemed forward-looking, they do not qualify for the safe harbor since because they lacked meaningful cautionary language and were made with actual knowledge.

Defendants' reliance on boilerplate cautionary statements in their press releases, SEC filings, and conference calls is inadequate. As the Court stated in *Amylin II*, "[v]ague or boilerplate disclaimers are insufficient to invoke safe harbor protection.... Rather, cautionary statements must be 'substantive and tailored to the specific future projections, estimates or opinions ... which the plaintiffs challenge.'" *Amylin II*, at *7 (quoting *In re Donald J. Trump Casino Sec. Litig*., 7 F.3d 357, 371-72 (3d Cir. 1993)); *see also Shaw*, 82 F.3d at 1214 (doctrine applicable "only when [defendants] include enough cautionary language or risk disclosure ... that 'reasonable minds' could not disagree that the challenged statements were not misleading") (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995). Cautionary language must

---

[7] The safe harbor and "bespeaks caution" doctrines do not shield defendants from liability for misrepresenting or failing to disclose current facts. *See In re Number Nine Visual Tech. Corp Sec. Litig.,* 51 F. Supp. 2d. 1, 23 (D. Mass. 1999) (doctrine "inapplicable where ... plaintiffs challenge the truthfulness of a claim regarding present facts as opposed to forward-looking statements."); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 930 (D.N.J. 1998) (safe harbor inapplicable where statement regarding future benefits of acquisition failed to disclose then-existing facts about integration difficulties); *In re Nortel Networks Corp. Sec. Litig.,* 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003) ("'No degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made.'") (citation omitted).

truthfully address specific risks, must exhaust the capacity of the positive false statements to mislead investors *and* must disclose, as defendants failed to do here, then-existing adverse facts. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) (cautionary statement must discredit alleged misrepresentations to such an extent that "the risk of real deception drops to nil"); *Brumbaugh*, 2006 U.S. Dist. LEXIS 725, at *22.

Even if defendants' alleged misrepresentations could be characterized as forward-looking, the generalized, boilerplate statements of possible risks in defendants' public statements and filings, which would apply to any company seeking to disclose pending litigation, failed to adequately inform the market about the significant likelihood of an adverse ruling in the Freedom Litigation (especially, in light of the previously-described steps taken by defendants to conceal their willful infringement). Moreover, defendants' boilerplate cautionary language was more than offset by the Company's insistence that it had not engaged in infringing activities, that Freedom's patents were invalid and that the Freedom Litigation was without merit. Such "disclaimers" are general, tautological truisms that do not inform anyone of anything they do not already know. In light of the undisclosed steps taken by defendants to conceal their willful infringement, defendants' bland cautionary statements were rendered meaningless.[8]

The utterly useless, generic risk warnings here, when contrasted with BCGI's true position at the time, cannot help but remind one of Judge Pollack's famous quote in *In re*

---

[8]  *See In re Amylin Pharms., Inc. Sec. Litig.*, No. 01-1455, 2002 U.S. Dist. LEXIS 19481, at *26-27 (S.D. Cal. Oct. 9, 2002) ("*Amylin I*") ("[B]ecause the cautionary language is not sufficiently meaningful … [i]ndividuals commonly ignore such boilerplate warnings. Even if investors read them, merely warning investors that FDA may not approve the drug tells them something they already know."); *see also Helwig v. Vencor, Inc.*, 251 F.3d 540, 561-62 (6th Cir. 2001) (cautionary statements that defendants could not predict the effect of any proposed legislation held insufficient to warn investors about the consequences of Balanced Budget Act, then pending before Congress, on Vencor's business); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 755 (S.D.N.Y. 2001) ("the cautionary language [must] 'warn investors of exactly the risk that plaintiffs claim was not disclosed.' ... '[W]arnings of specific risks ... do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described.'") (citations omitted).

*Prudential Sec. Inc. Ltd. P'ships Litig.,* 930 F. Supp. 68, 72 (S.D.N.Y. 1996): "The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."

Finally, defendants' statements concerning the Freedom Litigation are not protected from liability because defendants made them with *actual knowledge* of the infringing activity.  *See Helwig*, 251 F.3d at 556-68; *Amylin II*, at *8 n.3 ("If a defendant states that it believes or expects that the FDA will approve its drug but has information tending to seriously undermine the accuracy of its statement, the statement is actionable"); *see also Allaire*, 224 F. Supp. 2d at 335-36 (predictive statement about growth, where defendants alleged to have already known demand had decreased, was a "classic" actionable statement).

Defendants' argument that, notwithstanding their actual knowledge of the adverse facts, they had a "subjective belief" in the truth of their statements, is off the mark.  Defs. Mem. at 9-10.  Anyone can claim, post fact, to have a subjective belief, however impracticable, that they will be ultimately successful.  But, that is not the standard.  *See Amylin II*, at *5 (while "Amylin clearly *hoped* that its Phase III trials were sufficient to obtain FDA approval", this "does not negate" the "inference that Amylin knew the FDA had serious concerns about its study designs which could prevent the approval"); *Aldridge*, 284 F.3d at 83.  The critical fact here is that BCGI knew it had been infringing the Freedom patents and that it was facing a substantial loss at trial, not what BCGI may have *hoped* to happen during the Freedom Litigation.  Thus, defendants cannot escape the simple inference that they knew the most important facts about the infringement, but did not disclose them.

15

### C.    The Complaint Alleges A Strong Inference Of Scienter

#### 1.    Scienter Pleading Standard

The PSLRA requires that plaintiffs in a §10(b) case "state with particularity facts giving rise to a strong inference" of scienter.  15 U.S.C. §78u-4(b)(3)(A); *see also Greebel v. FTP Software, Inc.,* 194 F.3d 185, 195-96 (1st Cir. 1999); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976) ("a mental state embracing intent to deceive, manipulate, or defraud").  The First Circuit has rejected a rigid formula for pleading scienter, preferring to adopt a fact-specific approach that proceeds on a case-by-case basis.  *See, e.g., Sepracor*, 308 F. Supp. 2d at 30 (citing *Cabletron,* 311 F.3d at 39).   Scienter may be pled by alleging (1) that defendants acted knowingly or with a high degree of recklessness, *or* (2) defendants' motive and opportunity to commit the alleged fraud.[9]   Thus, a plaintiff may combine various facts and circumstances indicating fraudulent intent – including those demonstrating knowledge, recklessness and/or motive and opportunity – to show a strong inference of scienter. *Cabletron,* 311 F.3d at 40 ("Each individual fact about scienter may provide only a brushstroke, but the resulting portrait satisfies the requirement for a strong inference of scienter under the PSLRA").   *See also Aldridge,* 284 F.3d at 82 ("In evaluating whether the inferences of scienter are strong, ... Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder") (citations and internal quotations omitted).

As shown below, plaintiff has alleged many facts that, taken individually or together, create an overwhelming inference that defendants acted knowingly or recklessly in making

---

[9]  *See Aldridge,* 284 F.3d at 82; *Cabletron,* 311 F.3d at 38-39. In *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 13 (D. Mass. 2000), this District defined "recklessness" as an unreasonable omission that presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.

material misrepresentations and omissions, armed with both substantial motive and opportunity to commit the alleged fraud.

### 2.     The Complaint Adequately Pleads Defendants' Actual Knowledge

Defendants do not, and cannot, contest that they lacked actual knowledge of the undisclosed material adverse facts alleged in the Complaint.  Indeed, the Complaint cites extensive indicia of BCGI's knowing infringement of the Freedom patents (Compl., ¶¶ 41-48) which should effectively end the scienter inquiry.  *See Aldridge*, 284 F.3d at 83 ("the fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is *classic evidence of scienter.*").[10]

Refusing to acknowledge the strong factual predicate for an inference of knowledge that was pled here, defendants resort to pretending that the Complaint's sole predicate for actual knowledge is the willful infringement verdict itself.  Defs. Mem. at 15.  In fact, Judge Woodlock in *SeaChange*, while dismissing the complaint there on other grounds, ruled that a willful infringement verdict was a substantially sufficient basis for pleading scienter:

> [I]t may be inferred, from the jury verdict of willful infringement and the judge's grant of attorneys fees against SeaChange, that SeaChange knew it was infringing nCUBE's patent when generating the Prospectus and Registration Statement. This permissible inference is sufficient at the pleading stage to establish knowledge by SeaChange at the time of the registration statement that a loss in the nCUBE litigation was highly likely.

*SeaChange*, 2004 WL 240317, at *8.

While acknowledging this analysis (Defs. Mem. at 15-16), defendants, noting Judge Woodlock's observation that "willfulness in the context of patent infringement is not equivalent

---

[10]   *See also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their statements were materially inaccurate.") (collecting cases from other circuits); *Greebel*, 194 F.3d at 196 (evidence to prove scienter includes "divergence between internal reports and external statements on the same subject" and "disregard of the most current factual information before making statements") (citations omitted).

to actual knowledge", seize on the granting of attorney's fees under 35 U.S.C. § 258 in the patent case underlying *SeaChange* to argue incorrectly that because Judge Harrington did not award attorneys' fees or otherwise enhance the verdict under that same statute in the Freedom Litigation, the Freedom verdict cannot support an inference of scienter here. Defendants have misread *SeaChange*. Judge Woodlock did not rule that an attorneys' fees or "exceptional circumstances" award under 35 U.S.C. § 258 is a *sine qua non* of finding a factual predicate for an inference of scienter from a willful infringement verdict. Rather, the attorneys' fee award gave the Court additional comfort where the verdict itself was the only factual predicate for actual knowledge alleged in the complaint. Here, where, even though there was no post-trial enhancement under 35 U.S.C. § 258, plaintiff has alleged not only the willful infringement verdict itself, but also the particulars of what defendants knew as they were infringing the Freedom patents. Accordingly, the same inference of knowledge identified by Judge Woodlock in *SeaChange* may be drawn at the pleading stage here.[11]

### 3. The Complaint's Motive and Opportunity Allegations Add to the Strong Inference of Scienter

In addition to actual knowledge, scienter may also be pled through defendants' motive and opportunity to commit fraud. *See Cabletron*, 311 F.3d at 38-39; *see also Geffon*, 249 F.3d at 35-36.[12] Here, the Complaint has successfully pled both *motive* and *opportunity*.

---

[11]  Also noteworthy, Judge Harrington in his October 13, 2005 order in the Freedom patent litigation declined to exercise his discretion to award enhanced damages for purely economic reasons, while noting that the jury's findings of willfulness was well-grounded: "Although the Court considers that the evidence fully supports the jury's finding that the Defendant Boston Communications Group, Inc., willfully infringed plaintiff's patents, it is the Court's judgment that the [$128 million] jury verdict constitutes a fair, reasonable and just compensation for such willful infringement of said patents by the Defendant Boston Communications Group, Inc." Ex. 5 to Petschek Declaration.

[12]  Where, as here, there is strong evidence of defendants' actual knowledge or reckless misconduct, separate proof of motive or opportunity is not even necessary to demonstrate scienter. *See, e.g., In re Cendant Corp. Sec. Litig.,* 76 F. Supp. 2d 531, 538 (D.N.J. 1999).

As CEO and CFO of BCGI, respectively, defendants Snowden's and Walker's **opportunity** is not, and indeed cannot, be disputed.  *See, e.g., In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993) ("no one doubts that the defendants [officers of corporate defendant] had the opportunity, if they wished, to manipulate the price of [the] stock").  The Individual Defendants, by virtue of their high-level positions, made them privy to information about the threats to the Company relating to the Freedom Litigation.  Compl., ¶ 93.

With respect to **motive**, defendants were clearly operating for many years in a "bet-the-company" mode; having unsuccessfully attempted to cover up their tracks after defendant Snowden's receipt of the notice of infringement letter, defendants continued the deception in a different arena by refusing to acknowledge their infringing acts throughout the Class Period.  *See Aldridge,* 284 F.3d at 82-83 (scienter pled where "nondisclosure could hardly have been inadvertent" and the undisclosed fact was "important to their own survival and that of the Company").  Moreover, the Complaint's allegations concerning the Individual Defendants' proceeds from insider sales,[13] at a minimum, identify a substantial motive behind defendants' fraudulent conduct and add to the already extremely strong allegations from which scienter can

---

[13]    Defendants identify certain calculation errors in the Complaint where exercises of options were counted as sales rather than recognized as purchase cost offsets to the sales proceeds once the options were exercised and the shares subsequently sold.  According to defendants, the proper figures with these corrections are that defendant Walker sold 54,382 shares for proceeds of $476,641.49 and defendant Snowden sold 76,925 shares for proceeds of $664,291.56.)  Assuming defendants' calculations are correct (in fact, making all of the adjustments defendants suggest (Defs. Mem. 18 n. 16) results in sales of 52,082 shares for $475,622.56 in proceeds for defendant Walker and sales of 48,700 shares for $679,580.43 in proceeds for defendant Snowden), these insider sales figures still remain substantial and "add some weight to the other evidence of scienter," since "we need not determine whether alone they would suffice."  *Cabletron*, 311 F.3d at 40.  *See also Shaw*, 82 F.3d at 1224; *Brumbaugh*, 2006 U.S. Dist. LEXIS 725, at *28-29.

be inferred.  Compl., ¶¶ 92-94.  The Complaint pleads facts establishing that these insider sales were in fact unusual or suspicious in timing[14] and amount.[15]  *See Shaw*, 82 F.3d at 1204.

Contrary to defendants' suggestion, courts have held that there is no bright line test as to the amount of sales needed to support an inference of scienter; the volume of insider sales is not the only determinative factor.  *See Cabletron*, 311 F.3d at 40 (citing *Shaw*, 82 F.3d at 1224 (although allegations of smaller-scale insider trading did not show scienter on their own, they "provide some support")).   Accordingly, the timing and amount of insider sales made by defendants Snowden and Walker, who realized over $1 million in proceeds, is substantial enough, together with defendants' actual knowledge, to support a strong inference of scienter.

## IV.    CONCLUSION

For all the foregoing reasons, defendants' motion to dismiss should be denied.

Dated: January 13, 2006

---

[14]  Defendants Snowden's and Walker's sales, on the heels of the most bullish statements made about the Freedom Litigation (Compl., ¶¶ 59-60), were their first in over two years.  *See In re PerkinElmer, Inc. Sec. Litig.,* 286 F. Supp. 2d 46, 55 (D. Mass. 2003) (an inference of scienter found where defendants sold "substantial blocks of stock during the period when, according to the complaint, the problems … were becoming increasing apparent to [defendants]" and where the "sales were notable and significant because there had been no record of similar sales in the prior three years.").

[15]  Defendants unnecessarily draw attention to the fact that the individual defendants increased their stock holdings during the Class Period.  Defs. Mem. at 18.  However, what an insider may have *bought* is a non-issue since the proper analysis is of what was *sold* during the Class Period (and that the sales were at artificially inflated prices).  *See PR Diamonds, Inc. v. Chandler*, No. 02-3921, 2004 WL 422726, at *14 (6th Cir. Mar. 3, 2004) (rejecting individual defendants' contention that their *purchase* of shares during the class period refutes any inference that they knowingly or recklessly misled the market to increase the stock's price).  *Brumbaugh*, 2006 U.S. Dist. LEXIS 725, at *29 (sales after announcements caused artificial inflation deemed "quite suspicious").  In addition, defendants' assertion that the existence of a 10b5-1 plan renders some of the insider sales non-unusual as a matter of law is wholly misplaced on a motion to dismiss, as such plans merely offer defendants an affirmative defense under which they have the burden of proving that the plans meet all of the requirements under the regulation.  Defs. Mem. at 19. *See also Arnlund v. Deloitte & Touche LLP,* 199 F. Supp. 2d 461, 468 (E.D.Va. 2002).  *SEC. v. Healthsouth Corp*., 261 F. Supp. 2d 1298, 1322-23 (N.D. Ala. 2003), cited by defendants, is procedurally distinguishable in that it involved a SEC proceeding where the defendant corporate officer moved to dismiss a petition for emergency relief freezing his assets, which, unlike in a private damages action motion to dismiss, permitted the vetting of affirmative defenses.

**GILMAN AND PASTOR, LLP**

By:    /s/ David Pastor
     David Pastor (BBO # 391000)
     John C. Martland (BBO # 332980)
     60 State Street, 37th Floor
     Boston, MA 02109
     Telephone: (617) 742-9700
     Facsimile: (617) 742-9701

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ, LLP**
Peter C. Harrar, Esq.
Paulette S. Fox, Esq.
270 Madison Avenue
New York, New York  10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

**LAW OFFICES OF MARC HENZEL**
Marc S. Henzel
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004
Telephone: (610) 660-8000
Facsimile: (610) 660-8080

***PLAINTIFF'S COUNSEL***