# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROSENBAUM CAPITAL LLC, On Behalf of Itself and All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. CIV. A. 05-11165-WGY |
| BOSTON COMMUNICATIONS GROUP, INC., KAREN A. WALKER and EDWARD H. SNOWDEN, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## SUPPLEMENTAL DECLARATION OF CLARK W. PETSCHEK IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

I, Clark W. Petschek, hereby declare:

1.     I am an attorney associated with the law firm of Wilmer Cutler Pickering Hale and Dorr LLP, counsel of record to defendants Boston Communications Group, Inc. ("BCGI"), Karen A. Walker and Edward H. Snowden (the "Individual Defendants"). I am a member in good standing of the Bar of the Commonwealth of Massachusetts, and I submit this Supplemental Declaration in connection with Defendants' Reply Memorandum in Support of Their Motion to Dismiss the Amended Class Action Complaint, filed herewith.

2.     Attached hereto as Exhibit 1 are true and correct copies of the Jury Instructions, marked as Court Exhibit No. 2, and the Court's Notice regarding Exhibit No. 2, entered on May 16, 2005 in *Freedom Wireless, Inc. v. Boston Communications Group, Inc. et al.,* No. 00-12234 (D. Mass.).

3.     Attached hereto as Exhibit 2 are true and correct copies of excerpts of Freedom

Wireless, Inc.'s Opposition to BCGI's Motion for Judgment as a Matter of Law, filed on April 18, 2005 in *Freedom Wireless, Inc. v. Boston Communications Group, Inc., et al.*, No. 00-12234 (D. Mass.).

4.    Attached hereto as Exhibit 3 are true and correct copies of excerpts of Freedom Wireless, Inc.'s Reply in Support of Its Motion for Attorney's Fees and Enhanced Damages, filed on October 14, 2005 in *Freedom Wireless, Inc. v. Boston Communications Group, Inc., et al.*, No. 00-12234 (D. Mass.).

5.    Attached hereto as Exhibit 4 are true and correct copies of excepts of the *Freedom Wireless, Inc. v. Boston Communications Group, Inc., et al.*, No. 00-12234 (D. Mass.) docket reflecting the Order denying BCGI's and Freedom Wireless Inc.'s Motions for Summary Judgment, entered on August 10, 2004.

6.    Attached hereto as Exhibit 5 is a true and correct copy of the April 29, 1996 Memorandum and Order in *In re Chipcom Corp. Sec. Litig.*, No. 95-11114-DPW, slip op. (D. Mass. Apr. 29, 1996).

7.    Attached hereto as Exhibit 6 is a true and correct copy of BCGI's April 17, 2002 press release entitled "Boston Communications Group Announces First Quarter Financial Results.

8.    Attached hereto as Exhibit 7 are true and correct copies of excerpts from BCGI's 1st Quarter 2002 Earnings Conference Call, conducted on April 17, 2002.

9.    Attached hereto as Exhibit 8 is a true and correct table reflecting BCGI's common stock prices for the period August 9, 2004 to August 18, 2004.

10.    Attached hereto as Exhibit 9 is a true and correct copy of the Report and Recommendation Re: Defendants' Motion to Dismiss in *In re Cytyc Corp. Sec. Litig.*, Civ. A.

No. 02-12399-NMG, slip op. (D. Mass. Mar. 1, 2005).

I declare under penalty of perjury under the laws of Massachusetts that the foregoing is true and correct.

Executed this 10th day of February 2006, at Boston, Massachusetts.

_____/s/ Clark W. Petschek_____
Clark W. Petschek

# EXHIBIT 1

*Court Ex #* (handwritten)

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

FREEDOM WIRELESS, INC.,
                Plaintiff

         v.                                CIVIL ACTION NO.:
                                          00-12234-EFH

BOSTON COMMUNICATIONS GROUP,
INC., CINGULAR WIRELESS LLC, AT & T
WIRELESS PCS, CMT PARTNERS and
WESTERN WIRELESS CORPORATION
                Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## JURY INSTRUCTIONS

**A.**    **The Parties and Their Contentions**

       This case is a dispute between the Plaintiff Freedom Wireless, Inc. and the

Defendant Boston Communications Group, Inc. and the Defendant carriers, Cingular

Wireless, LLC, AT&T Wireless PCS, CMT Partners, and Western Wireless Corp.

Plaintiff Freedom Wireless owns both the '067 and '823 patents. The Plaintiff alleges

that Defendant Boston Communications Groups's prepaid service bureau and Defendant

carriers' use thereof jointly infringe the '067 and '823 patents. The Defendants deny this

allegation and allege that the '067 and '823 patents are invalid for anticipation and

obviousness. I will now set forth the rules of law that you are to apply in deciding the

outcome of this case.

**B.**    <u>Instructions Regarding Patent Infringement</u>

1.    <u>Description of a Patent</u>

A patent is a document that consists of (1) a specification; (2) a claim or claims, which are part of the specification; (3) a drawing; and (4) an oath supplied by the applicant. The specification is essentially a description of the invention. The law requires that the specification of a patent give a written description of the invention that is clear, concise and exact, so that a person skilled in the art to which the patent pertains could make and use the invention.

The specification must conclude with one or more claims. The claims are numbered paragraphs which define, in words, the inventor's rights by marking the limits or boundaries of the invention claimed to have been invented. The claims of the patent must define the particular thing claimed to have been invented with precision so that the public will know what the thing is, and be able to avoid infringing the patent.

The claims are also important because only the claims of a patent can be infringed. Each of the claims must be considered individually. It takes infringement of only one claim of a patent for the patent to be infringed.

2.    <u>Presumption of Validity</u>

In this case, the United States Patent and Trademark Office has granted two patents that are now owned by Plaintiff Freedom Wireless: the '067 and '823 patents. The law presumes, in the absence of clear and convincing evidence to the contrary, that

the Patent Office acted correctly in issuing the patents. Therefore, you must presume that each claim of the patents asserted in this lawsuit is valid.

3.      Patent Infringement

Patent law provides that any person or entity which makes, uses, offers to sell, or sells, without the patent owner's permission, a product, apparatus, or method legally protected by at least one claim of a patent, within the United States, before the patent expires, infringes that patent.

A patent owner may enforce his right to exclude others from making, using, offering for sale, or selling the patented invention by filing a lawsuit for patent infringement. Here, the patent owner, Freedom Wireless, sued the Defendants, alleging that Boston Communications Group's prepaid service bureau and the Defendant carriers' use thereof jointly infringe claims of the '067 and '823 patents.

In determining whether a Defendant is liable for infringement of Plaintiff Freedom Wireless' patents, you should disregard whether the Defendant has entered into an indemnification provision with one or more of the other Defendants.

4.      Only Claims Are Infringed

Before you can decide whether Defendant Boston Communications Group's prepaid service bureau and the Defendant carriers' use thereof infringe the '067 and '823 patents, you will have to understand the patent claims. The patent claims are the numbered paragraphs at the end of the patent. They describe and measure, in words, the

-3-

boundaries of the invention.  In this case, Plaintiff has alleged that Defendant Boston

Communications Group and the Defendant carriers have jointly infringed claims 10, 11,

12, 13, 14, 15, 16, and 18 of the '067 patent and claims 1, 2, 3, 5, 9, 11, 12, 15, 17, 19, 20,

27, 28, 29, 30, 31, 34, 35, 36, 39, 42, 53, 57 and 59 of the '823 patent.  Each of these

claims must be considered individually.  To show infringement of a patent, Plaintiff need

only to establish that one of a patent's claims has been infringed.

Only the claims of the '067 and '823 patents can be infringed.  The written

description in the specification and drawing portions of the patents cannot be infringed.  It

is error to read everything from the specification into the claims.  It is also error to limit

the claims to the exact description of the examples in the specification.

5.     Dependent and Independent Claims

There are two different types of asserted claims in the '067 and '823 patents.  The

first type is called an independent claim.  An independent claim does not refer to any

other claim of the patent.  An independent claim is read separately to determine its scope.

Claims 10 and 15 of the '067 patent and claims 1, 9, 11, 15, 17, 19, 20, 27, 28, 29, 30, 31,

34, 35 and 42 of the '823 patent are the independent claims asserted in this case.

On the other hand, a dependent claim refers to at least one other claim in the patent

and incorporates whatever that other claim says.  Accordingly, to determine what a

dependent claim covers, you must read both the dependent claim and the claim or claims

to which it refers together.  In this case, claims 11, 12, 13, 14, 16 and 18 of the '067

-4-

patent and claims 2, 3, 5, 12, 36, 39, 53, 57 and 59 of the '823 patent are dependent claims. All of these claims are dependent because they refer to another claim in the patent. For example, in order to determine what claim 11 of the '067 patent covers, then, you must read that claim together with claim 10.

Some of the claims in the '067 and '823 patents are broader than other claims. You are not to imply the limitations or words of the narrower or dependent claims into a broad or independent claim if the broader claim does not include the same limitations. One may infringe an independent claim and not infringe a claim that is dependent on that infringed claim, but the reverse is not true. Accordingly, a dependent claim cannot be found infringed unless the claim on which it depends has likewise been found to be infringed. For example, because claim 11 of the '067 patent is dependent on claim 10 of said patent, if you find that the Defendants did not infringe claim 10, you must also find that the Defendants did not infringe claim 11.

6.     <u>Two-Step Process for Determining Infringement</u>

Determining whether an asserted claim of the '067 and '823 patents has been infringed is a two-step process. First, the claims must be interpreted to determine the scope and extent of the rights granted by the United States Patent and Trademark Office. Because patent law allows the inventor to use his own terms in describing his invention, the meaning of the terms in an asserted claim must be properly interpreted based on a patent's specification, the prosecution history, the prior art, and other evidence. Claim

-5-

interpretation is my job, and I will instruct you as to the proper interpretation of any disputed terms in the claims of the '067 and '823 patents.

The second step is to compare the claims, as properly construed, with the allegedly infringing product. It is your job to perform this second step. You must compare each asserted claim, as properly interpreted, with Boston Communications Group's prepaid service bureau and the Defendant carriers' use thereof.

7.    Claim Construction

As I have already explained, claim construction is my job. You must determine, based on my interpretation of the claims, whether Boston Communications Group's pre-paid service bureau and the Defendant carriers' use thereof jointly infringe the '067 and '823 patents. I have recently construed the term "ANI," as used in the '067 and '823 patents. For the purposes of your deliberations, the term "ANI" means the cellular subscriber's number.

I will now hand each of the jurors a copy of the elements and construction of the claims of the '067 and '823 patents. These claims and their construction are hereby incorporated into my instructions.

8.    Literal Infringement

A patent may be infringed in two ways, either literally or under what is called the doctrine of equivalents. The Plaintiff alleges that the Defendants jointly infringed the '067 and '823 patents both literally and under the doctrine of equivalents. In order to

-6-

infringe a patent claim either literally or under the doctrine of equivalents, the allegedly infringing product must include every limitation of the claim. This means that if you find that the Defendant Boston Communications Group's prepaid service bureau and the Defendant carriers' use thereof jointly infringe each and every element in an asserted claim of the '067 or '823 patents, you must find that Defendants jointly infringe that claim. On the other hand, if you find that Boston Communications Group's prepaid service bureau and the carriers' use thereof omit even a single element of an asserted claim of the '067 and '823 patents, you must find that Defendants do not literally infringe that claim.

I will now instruct you as to literal infringement. For the Defendant Boston Communications Group's prepaid service bureau and the Defendant carriers' use thereof to literally infringe any one of the asserted patent claims, the Plaintiff must prove by a preponderance of the evidence that the prepaid service bureau and its use thereof contain all of the claimed elements of the patented invention just as those elements are described in the claim language, either as I have construed that language for you or, if I did not construe it, in accordance with its ordinary meaning.

You may find that the Defendant Boston Communications Group's prepaid service bureau and the Defendant carriers' use thereof literally infringe the '067 and '823 patents even if the prepaid service bureau includes additional features not recited in the '067 and '823 claims. In other words, if you find that Boston Communications Group's prepaid

service bureau and the carriers' use thereof include each and every element set out in one

of the '067 and '823 patent claims, a finding by you that the prepaid service bureau also

includes additional components is irrelevant to the question of literal infringement of that

claim.

Remember that the question you are to answer is whether the Defendant Boston

Communications Group's prepaid service bureau and the Defendant carriers' use thereof

jointly infringe any asserted claim or claims of Plaintiff's '067 and '823 patents.  You

must determine literal infringement by comparing the prepaid service bureau and the

carriers' use thereof with each of the asserted patent claims individually.   Accordingly,

you must be certain to compare Boston Communications Group's accused system and the

carriers' use thereof with the <u>claims</u> of the '067 and '823 patents only.

9.    <u>Infringement Under the Doctrine of Equivalents</u>

As I mentioned earlier, a patent can also be infringed under what is called "the

doctrine of equivalents."  I will now instruct you on the doctrine of equivalents.

The doctrine of equivalents permits you to find infringement even if you were to

find that the Defendant Boston Communications Group's prepaid service bureau and the

Defendant carriers' use thereof fail to literally infringe the '067 and '823 patents.  In

deciding whether there is infringement under the doctrine of equivalents, you should

consider whether or not Boston Communications Group's prepaid service bureau and the

carriers' use thereof contain a step that is equivalent to any individual step of the asserted

-8-

claim that you find has not been literally infringed.  In determining whether a step performed by Defendants is equivalent to a step of the asserted claim, you should determine if the step Defendants perform and the step in the claim perform substantially the same function, in substantially the same way, to achieve substantially the same result as the invention claimed in the '067 and '823 patents.

Under the doctrine of equivalents, Defendant Boston Communications' service bureau and the Defendant carriers' use thereof can infringe an asserted patent claim if it includes steps that are identical or equivalent to the requirements of the claim.  If the Defendant Boston Communications' service bureau and the Defendant carriers' use thereof is missing an identical or equivalent step to even one requirement of the asserted patent claim, the Defendants cannot infringe the claim under the doctrine of equivalents. Thus, in making your decision under the doctrine of equivalents, you must look at each individual requirement of the asserted patent claim and decide whether the Defendant Boston Communications' service bureau and the Defendant carriers' use thereof has an identical or equivalent step to that individual claim requirement.

10.    Joint Infringement

As I have explained, you must determine whether Defendant Boston Communications Group's prepaid service bureau and the Defendant carriers' use thereof infringe any claims of the patents of Plaintiff Freedom Wireless.

-9-

Under federal patent law, if separate companies work together to perform all of the steps of a claim of a patent, the companies are jointly responsible – that is, responsible as a group – for the infringement of the patent. Even if no single company performs all of the steps of a claim, the companies are jointly responsible. When infringement results from the participation and combined action of several parties, they are all joint infringers and jointly liable for patent infringement. Infringement of a patented process or method cannot be avoided by having another perform one step of the process or method.

Therefore, if you find that Defendant Boston Communications Group and the Defendant carriers have worked together to perform all of the steps of any claim of Plaintiff's patents, you should find that Defendants are jointly responsible for the infringement of that claim.

## C.    **Patent Validity**

Defendants claim that the asserted claims of the '067 and '823 patents are invalid on the grounds of obviousness and anticipation. As I previously instructed you, the patent is presumed to be valid.

It is the Defendants' burden to establish invalidity by clear and convincing evidence. Clear and convincing evidence is a higher standard of proof than the preponderance of the evidence standard I instructed you on previously. Clear and convincing evidence leaves no substantial doubt in your mind. It is proof that establishes in your mind, not only that the proposition at issue is probable, but also that it is highly

-10-

probable.  Again, clear and convincing evidence is a more exacting standard of proof than

proof by a preponderance of the evidence.  However, clear and convincing proof is not as

high a standard as "proof beyond a reasonable doubt," the standard applied in criminal

cases.

       1.    <u>Prior Art Defined</u>

The prior art that has been introduced by Defendants into evidence in this trial with

respect to the issue of the '067 and '823 patents' validity are the Klepp article from Telephony

magazine, the Cominex invention, the Cominex brochure, the CSI reseller switch proposal, the

Banana Cellular system that was on sale in November 1993 and described in the Wise patent

(5,826,185), the Klotz patent (5,592,535), and the LinkUSA call processing system that was

described in the Hogan patent (5,586,175).  Plaintiff disputes whether the Cominex invention and

brochure, the CSI reseller switch proposal, the Wise patent, and the Klotz patent constitute prior

art.

Prior art means technology and information that was publicly known in the United States

before the date of the invention, or described in an issued United States patent which was filed in

the United States before the date of the invention, or as a prior invention in the United States that

was not abandoned, suppressed, or concealed.

An invention made by another person before the inventors on the patent made the

invention is prior art to the patent claim, unless that other person abandoned, suppressed or

concealed his invention.

-11-

As a general rule, the first person to reduce an invention to practice is said to be the first inventor. An invention is reduced to practice when the invention is made and shown to work for its intended purpose. Thus, if another person reduces to practice an invention before the inventor on the patent, then the reduction to practice by the other person will be prior art to the patent claims.

There is, however, an important exception to this general rule. Someone who was first to conceive of an invention but reduced it to practice after someone else will be the first inventor if he was the first to conceive of the invention and he exercised "reasonable diligence" in reducing the invention to practice from a time just before the other person's conception. Conception of an invention occurs when the inventor has formed the idea of how to make and use every aspect of the patented invention, and all that is required is that it be made, without the need for any further inventive effort. Witness testimony by an inventor by itself cannot establish the date of conception. Reasonable diligence means that the inventor worked continuously on reducing the invention to practice. Interruptions necessitated by the everyday problems and obligations of the inventor or those working with him do not prevent a finding of diligence.

The final requirement for a prior invention to be prior art is that the prior inventor did not abandoned, suppress or conceal his invention. Generally, an invention was not abandoned suppressed or concealed if the invention was made public, sold or offered for sale, or otherwise used for a commercial purpose. The filing of a patent application that discloses the invention is evidence that the invention was not abandoned, suppressed or concealed. Here, the parties agree that the Cominex invention was not abandoned, suppressed or concealed; therefore, you need not consider this element during your deliberations as to the Cominex invention.

To establish the actual reduction to practice of a process or system that Defendants claim is prior art, Defendants, in this case, must prove two facts by clear and convincing evidence:

-12-

(1)    that the prior art inventor performed a process, or constructed an embodiment of the prior invention; and

(2)    that the prior art process worked for its intended purpose.

If you find by clear and convincing evidence that Defendants proved these two facts, then you should find that the invention is prior art. If you find that Defendants did not prove by clear and convincing evidence these two facts, then you should not find that the invention is prior art.

In addition, witness testimony, by itself, cannot establish the invalidity of a patent on the basis of prior knowledge, prior use, or prior invention. That is, witness testimony, by itself, cannot establish that an invention was known to, made by, or used by someone other than the inventors before the date of invention by the inventors on the patent;

These facts can be established only if witness testimony can be sufficiently corroborated by clear and convincing independent evidence. Sufficient corroboration by independent evidence is required, even if a witness has no interest in this suit, the parties to this suit, the subject matter of this suit, or otherwise.

I have one final point about prior art. Although the Cominex invention and brochure have been introduced as prior art, the patent application filed by Cominex, which was ultimately abandoned, is not prior art. As such, you should disregard any information that was shown to you from the abandoned patent application, and you should also disregard the testimony you heard about this Cominex patent application. This evidence has been stricken from the record and may not be considered in reaching your verdict.

-13-

2.     <u>Anticipation</u>

Defendants have alleged that claim 15 of the '067 patent and claims 1, 27, 28 and 35 of the '823 patent are anticipated by the four introduced pieces of prior art, namely, the Klepp article from Telephony magazine, the Cominex invention, the Cominex brochure, and the CSI reseller switch proposal. As I instructed you earlier, the law presumes, in the absence of clear and convincing evidence to the contrary, that the Patent Office acted correctly in issuing the '067 and '823 patents.

In order for a claim to have been anticipated, you must find that the earlier invention completely embodied the same process as the patented claim and that all of the elements recited in the patented claim were previously found in exactly the same situation and united in the same way to perform the identical function. Put another way, each and every element of the patented claim must have been either inherent or expressly disclosed in a single prior art reference or a single prior art invention.

In determining whether every one of the elements of the claimed invention is found in the prior art, you should take into account what a person of ordinary skill in the art at the time of the filing of the patent application would have understood from his examination of that prior art.

For Defendants to prove that the subject matter of a claim of the '067 or '823 patents is anticipated by prior art, it is necessary that each and every element of that claim be found in a single prior art reference. Those prior art references must identically disclose or describe the subject matter of claim 15 of the '067 patent or claims 1, 27, 28

-14-

and 35 of the '823 patent with sufficient clarity to prove its existence in the prior art, or such disclosure should be inherent in the prior art reference. That is, a prior art reference may anticipate when a claim limitation not expressly found in that reference is nonetheless inherent in it. The word "inherent" in this context means that if the prior art reference necessarily and inevitably functions in accordance with the claimed limitation, it anticipates. To establish the actual reduction to practice of a process or system that defendants claim anticipates, defendants, in this case must prove two facts by clear and convincing evidence:

(1)    that the claimed prior art inventor performed a process that contained all of the steps, or constructed an embodiment that contained all of the elements, of the claimed invention; and

(2)    that the claimed prior art process or system worked for its intended purpose. To determine whether there is anticipation, you must compare each and every element of claim 15 of the '067 patent and claims 1, 27, 28 and 35 of the '823 patent to the prior art to determine whether all of the elements of said claims are disclosed or described with sufficient clarity within that single piece of prior art.

You may not combine two or more items of prior art to make out an anticipation. In this case, you may only look to the four pieces of prior art individually to determine whether there is anticipation. If a claim is anticipated by a single prior art reference or a single prior art invention, it is invalid and cannot be infringed.

-15-

3.    <u>Obviousness</u>

An inventor is not entitled to a patent if his invention would have been obvious to a person of ordinary skill in the field of the invention at the time the invention was made.

The question is, would it have been obvious for a skilled person who knew of the prior art to make the claimed invention.  If the answer to that question is yes, then the patent claims are invalid.  Defendants have the burden of proving by the clear and convincing standard that the asserted claims of the '067 patent and '823 patent are invalid for obviousness.

Obviousness is determined from the perspective of a person of ordinary skill in the field of the invention.  The issue is not whether the claimed invention would have been obvious to you, to me as a judge, or to a genius in the field of the invention.  Rather, the question is whether or not the invention would have been obvious to a person of ordinary skill in the field of the invention.

In deciding obviousness, you must avoid using hindsight.  That is, you should not consider what is known today or what was learned from the teachings of the patent.  You must not use the patent as a road map for selecting and combining items of prior art.  You must put yourself in the place of a person of ordinary skill at the time the invention was made.

You must also keep in mind that the test for obviousness is not whether or not it would have been obvious to try to make the invention, but, rather, whether or not the

-16-

invention would have been obvious to a person of ordinary skill in the inventor's field at the time the invention was made.

In determining whether or not these claims would have been obvious, you should make the following determinations:

First, what is the scope and content of the prior art?

Second, what differences, if any, are there between the invention of the claims of the patent and the prior art?

Third, what was the level of ordinary skill in the art at the time the invention was made?

Fourth, are there any objective indications of non-obviousness?

Against this background, you must decide whether or not the invention covered by the asserted claims of the '067 patent and '823 patent would have been obvious.

I will now describe in more detail the specific determinations you must make in deciding whether or not the claimed invention would have been obvious.

Prior art means technology and information that was publicly known in the United States before the date of the invention, or described in an issued United States patent which was filed in the United States before the date of the invention, or as a prior invention in the United States that was not abandoned, suppressed or concealed, including the material that was before the patent examiner. The prior art that has been introduced into evidence in this trial with respect to the '067 and '823 patents' validity are the Klepp article from Telephony magazine, the

-17-

Cominex invention, the Cominex brochure, the CSI reseller switch proposal, the Banana

Cellular system that was on sale in November 1993 and described in the Wise patent

(5,826,185), the Klotz patent (5,592,535), and the LinkUSA call processing system that

was described in the Hogan patent (5,586,175).

Second, in determining the differences between the invention covered by the patent

claims and the prior art, you should not look at the individual differences in isolation. You

must consider the claimed invention as a whole and determine whether or not it would

have been obvious in light of all the prior art.

In deciding whether to combine what is described in various items of prior art, you

should keep in mind that there must be some motivation or suggestion for a skilled person

to make the combination covered by the patent claims. You should also consider whether

or not the prior art "teaches away" from the invention covered by the patent claims. The

question to be answered is this: Would someone reading the prior art be discouraged from

following the path taken by the inventor?

Third, I have referred in these instructions to a person of ordinary skill in the art.

What do I mean by such a person? The person of ordinary skill is a hypothetical person at

the time of the filing of the patent application, who is presumed to be aware of all

pertinent prior art. The skill of the actual inventor is irrelevant because inventors may

possess something that sets them apart from the workers of ordinary skill in the art.

-18-

Fourth, you must also consider what are referred to as objective indications of non-obviousness.  Some of these indications are:

1.    Commercial success of products covered by the patent claims or made by a process covered by the patent claims.

2.    A long-felt need for the invention.

3.    Failed attempts by others to make the invention.

4.    Copying the invention by others in the field.

5.    Unexpected results achieved by the invention.

6.    Praise of the invention by the infringer or others in the field.

7.    The taking of licenses under the patents by others.

8.    Expression of surprise by experts and those skilled in the art at the making of the invention.

9.    The patentee proceeded contrary to the accepted wisdom of the prior art.

The presence of any of these objective indications may suggest that the invention was not obvious.  The objective indications are only relevant to obviousness if there is a connection, or nexus, between them and the invention covered by the patent claims.  For example, commercial success is relevant to obviousness only if the success of the product is related to a feature of the patent claims.  If the commercial success is the result of something else, such as innovative marketing, and not to a patented feature, then you should not consider it to be an indication of non-obviousness.

-19-

As a final note about obviousness, during the trial you viewed some video testimony from an inventor named Steven Hogan about his patent and his company, LinkUSA. As I have already instructed you, Hogan's patent, which is called the '175 patent, has been introduced as prior art and may be considered by you in determining whether or not the claims of the '067 and '823 patents are invalid for obviousness.

However, I instruct you that any opinions offered by Hogan about how the technology in his patent could have been used with or combined with other technologies were inadmissible, have been stricken from the record, and may not be considered by you in reaching your verdict. This relates to opinions on obviousness. Similarly, any assertions or opinions offered by Hogan about any systems he claimed to have implemented were also inadmissible, have been stricken from the record, and may not be considered by you in reaching your verdict. This relates to the prepaid system he claimed to have implemented in a hotel.

The other portions of Hogan's testimony, however, were proper and may be considered by you in reaching your verdict. That testimony concerned LinkUSA, a company that provided a call processing system, and an advertisement placed by the company. Hogan testified about certain features the advertisement disclosed and how the system worked. Hogan also testified that he had obtained a patent on the LinkUSA call processing system, and he explained portions of the patent.

**D.    Damages**

1.    Compensatory Damages in General

If, after considering all of the evidence and the law as I have stated it, you decide that the '067 and '823 patents are infringed and are valid, the Plaintiff is entitled to

damages for the Defendants' joint infringement.

The patent laws specifically provide that when infringement is found, the plaintiff shall be awarded damages adequate to compensate for the infringement. The goal of patent infringement damages is to put the patent owner in the same financial position it would have been in had there been no infringement. As such, you may not include any additional amount for the purpose of punishing the Defendants or setting an example. In addition, you may not include damages that are speculative, only possible, or based on guesswork.

In this case, the award of damages, if any, must be calculated based on a reasonable royalty for the period of infringement by the Defendants. If you find that the '067 and '823 patents are not infringed, your verdict should be for the Defendants and you need go no further in your deliberations.

The fact that I will now turn to the issue of how you should measure damages should not be taken by you to mean that the Court believes that there was an infringement. I am instructing you on damages so that you will have guidance should you decide that Plaintiff is entitled to recovery.

2.    Reasonable Royalty

A reasonable royalty is the amount of money a willing patent owner and a willing prospective licensee would have agreed upon, at the time of the infringement, for a license to make, use, or sell the invention. That is, the amount of money that would be agreed to in a hypothetical arms-length negotiation in which the parties in this case are operating

-21-

under the assumption that the patent to be licensed is valid, enforceable, and infringed by the Defendants, and that the parties in this case had been reasonably and voluntarily trying to reach an agreement.

In determining a reasonable royalty, you should place yourself at the point in time at which you believe the arms-length negotiation to which I just referred would have likely occurred. In this case, the appropriate point in time to consider is February/March 1998. If you find the '823 patent is infringed and not invalid, but the '067 patent is not infringed or is invalid, the hypothetical negotiation could have been no earlier than December 5, 2000.

In determining the amount of the reasonable royalty, some of the factors that you should consider are:

1.     The royalties received by Plaintiff for the licensing of the '067 and '823 patents.

2.     The rates paid by licensees for the use of other patents comparable to the '067 and '823 patents.

3.     The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted, in terms of geographic territory or with respect to whom the system may be sold.

4.     Any established policy and marketing program of the Plaintiff to maintain its exclusive rights to its patents by not licensing others to use the invention or

-22-

by granting licenses under special conditions designed to preserve those exclusive rights.

5. The commercial relationship between the Plaintiff and the Defendants, such as whether they are competitors in the same territory and in the same line of business, or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting the sales of the Defendants' other services, the existing value of the inventions to the Plaintiff as a generator of sales of its non-patented items, and the extent of such derivative or convoyed sales.

7. The duration of the patents and the terms of the license.

8. The established profitability of the systems made under the patent, its commercial success, and its current popularity.

9. The utility and advantages of the patented system over the old means and/or methods, if any, that had been used in the industry.

10. The nature of the patented invention, the character of the commercial embodiment of it as owned and used by the Plaintiff, and the benefits to those who have used the invention.

11. The extent to which the Defendants have made use of the invention, and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the

invention or analogous inventions.

13.    The portion of the realizable profit that should be credited to the invention as

distinguished from non-patented elements, business risks, or significant

features or improvements added by the infringer.

14.    The opinion testimony of experts.

15.    The amount that the Plaintiff and the Defendants would have agreed upon if

both parties had been reasonably and voluntarily trying to reach an

agreement.  That is, the amount which a prudent licensee – who desired as a

business proposition, to obtain a license to make and sell the invention –

would have been willing to pay as a royalty and yet be able to make a

reasonable profit.

To calculate reasonable royalty damages, you must first determine the reasonable

royalty rate.  The Plaintiff argues that the reasonable royalty rate should be a fixed number

of cents per minute.   Defendants argue that the reasonable royalty rate should be a

percentage of revenue.  To calculate the reasonable royalty damages, you must multiply

the reasonable royalty rate, as determined by you in accordance with these instruction, by

the total number of minutes or revenue.

**E.    Willfulness**

The Plaintiff Freedom Wireless contends that Defendant Boston Communications

Group committed the act of infringement willfully.  The purpose of your determination of

-24-

whether Boston Communications Group infringed willfully is to aid the Court in making decisions that it will thereafter be called upon to make.

You must determine whether Plaintiff has proven willful infringement by clear and convincing evidence. As I described above in the patent validity section, clear and convincing evidence is a higher standard of proof than the preponderance of the evidence standard I instructed you on previously. Clear and convincing evidence leaves no substantial doubt in your mind. It is proof that establishes in your mind, not only that the proposition at issue is probable, but also that it is highly probable. Again, clear and convincing evidence is a more exacting standard of proof than proof by a preponderance of the evidence. However, clear and convincing proof is not as high a standard as "proof beyond a reasonable doubt," the standard applied in criminal cases.

The Plaintiff can establish willful infringement by proving two things:  first, that Defendant Boston Communications Group was aware of Plaintiff's patent rights; and, second, that Boston Communications Group had no reasonable good faith basis for concluding that it did not infringe the Plaintiff's patents. The Plaintiff may also establish willful infringement by proving that Boston Communications Group did not exercise due care to determine whether or not it was infringing the '067 and '823 patents after it had actual knowledge of Plaintiff's patent rights. The test is whether a prudent person would have sound reason to believe that the patents were not infringed or were invalid or unenforceable, and would be so held if litigated.

-25-

In determining whether infringement is willful, you should look at all of the surrounding circumstances. One factor you should consider with respect to Defendant Boston Communications Group's good faith and due care is whether it obtained and followed a competent legal opinion from an attorney soon after becoming aware of the '067 and '823 patents. A competent legal opinion means an opinion based on reasonable examination of the facts and law relating to the issues of the validity of the '067 and '823 patents and the infringement of Boston Communications Group. A good faith opinion is also one that is prepared in conformance with the standards and practices generally followed by competent lawyers. Moreover, you should consider whether Boston Communications Group actually relied upon and followed the legal opinion.

Another factor in determining whether Plaintiff has proven that Defendant Boston Communications Group willfully infringed the '067 and '823 patents is your assessment of whether or not it copied the invention covered by the '067 and '823 patents. This is evidence tending to show willfulness. On the other hand, if Boston Communications Group tried to match Plaintiff's commercial product with a functionally competitive system but did not set out to copy Plaintiff's inventions, that is evidence tending to show that any infringement by Boston Communications Group was not willful.

The examples I have just given you, legal advice and copying, are but two factors you should consider. You are instructed that no factor by itself requires a finding of willful or non-willful infringement. In other words, your decisions with regard to legal

advice and copying do not mandate any particular conclusion on willfulness. Rather, in considering whether Defendant Boston Communications Group's infringement was willful, you should consider the totality of the circumstances and all of the evidence demonstrating its intentions.

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

FREEDOM WIRELESS, INC.,
Plaintiff

v.

BOSTON COMMUNICATIONS GROUP,
INC., CINGULAR WIRELESS LLC, AT & T
WIRELESS PCS, CMT PARTNERS and
WESTERN WIRELESS CORPORATION
Defendants.

CIVIL ACTION NO.:
00-12234-EFH

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# N O T I C E

May 16, 2005

HARRINGTON, S.D.J.

Court Exhibit No. 2 has been revised to conform with the oral instructions given to the jury subsequent to the rulings at side bar on Requests for Further Instructions made on May 13, 2005 as follows:

Page 12, paragraph three, line 5. After the word "concealed," add "[h]ere, the parties agree that the Cominex invention was not abandoned, suppressed or concealed; therefore, you need not consider this element during your deliberations."

Page 15, paragraph one, line 7. Strike the words "is prior are [sic]" after the word "claim" and insert in place thereof the word "anticipates."

Page 15, paragraph four, line 2. Strike the word "three" and insert in place thereof the word "four."

Page 20, paragraph two, line 4. After the word "verdict," add "[t]his relates to opinions on obviousness."

Page 20, paragraph two, line 7. After the word "verdict," add [t]his relates to the prepaid system he claimed to have implemented in a hotel."

Page 12 has been corrected to reflect the accurate oral instruction given to the jury as follows:

Page 12, paragraph three, lines 5, 6 and 7. After the word "concealed" on line 5, add "[h]ere, the parties agree that the Cominex invention was not abandoned, suppressed or concealed; therefore, you need not consider this element during your deliberations as to the Cominex invention."

/s/ Edward F. Harrington
EDWARD F. HARRINGTON
United States Senior District Judge

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FREEDOM WIRELESS, INC., | ) | Civil Action No. 00-CV-12234-EFH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOSTON COMMUNICATIONS GROUP, INC. et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| And Related Counterclaims. | ) | |
| | ) | |

## PLAINTIFF FREEDOM WIRELESS, INC.'S OPPOSITION TO BOSTON COMMUNICATION GROUP, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW OF NO WILLFUL INFRINGEMENT

Defendant Boston Communication Group, Inc. moves under the "stringent" standard of Rule 50(a) for judgment as a matter of law that there was no willful infringement of Freedom's patents-in-suit. BCGI argues that Freedom has presented evidence only that it provided BCGI with notice of Freedom's patents, and that Freedom has presented no evidence that BCGI engaged in any culpable conduct. However, Freedom has presented sufficient evidence, beyond notice of its patents, for the jury to find willful infringement under the totality of the circumstances.

For these reasons, BCGI's motion should be denied in its entirety.

Wireless Service Agreement with Cingular Wireless, dated June 17, 2002)).[1] From this conduct,

a jury could fairly infer that BCGI did not have a good faith belief that it was not infringing.

### C.    BCGI Obtained an Opinion from Counsel Merely for Use as a Shield Against Subsequent Claims of Willful Infringement

In fact, while BCGI's motion would have the Court treat Mr. Snowden's mere reference

to an opinion letter as a defense to willfulness, Mr. Snowden admitted that BCGI did not obtain

an opinion letter until April 1999—almost one year after BCGI received notice of Freedom's

patents. (Trial Tr. (3/9/2005) 121:18-141:25). More tellingly, Mr. Snowden, BCGI's CEO,

admitted that he did not even bother to read—let alone rely on—the opinion letters. (Id.) From

this conduct, a fair inference is that BCGI obtained an opinion from counsel merely for use as a

shield against subsequent claims of willful infringement. See, e.g., Central Soya Co., Inc. v.

Geo. A. Hormel & Co., 723 F.2d 1573, 1577 (Fed. Cir. 1983) ("Hormel's intentional disregard

of its counsel's opinion negates any inference of good faith, placing Hormel in the same position

as one who failed to secure the advice of counsel. To overcome the district court's holding of

---

[1] See also Trial Ex. No. 855 (C2C Wireless Pre-Paid Calling Service Agreement with AT&T Wireless Services, Inc., dated Dec. 22, 1999); Trial Ex. No. 1011 (C2C Wireless Pre-Paid Calling Service Agreement with CMT Partners d/b/a AT&T Wireless, dated Jan. 1, 2000); Trial Ex. No. 876 (Prepaid Connection Agreement with Smith Bagley, Inc. d/b/a Cellular One of Northeast Arizona, dated Mar. 1, 2000); Trial Ex. No. 890 (Prepaid Connection Agreement with Bluegrass Cellular, Inc., dated Apr. 24, 2000); Trial Ex. No. 894 (Prepaid Connection Service Agreement with Price Communications, dated May 15, 2000); Trial Ex. No. 948 (Prepaid Connection Service Agreement with Brazos Cellular, dated Aug. 1, 2000); Trial Ex. No. 968 (Prepaid Connection Service Agreement with Great Lakes Cellular, dated Sept. 14, 2000); Trial Ex. No. 978 (Prepaid Connection Service Agreement with Thumb Cellular L.P., dated Oct. 27, 2000); Trial Ex. No. 989 (C2C Wireless Pre-Paid Calling Service Agreement with Cincinnati Bell Wireless, LLC, dated Nov. 27, 2000); Trial Ex. No. 1007 ((Prepaid Connection Service Agreement with Marseilles Cellular, Inc. d/b/a Illinois Valley Cellular, dated Jan. 2, 2001); Trial Ex No. 1006 (Prepaid Connection Service Agreement with PC Management, Inc., dated Jan. 30, 2001); Trial Ex. No. 1020 (Prepaid Connection Service Agreement with Wireless II, LLC d/b/a Nebraska Wireless Telephone Co., dated Apr. 10, 2001); Trial Ex. No. 1030 (Prepaid Connection Service Agreement with UBET, dated May 15, 2001).

willful infringement, Hormel had not only to show an opinion from competent counsel but also

that it had exercised reasonable and good faith adherence to the analysis and advice therein.")

(citations omitted); In re Hayes Microcomputer Prods., Inc. Patent Litig., 982 F.2d 1527, 1543-

44 (Fed. Cir. 1992) ("The evidence shows that the advice of counsel was more of a protective

device than a genuine effort to determine before infringing whether the patent was invalid. . . .

Although [the defendant] received advice of counsel on the invalidity of the '302 patent, advice

of counsel alone cannot be used as a shield irrespective of the nature and timing of that advice in

the context of the surrounding circumstances") (citation omitted).  Of course, absent evidence of

"reliance," there is no basis for BCGI's claim of reliance on advice of counsel as a matter of law.

See, e.g., Central Soya, 723 F.2d at 1577.

> ### D.     While Continuing To Infringe, BCGI Did Not Hold a Good Faith Belief that Its Systems Did Not Infringe or that Freedom's Patents Were Invalid or Unenforceable

Freedom has also presented evidence for the jury to find that while continuing to infringe

Freedom's patents, BCGI did not even believe its counsel's opinion that BCGI was not

infringing Freedom's patents.  Mr. Snowden admitted that after it was sued by Freedom, BCGI

hired a firm called "BountyQuest" to offer $60,000 in bounties to any persons who could come

forward with "prior art" that might invalidate Freedom's patents.  (Trial Tr. (3/10/2005) 26:4-

29:21).  From this conduct, the jury could fairly infer that BCGI did not have a good faith belief

that its systems were non-infringing.

In addition, Mr. Snowden admitted that, before this action was filed, BCGI stated in its

SEC filings that BCGI started to offer prepaid service in 1996.  (Trial Tr. (3/10/2005) 4:20-7:1;

Trial Ex. Nos. 4433, 4631, 4820).  However, after this action was filed and BCGI received the

original complaint based on the '067 patent, BCGI instead stated in its SEC filings that BCGI

started to offer prepaid service in mid-1994 (i.e., before the December 23, 1994 filing date of the application for the '067 patent). From such conduct, the jury could fairly infer that BCGI changed the dates as an attempt to hide its infringement of Freedom's valid and enforceable patents.

### E.    The Jury May Conclude That Infringement Was Clear

Although BCGI does not address the issue of infringement in its motion, Freedom has presented evidence that infringement was clear and did not involve close questions. This evidence includes testimony from Freedom's infringement expert Dr. Levine; testimony from defendants' representatives William Wessman, Edward Snowden, and Kenneth Sonberg (BCGI), Andrea Kullman (AT&T Wireless Services, Inc.), Heather Slee (Western Wireless), Judy Espejo (Cingular Wireless), and Larry Catipon (CMT Partners); and numerous documents from defendants' files regarding the components and functions of defendants' systems. This is another factor for the jury to consider in determining willful infringement. See, e.g., Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH, 383 F.3d at 1346.

**F.**    <u>The Jury May Conclude that BCGI Copied Freedom's System</u>

Furthermore, Freedom presented evidence for the jury to find that BCGI copied

Freedom's system. Lawrence Rybar—an engineer at Bell Atlantic Mobile, Inc. ("BAM"), a

cellular carrier—testified (via deposition) that after meeting with representatives of Cellexis,

visiting their operations, and inspecting their system in early 1995, Mr. Rybar would speak to or

meet with BCGI about the same type of prepaid system—in some instances the following day.

(<u>See, e.g.</u>, Lawrence Rybar Dep. Tr. (9/26/2002) 48:7-48:17, 82:11-82:21, 115:3-115:11, 253:23-

255:12, 255:15-257:8, 257:11-257:14, 258:1-261:1, 264:2-265:13, 266:20-268:2, 273:3-275:3,

277:15-277:16, 279:8-280:11, 298:17-300:9, 320:13-321:9 (played at trial on Mar. 7, 2005).)

Mr. Rybar met with BCGI after acknowledging that <u>no one</u> had a system like Cellexis'; that Bell

Atlantic Mobile should explore the "boundaries" of its confidentiality agreement with Cellexis;

and that it should "scour" the marketplace for others. BCGI then started to offer prepaid services

in 1996—starting with BAM, and working with Mr. Rybar and others to create the first

implementation of the BCGI system. (Trial Tr. (3/10/2005) 4:20-7:1; Trial Ex. Nos. 4433, 4631,

4820). As discussed above, the jury may conclude that BCGI's prepaid system clearly infringes

Freedom's system. From this evidence, the jury may also fairly infer that BCGI copied

Freedom's system with the assistance of Mr. Rybar.

*    *    *

Accordingly, the principle case relied on by BCGI is inapposite. In <u>Norian Corp. v.

Stryker Corp.</u>, the plaintiff had presented evidence only that the defendant had infringed and had

knowledge of the plaintiff's patents. 363 F.3d 1321, 1332 (Fed. Cir. 2004). The court expressed

its concern that willful infringement should not be established by the mere fact of infringement.

<u>Id.</u> That concern is not implicated here. As discussed above, Freedom has presented substantial

**Conclusion**

Freedom respectfully requests that the Court deny BCGI's motion in its entirety.

DATED:  April 18, 2005

Respectfully submitted,

FREEDOM WIRELESS, INC.
By their attorneys

*Marshall M. Searcy III/Clor*

Paul Ware (BBO #512240)
Douglas C. Doskocil (BBO #558949)
Benjamin M. Wattenmaker (BBO #644919)
Goodwin Procter, LLP
Exchange Place
Boston, MA  02109-2881
Tel:  (617) 570-1000
Fax:  (617) 523-1231

A. William Urquhart
Marshall M. Searcy III
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017
(pro hac vice)

Attorneys for Plaintiff Freedom Wireless, Inc.

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FREEDOM WIRELESS, INC., ) | Civil Action No. 00-CV-12234-EFH |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| BOSTON COMMUNICATIONS ) | |
| GROUP, INC. et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| And Related Counterclaims. ) | |
| ) | |

## PLAINTIFF FREEDOM WIRELESS, INC.'S REPLY IN
## SUPPORT OF ITS MOTION FOR ATTORNEYS FEES
## AND ENHANCED DAMAGES

### Preliminary Statement

In their opposition, defendants justify their overly aggressive litigation tactics not by their good faith belief in their defenses, but by the amount of money at stake. Defendants' desire to win, however, is not an excuse under the patent laws to litigate instead of license. Defendants concede they zealously sought out a defense by posting a bounty for potentially invalidating art, claiming there were four other unnamed inventors--all of which were abandoned at trial, hiring ten expert witnesses for hundreds of thousands of dollars each, asserting over three hundred documents as supposedly invalidating prior art, and taking over a hundred days of deposition. Defendants do not, and cannot, claim that they were merely gathering back-up for the good faith defense they always had. Under the patent laws, defendants must bear the entire cost of their fruitless search for a defense.

("Our cases uniformly indicate that the willfulness of the infringement by the accused

infringer may be a sufficient basis in a particular case for finding the case 'exceptional'

for purposes of awarding fees to the prevailing patent owner.").

BCGI claims that the evidence amounted to no more than a few questions of Mr.

Snowden.[17] But evidence of willfulness also included BCGI's failure to respond to

Freedom's notice letter,[18] BCGI's offer of $60,000 in bounties to any persons who could

come forward with prior art that might invalidate Freedom's patents,[19] the post-lawsuit

decision to change of the date BCGI claimed in its SEC filings to have begun offering

prepaid service to a date earlier than Freedom's patent application,[20] the testimony of

defendants' representatives William Wessman, Edward Snowden, and Kenneth Sonberg

(BCGI), and numerous documents from defendants' files establishing that infringement

was clear and that defendants' distinctions were not credible, the fact that BCGI was only

successful at developing its prepaid system after working with Bell Atlantic Mobile

engineer who had just inspected Freedom's patented technology and stated that he would

"scour the marketplace" for another provider,[21] and the witnesses' unbelievable

testimony that they had never heard of Cellexis prior to the lawsuit.[22]

Defendants' opposition also attaches five opinions of counsel and asserts that

"this evidence . . . strongly supported the conclusion that there was no willful

---

[17] Mot. at 10.

[18] Trial Testimony of Larry Day, President of Freedom Wireless, March 28, 2005, at 17:6-20:15.

[19] Trial Testimony of E. Y. Snowden, President of BCGI, March 10, 2005, at 26:4-29:21.

[20] Trial Testimony of E. Y. Snowden, President of BCGI, March 10, 2005, at 4:20-7:1; Trial Ex. Nos. 4433, 4631, 4820.

[21] Lawrence Rybar Dep. Tr., September 26, 2002, at 48:7-48:17, 82:11-82:21, 115:3-115:11, 279:8-280:11, 298:17-300:9, 320:13-321:9 (played at trial on Mar. 7, 2005); Trial Testimony of E. Y. Snowden, BCGI's President, March 10, 2005, 4:20-7:1; Trial Ex. Nos. 4433, 4631, 4820.

[22] See, e.g., Trial Testimony of Kimberly Obremski, April 7, 2005, at 14:11-29:6.

REPLY SUPPORTING MOTION FOR ATTORNEYS FEES

infringement."[23]  Defendants did not attempt to introduce any of these opinions at trial.

Had they done so, Freedom would have presented evidence that defendants did not

reasonably rely on them as a good faith basis to continue their infringement, including:

- BCGI's first advice of counsel, and the only one it received before the litigation, was written by BCGI's litigation counsel, Foley Hoag.  Moreover, it's author and signatory was just an associate at the time.[24]  It was based on such dubious grounds as "Although the cellular switch may perform operations to work with the BCGI Prepaid System, it is not the BCGI Prepaid System itself that performs operations at the cellular switch."[25]

- BCGI did not obtain even that opinion until April 15, 1999, nine months after receiving notice of infringement from Freedom, eight months after receiving a request from a carrier customer for an analysis "preferably in the form of an opinion from your outside counsel,"[26] seven months after another carrier customer requested "some form of assurance that we are not infringing on anyone's patents,"[27] six months after the associate giving the opinion told BCGI it would need a letter to comply with due diligence,[28] and five months after BCGI threatened to fire the author, Foley, Hoag if it did not promptly deliver the requested opinion of counsel.[29]

---

[23] Mot. at 12.

[24] Deposition of Edward Kelly, April 24, 2002, at 41:14-16 (Taggart Aff., Exh. E).

[25] Foley, Hoag & Eliot opinion, dated April 15, 1999, at 20 (Henry Aff., Exh. C).

[26] Letter from Greg Caligari to Boston Communications Group, July 13, 1998, at 1, Identification Trial Exhibit 707-1 (not introduced in evidence) (Taggart Aff., Exh. F).

[27] Fax from Alan Bouffard to Ed Kelly, August 12, 1998, attaching August 11, 1998 Memo from Bob Matthews (BCGI), forwarding BAM's August 5, 1998 letter, Identification Trial Exhibit 719 (not introduced in evidence) (Taggart Aff., Exh. G).

[28] Letter from Edward Kelly to Alan Bouffard, August 6, 1998, Identification Trial Exhibit 717 (not introduced in evidence) (Taggart Aff., Exh. H) ("to ensure that we use the proper diligence in addressing this matter, I have docketed a date of 15 September 1998 for completing this analysis.  My understanding of U.S. patent laws is that this timeframe evidences the proper diligence in addressing such a matter.").

[29] Fax from Alan Bouffard to Ed Kelly, November 9, 1998, Identification Trial Exhibit 743 (not introduced in evidence) (Taggart Aff., Exh. I) ("Please provide a written

REPLY SUPPORTING MOTION FOR ATTORNEYS FEES

The other four letters were done by another firm during the litigation and were dated more than seventeen months after the lawsuit was filed. These litigation opinions included such dubious bases as that the system does not "cause the call to be connected" because it directs the switch to disconnect the call.[30] The author gave this opinion despite the fact that defendants had already filed a sworn statement explaining that "If the maximum call duration is reached before the Node Site senses an 'on-hook' condition from either the subscriber's cellular telephone or the destination telephone number, the Node Site will cause the call to be terminated. . ."[31]

There was thus more than sufficient evidence that BCGI willfully infringed Freedom's patents and had no good faith basis to force Freedom to endure five years of litigation. See Jurgens v. CBK, Ltd., 80 F.3d 1566, 1572 -1573 (Fed. Cir. 1996) ("If infringers could rely on any opinion to defeat willful infringement, no matter how incompetent, insulation from increased damages would be complete."). It also participated in defendants' overall strategy of boundless litigation, including paying hundreds of thousands of dollars for a purported license from the former employer of one of Freedom's inventors.[32] Moreover, BCGI, along with Cingular, continues to infringe Freedom's patents and shows no signs of voluntarily stopping or paying a royalty.

---

response on Freedom Wireless. If I do not receive a response by this Friday (11/13), I will assume that you have abandoned the matter and hire other counsel. BCGI cannot afford to lose further credibility on this matter.").

[30] Letter from Stanley M. Schurgin to Alan J. Bouffard, August 24, 2001, at page 42 (Henry Aff., Exh. D) ("[T]he BCGI system does not cause a call to be connected to a destination. Rather this function is performed by a respective MSC in a manner well-known to practitioners in the art.").

[31] Corrected Declaration of William D. Wessman in Support of Defendant Boston Communications Group, Inc.'s Motion to Transfer Venue, June 14, 2000, Trial Exhibit 904.

[32] License & Covenant Not To Sue between Orbital Sciences Corporation and Boston Communications Group Inc., May 2002, Identification Trial Exhibit 1163 (not admitted in evidence) (Taggart Aff., Exh. J).

REPLY SUPPORTING MOTION FOR ATTORNEYS FEES

## <u>CERTIFICATE OF SERVICE</u>

I, Erica P. Taggart, hereby certify that on October 14, 2005, I caused a true copy of the foregoing Plaintiff Freedom Wireless, Inc.'s Reply in Support of Its Motion for Attorneys Fees and Enhanced Damages to be served by overnight courier, by hand and facsimile to counsel of record.

Dated:  October 14, 2005

Erica P. Taggart

LIBA/1638818.1

# EXHIBIT 4

APPEAL, STAY

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:00-cv-12234-EFH

Freedom Wireless Inc v. Boston Communication, et al
Assigned to: Judge Edward F. Harrington
Demand: $0
Related Cases: 1:05-cv-11061-EFH
                1:05-cv-11062-EFH
Case in other court: N.D. of CA (Oakland), 00-cv-1129
Cause: 28:1338 Patent Infringement

Date Filed: 10/30/2000
Jury Demand: Defendant
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Freedom Wireless Inc**      represented by   **A. William Urquhart**
Quinn Emanuel Urquhart Oliver &
Hedges, LLP
865 South Figueroa
10th Floor
Los Angeles, CA 90017-0243
213-624-7707
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adrian M. Pruetz**
Quinn Emanuel Urquhart Oliver &
Hedges, LLP
10th Floor
865 South Figueroa Street
Los Angeles, CA 90017
213-443-3134
Fax: 213-443-3100
Email:
adrianpruetz@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aimee DeSantis**
Quinn Emanuel Urquhart Oliver &
Hedges, LLP
865 South Figueroa Street
10th Floor
Los Angeles, CA 90017
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carolyn I. McGowan**

| 10/20/2003 | 896 | CERTIFICATE OF CONSULTATION re 894 MOTION to Modify scheduling order by John Nilsson on behalf of Boston Communications Group, Inc.. (Holahan, Sandra) (Entered: 10/21/2003) |
| 10/24/2003 | 897 | MOTION to Strike portions of the 9/13/2003 reply report of Dr. Richard Levine and 9/17/2003 claim charts by Boston Communications Group, Inc..(Holahan, Sandra) (Entered: 10/28/2003) |
| 10/24/2003 | 898 | MEMORANDUM in Support re 897 MOTION to Strike filed by Boston Communications Group, Inc.. (Holahan, Sandra) (Entered: 10/28/2003) |
| 10/24/2003 | 899 | MOTION to Seal by Boston Communications Group, Inc..(Holahan, Sandra) (Entered: 10/28/2003) |
| 10/24/2003 | 900 | ****** SEALED ****** APPENDIX re 897 MOTION to Strike by Boston Communications Group, Inc.. (Attachments: # 1 Exhibit A-E NOT SCANNED)(Holahan, Sandra) (Entered: 10/28/2003) |
| 10/29/2003 | 901 | RENEWED MOTION for PARTIAL Summary Judgment re Infringement of selected claims of the '823 Patent by Freedom Wireless Inc.(Holahan, Sandra) (Entered: 10/31/2003) |
| 10/29/2003 | 902 | STATEMENT of UNDISPUTED Material and claim chart facts in support of 901 MOTION for Summary Judgment. c/s (Attachments: # 1 pages 36 - 73)(Holahan, Sandra) (Entered: 10/31/2003) |
| 10/29/2003 | 903 | ASSENTED MOTION for Leave to File Memorandum of Law in excess of page limit by Freedom Wireless Inc.(Holahan, Sandra) (Entered: 10/31/2003) |
| 10/29/2003 | 904 | ASSENTED MOTION to Seal by Freedom Wireless Inc.(Holahan, Sandra) (Entered: 10/31/2003) |
| 10/29/2003 | 905 | ****** SEALED ****** MEMORANDUM in Support re 901 MOTION for Summary Judgment filed by Freedom Wireless Inc. (Holahan, Sandra) (Entered: 10/31/2003) |
| 10/29/2003 | 906 | ****** SEALED ****** AFFIDAVIT of Marshall M Searcy III, Esq. re 901 MOTION for Summary Judgment by Freedom Wireless Inc. (VOLUME I, EXHIBITS 1-10) (Holahan, Sandra) (Entered: 10/31/2003) |
| 10/29/2003 | 907 | ****** SEALED ****** AFFIDAVIT of Marshall M. Searcy III, Esq. re 901 MOTION for Summary Judgment by Freedom Wireless Inc. (VOLUME II, EXHIBITS 11-23) (Holahan, Sandra) (Entered: 10/31/2003) |
| 10/29/2003 | 908 | ****** SEALED ****** AFFIDAVIT of Marshall M. Searcy III, Esq. re 901 MOTION for Summary Judgment by Freedom Wireless Inc. (VOLUME III, EXHIBITS 24-54) (Holahan, Sandra) (Entered: 10/31/2003) |
| 10/29/2003 | 909 | ****** SEALED ****** AFFIDAVIT of Marshall M. Searcy III, Esq. re 901 MOTION for Summary Judgment by Freedom Wireless Inc. (VOLUME IV, EXHIBITS 55-64) (Holahan, Sandra) (Entered: |

| 01/23/2004 | 980 | ****** SEALED ****** MOTION for Partial Summary Judgment that the patents are enforceable by Freedom Wireless Inc.(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 981 | ASSENTED MOTION to Seal by Freedom Wireless Inc.(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 982 | ASSENTED MOTION for Leave to File memorandum in excess of 20 pages by Freedom Wireless Inc.(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 983 | ****** SEALED ****** STATEMENT of undisputed material facts re 980 MOTION for Partial Summary Judgment that the patents are enforceable. (Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 984 | ****** SEALED ****** MEMORANDUM in Support re 980 MOTION for Partial Summary Judgment that the patents are enforceable filed by Freedom Wireless Inc. (Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 985 | ****** SEALED ****** AFFIDAVIT of Marc Morriss in Support re 980 MOTION for Partial Summary Judgment that the patents are enforceable. (Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 986 | MOTION for Partial Summary Judgment regarding the on-sale bar by Freedom Wireless Inc.(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 987 | ASSENTED MOTION to Seal by Freedom Wireless Inc.(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 988 | ASSENTED MOTION for Leave to File memorandum in excess of 20 pages by Freedom Wireless Inc.(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 989 | ****** SEALED ****** STATEMENT of undisputed material facts re 986 MOTION for Partial Summary Judgment regarding the on-sale bar. (Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 990 | ****** SEALED ****** MEMORANDUM in Support re 986 MOTION for Partial Summary Judgment regarding the on-sale bar filed by Freedom Wireless Inc. (Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 991 | ****** SEALED ****** AFFIDAVIT OF Erica P. Taggart in Support re 986 MOTION for Partial Summary Judgment regarding the on-sale bar. (Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 992 | MOTION for Partial Summary Judgment of INVALIDITY by Boston Communications Group, Inc..(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 993 | MEMORANDUM in Support re 992 MOTION for Partial Summary Judgment of INVALIDITY filed by Boston Communications Group, Inc.. (Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 994 | STATEMENT of undisputed material facts re 992 MOTION for Partial Summary Judgment of INVALIDITY. (Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | 995 | ****** SEALED ****** AFFIDAVIT of Peter A. Casciato, Esq. in |

| | | |
|---|---|---|
| | | Support re <u>992</u> MOTION for Partial Summary Judgment of INVALIDITY. (Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | <u>996</u> | \*\*\*\*\*\* SEALED \*\*\*\*\*\* APPENDIX of EXHIBITS re <u>992</u> MOTION for Partial Summary Judgment of INVALIDITY by Boston Communications Group, Inc.. (VOLUME I)(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | <u>997</u> | \*\*\*\*\*\* SEALED \*\*\*\*\*\* APPENDIX of EXHIBITS re <u>992</u> MOTION for Partial Summary Judgment of INVALIDITY by Boston Communications Group, Inc.. (Holahan, Sandra) (VOLUME II) (Entered: 01/28/2004) |
| 01/23/2004 | <u>998</u> | \*\*\*\*\*\* SEALED \*\*\*\*\*\* APPENDIX of EXHIBITS re <u>992</u> MOTION for Partial Summary Judgment of INVALIDITY by Boston Communications Group, Inc.. (VOLUME III)(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | <u>999</u> | MOTION for Partial Summary Judgment of NONINFRINGEMENT by Boston Communications Group, Inc..(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | <u>1000</u> | \*\*\*\*\*\* SEALED \*\*\*\*\*\* MEMORANDUM in Support re <u>999</u> MOTION for Partial Summary Judgment of NONINFRINGEMENT filed by Boston Communications Group, Inc.. (Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | <u>1001</u> | \*\*\*\*\*\* SEALED \*\*\*\*\*\* STATEMENT of undisputed material facts re <u>999</u> MOTION for Partial Summary Judgment of NONINFRINGEMENT. (Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | <u>1002</u> | \*\*\*\*\*\* SEALED \*\*\*\*\*\* APPENDIX of EXHIBITS re <u>999</u> MOTION for Partial Summary Judgment of NONINFRINGEMENT by Boston Communications Group, Inc.. (VOLUME I)(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | <u>1003</u> | \*\*\*\*\*\* SEALED \*\*\*\*\*\* APPENDIX of EXHIBITS re <u>999</u> MOTION for Partial Summary Judgment of NONINFRINGEMENT by Boston Communications Group, Inc.. (VOLUME II)(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | <u>1004</u> | \*\*\*\*\*\* SEALED \*\*\*\*\*\* APPENDIX of EXHIBITS re <u>999</u> MOTION for Partial Summary Judgment of NONINFRINGEMENT by Boston Communications Group, Inc.. (VOLUME III)(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | <u>1005</u> | \*\*\*\*\*\* SEALED \*\*\*\*\*\* APPENDIX of EXHIBITS re <u>999</u> MOTION for Partial Summary Judgment of NONINFRINGEMENT by Boston Communications Group, Inc.. (VOLUME IV)(Holahan, Sandra) (Entered: 01/28/2004) |
| 01/23/2004 | <u>1006</u> | \*\*\*\*\*\* SEALED \*\*\*\*\*\* APPENDIX of EXHIBITS re <u>999</u> MOTION for Partial Summary Judgment of NONINFRINGEMENT by Boston Communications Group, Inc.. (VOLUME V)(Holahan, Sandra) (Entered: |

| 07/02/2004 | 1183 | MOTION for Leave to Appear Pro Hac Vice by Charles K. Verhoeven by Freedom Wireless Inc.(Holahan, Sandra) (Entered: 07/06/2004) |
| 07/06/2004 | | Filing fee: $ 50.00, receipt number 57043 regarding motion to appear phv (Holahan, Sandra) (Entered: 07/07/2004) |
| 07/07/2004 | 1184 | NOTICE of lodging supplemental affidavit of Diane C. Hutnyan in support of plaintiff's reply brief by Freedom Wireless Inc re 901 MOTION for Summary Judgment (Attachments: # 1 Exhibit A - 15 (NOT SCANNED))(Holahan, Sandra) (Entered: 07/14/2004) |
| 07/08/2004 | | Judge Edward F. Harrington : ELECTRONIC ORDER entered granting 1183 Motion for Leave to Appear Pro Hac Vice Added Charles K. Verhoeven for Freedom Wireless Inc. MOTION ALLOWED. cc/cl (Holahan, Sandra) (Entered: 07/12/2004) |
| 07/08/2004 | | Judge Edward F. Harrington : ELECTRONIC ORDER entered granting 1179 Motion for Leave to File response. MOTION ALLOWED. cc/cl (Holahan, Sandra) (Entered: 07/12/2004) |
| 07/08/2004 | | Judge Edward F. Harrington : ELECTRONIC ORDER entered granting 1181 Motion for Leave to File reply brief. MOTION ALLOWED. cc/cl (Holahan, Sandra) (Entered: 07/12/2004) |
| 07/12/2004 | 1185 | MOTION for Leave to File supplemental memorandum in support of motion for S/J on claims 16 and 35 by Freedom Wireless Inc.(Holahan, Sandra) (Entered: 07/14/2004) |
| 07/12/2004 | 1186 | SUPPLEMENTAL MEMORANDUM in Support re 901 MOTION for Summary Judgment filed by Freedom Wireless Inc. and in OPPOSITION to Boston Communications motion for partial S/J of noninfringement as to claims 10-14 and 16-18 of the '067 patent and claims 2,3,5,9-12,15-20,29-31,34,36-39,42,53,57 and 59 of the '823 patent(Holahan, Sandra) (Entered: 07/14/2004) |
| 07/13/2004 | 1187 | Letter(non-motion) from Scott G. Lindvall, Esq.. (Attachments: # 1 Exhibit (NOT SCANNED))(Holahan, Sandra) (Entered: 07/14/2004) |
| 07/14/2004 | | Judge Edward F. Harrington : ELECTRONIC ORDER entered granting 1185 Motion for Leave to File memorandum. MOTION ALLOWED. cc/cl (Holahan, Sandra) (Entered: 07/14/2004) |
| 07/15/2004 | 1188 | OPPOSITION and RESPONSE to plaintiff's supplemental memorandum in support of 901 MOTION for Summary Judgment and in opposition to Boston Communications motion for partial S/J of noninfringement as to claims 10-14 and 16-18 of the '067 patent and claims 2,3,5,9-12,15-20,29-31,34,36-39,42,53,57, and 59 of the '823 patent filed by Boston Communications Group, Inc.. (Holahan, Sandra) (Entered: 07/19/2004) |
| 07/16/2004 | 1189 | Letter(non-motion) from Paul F. Ware, Esq.. (Holahan, Sandra) (Entered: 07/20/2004) |
| 08/05/2004 | 1190 | Judge Edward F. Harrington : ELECTRONIC ORDER entered denying 901 Motion for Summary Judgment, denying 967 Motion for Summary |

| | | Judgment, denying 970 Motion for Summary Judgment, denying 974 Motion for Partial Summary Judgment, denying 980 Motion for Partial Summary Judgment, denying 986 Motion for Partial Summary Judgment, denying 992 Motion for Partial Summary Judgment, denying 999 Motion for Partial Summary Judgment (Holahan, Sandra) (Entered: 08/10/2004) |
|---|---|---|
| 08/12/2004 | | Judge Edward F. Harrington : ELECTRONIC ORDER entered granting 1008 Motion for Joinder. MOTION ALLOWED. cc/cl (Holahan, Sandra) (Entered: 08/12/2004) |
| 08/17/2004 | | Judge Edward F. Harrington : ELECTRONIC ORDER entered denying 1160 Motion to Dismiss. MOTION DENIED. cc/cl (Holahan, Sandra) (Entered: 08/19/2004) |
| 08/30/2004 | | Motions terminated: [183] Motion to Compel filed by Freedom Wireless Inc, [185] Motion to Compel filed by Freedom Wireless Inc, [218] Motion to Compel filed by Cellco Partnership, [258] Motion to Compel filed by Freedom Wireless Inc. (Holahan, Sandra) (Entered: 08/30/2004) |
| 08/30/2004 | | Motions terminated: [119] Motion to Dismiss filed by Bellsouth Cellular, Corp., Bellsouth Mobility, Inc., Southwestern Bell Mobile Systems, Inc., [95] Motion to Dismiss filed by Freedom Wireless Inc, Alltel Communications Products, Inc.. (Holahan, Sandra) (Entered: 08/30/2004) |
| 08/30/2004 | 1191 | MOTION for status conference and trial date by Freedom Wireless Inc. (Holahan, Sandra) (Entered: 09/07/2004) |
| 08/31/2004 | 1192 | RESPONSE to Motion re 1191 MOTION for status conference and trial date filed by AT & T Wireless PCS, Airtouch Communications, Inc., Boston Communications Group, Inc., CMT Partners, Western Wireless Corporation. (Holahan, Sandra) (Entered: 09/07/2004) |
| 09/09/2004 | | Judge Edward F. Harrington : ELECTRONIC ORDER entered denying 1191 Motion for Hearing and trial date. MOTION DENIED. PRE-TRIAL CONFERENCE IS SET FOR 11/8/2004 AT 2:00 P.M. cc/cl (Holahan, Sandra) (Entered: 09/09/2004) |
| 09/09/2004 | 1193 | Judge Edward F. Harrington : PROCEDURAL ORDER re pretrial Final Pretrial Conference set for 11/8/2004 02:00 PM in Courtroom 13 before Edward F. Harrington. SO ORDERED. cc/cl(Holahan, Sandra) (Entered: 09/09/2004) |
| 09/09/2004 | 1194 | MOTION to Compel discovery relating to Freedom's decision to withhold prior art from the patent office by AT & T Wireless PCS, Airtouch Communications, Inc., Boston Communications Group, Inc., CMT Partners, Cingular Wireless LL, Western Wireless Corporation. (Holahan, Sandra) (Entered: 09/13/2004) |
| 09/09/2004 | 1195 | MEMORANDUM in Support re 1194 MOTION to Compel filed by AT & T Wireless PCS, Airtouch Communications, Inc., Boston Communications Group, Inc., CMT Partners, Cingular Wireless LL, Western Wireless Corporation. (Holahan, Sandra) (Entered: 09/13/2004) |
| 09/09/2004 | 1196 | APPENDIX OF EXHIBITS re 1194 MOTION to Compel filed by |

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE:    CHIPCOM CORPORATION      )    CIVIL ACTION NO.
          SECURITIES LITIGATION    )    95-11114-DPW

<u>MEMORANDUM AND ORDER</u>
April 29, 1996

I.

This is a consolidated putative class action alleging
securities fraud violations by Chipcom Corporation ("Chipcom")
and certain individual defendants.[1]  Specifically, plaintiffs
allege violations under § 10(b) (Count I) and § 20(a) (Count II)
of the Securities Exchange Act of 1934.  The action is brought on
behalf of purchasers of Chipcom common stock during the period of
February 8, 1995 through and including May 26, 1995

_____

[1]The individual defendants are:
John Robert Held ("Held")
     -President and Chief Executive Officer, member of Board
     of Directors
Robert Peter Badavas ("Badavas")
     -Senior Vice President, Finance, and Chief Financial
     Officer
Bruce L. Cohen ("Cohen")
     -Senior Vice President, Field Operations
Menachem E. Abraham ("Abraham")
     -Senior Vice President, Product Development, and Chief
     Technical Officer
Jerald G. Fishman ("Fishman")
     -member of Board of Directors



("the class period").[2]

The plaintiffs contend that during the class period the defendants made materially false and misleading statements, and failed to disclose information regarding Chipcom's operations, competitive position and future business prospects.  Especially at issue is defendants' alleged knowledge that the primary distribution channel, International Business Machine Corporation ("IBM"), was 1) oversupplied with Chipcom's products, 2) experiencing difficulties selling the products, and 3) reducing orders, thereby drastically affecting Chipcom's revenues.  A

---

[2]The named plaintiffs are:

| Plaintiffs | Purchase Date | Shares | Share Price |
|---|---|---|---|
| Manuel & Barbara De Sousa | February 10, 1995 | 100 | $46.50 |
| Anthony Malozzi | March 3, 1995 | 5000 | $35.625 |
| | March 29, 1995 | 5000 | $42.375 |
| | March 29, 1995 | 5000 | $42.50 |
| | March 30, 1995 | 5000 | $40.75 |
| | March 30, 1995 | 5000 | $39.625 |
| Carol Benjamin | March 30, 1995 | 500 | $38.25 |
| Marc Linsky | April 5, 1995 | 150 | $33.25 |
| Sean Carney | April 13, 1995 | 500 | $32.75 |
| N. Giannantonio | April 13, 1995 | 500 | $32.75 |
| | May 23, 1995 | 500 | $34 |
| Constandine & Mary Machakos | April 20, 1995 | 300 | $28.75 |
| Daniel List | May 1, 1995 | 200 | $32.25 |
| Lucille Nappo | May 9, 1995 | 300 | $35 |
| Victor Mosso | May 15, 1995 | 20 | $32.50 |

critical consideration in these claims is *when* Chipcom became
aware of this situation and *what* duty it had to disclose what it
knew.

Chipcom announced on April 19, 1995 that second quarter IBM
revenue would be approximately $24 million (20% less than the
first quarter).  On May 26, 1995, Chipcom lowered the prediction
to $15 million (50% less than the first quarter).  That day,
Chipcom's stock plummeted by $11 7/8 or 37%.[3]  Plaintiffs allege
that Chipcom had knowledge of the gravity of the situation before
May 26, indeed before April 19, and had a duty to disclose its
knowledge.

The original complaint in this action was filed on May 30,
1995, four days after the precipitous fall in stock price.  A
second consolidated complaint was filed on September 13, 1995.  A
third version, the "Consolidated First Amended Complaint"
("Complaint"), challenged by defendants' motion to dismiss, is
now before me.

II.

Chipcom designed, manufactured and distributed computer
networking fault-tolerant intelligent switching systems,
including hubs and internetworking and network management
products.[4]  During the relevant period, Chipcom was the world's

---

[3]Approximately 1,502,300 shares were traded, representing
almost 10% of all outstanding shares.

[4]On December 29, 1995, Chipcom merged into 3Com Corporation,
and ceased to exist.  (Defs.' Reply to Pls.' Opp'n at 1, n.1.)
At all relevant times, Chipcom's stock was traded on NASDAQ, and

third largest supplier of intelligent hubs, and approximately 70-80% of revenues were generated from the sales of intelligent hubs. (Compl. ¶ 47.) Switching hubs allow users "to build and manage networks with dissimilar hardware and software technologies within an entire building or campus or across remote locations of an enterprise." (Compl. ¶ 16(a).) "Fault tolerant" technology allows networks to run without interruption, if a connection or component should fail.[5] (Compl. ¶ 48.)

Chipcom marketed and sold its products primarily through third-party distribution channels, including value-added resellers, original equipment manufacturers and distributors (collectively "resellers"). Although Chipcom dealt with 245 resellers worldwide, the single most important reseller was IBM.

---

was registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l. Approximately 16,910,109 shares of Chipcom stock were outstanding as of March 10, 1995. (Compl. ¶ 16(b).) Chipcom was incorporated in Delaware with its principal place of business in Southborough, Massachusetts.

> [5]Chipcom's various hub products included:
> 1) the ONline System Product Family (introduced in 1990) [product 8250];
> 2) the ONcore Switching System (the ONline system designed for high end enterprise networks, introduced in the first quarter of 1994) [product 8260];
> 3) the InfiNET Switching Solutions (family of packet-switching products providing increased network capacity and speed, including the Galactica Network Switching Hub, introduced in 1994); and
> 4) the ONsemble StackSystem (Ethernet and Token Ring hubs, designed for remote sites or workgroups, incorporating technology from third-party vendors; introduced during the first quarter of 1995 but not available for distribution).

(Compl. ¶ 49.)

(Compl. ¶ 50.)

Chipcom's relationship with IBM began in September 1992 upon the signing of the "Alliance Agreements."[6]  The Alliance Agreements established a mutually beneficial marketing and development affiliation: the companies would make available to each other certain products, and agreed to jointly develop hub technology.  For example, IBM would gain access to Chipcom's hub and switching technology, and Chipcom would gain access to IBM's research on Token Ring technology and Asynchronous Transfer Mode ("ATM") technology.[7]  (Compl. ¶¶ 51-52.)

The Alliance Agreements also provided for a comprehensive meeting and review process.  First, the Agreements provided that each company would appoint an Alliance Executive, a Marketing Executive, a Financial Executive, and a Development Executive, all of whom (known as the "Alliance Executive Committee") would be jointly responsible for overseeing the Agreements.  (Compl. ¶¶ 53-55.)  Further, the Agreements required: 1) that the Alliance Executive Committee meet semi-annually, 2) that the President of Chipcom and the IBM General Manager for Networking Services Line of Business ("NSLOB") meet annually, and 3) that there would be

---

[6]The companies signed three integrated commercial agreements: the Master Agreement, the Remarketing Agreement and the Development Agreement (collectively known as the "Alliance Agreements").  (Compl. ¶ 51.)

[7]ATM is a cell switching technology designed to simultaneously transport data, voice and video at greater speeds than standard Ethernet or Token Ring.  IBM was the sole supplier of ATM and Token Ring expertise to Chipcom in 1994.  (Compl. ¶ 75.)

individual Marketing/Remarketing, Financial, and Development meetings each quarter, during which time important information such as volume outlooks, industry trends, project status, and relevant financial data would be shared.  (Compl. ¶¶ 58-63.)

Specifically, the Remarketing Agreement required either party, after deciding to remarket the other party's product, to submit 1) an initial three-year forecast of volume requirements, 2) interval three-month forecasts for the coming twelve month period, and 3) firm purchase orders at least ninety days prior to a delivery date.[8]  (Compl. ¶¶ 64-65.)  Chipcom recognized the importance of the forecasts, stating in its March 30, 1995 10K report that the "volume of products to be sold by the Company to IBM [was] based on forecasts supplied by IBM and not on specific purchase requirements."  (Compl. ¶ 69.)  In addition to the formal requirements, plaintiffs allege that informally

> IBM and Chipcom constantly communicated at various organizational levels . . . in order to remain current as to the state of all aspects of their relationship, including inventory needs, product and spare parts levels, forecasts of purchasing requirements, development projects, engineering changes and the sales and purchases of Remarketing products.

(Compl. ¶ 62.)

Chipcom began selling products to IBM under the Alliance Agreements in the fourth quarter of 1992.  Over the next two years, sales to IBM increased dramatically:

---

[8]Modifications or cancellations of purchase orders were strictly controlled, triggering penalties under an agreed upon schedule.  (Compl. ¶ 67.)

IBM Contribution to Chipcom Revenues
(in millions)

| | 1993 | 1Q94 | 2Q94 | 3Q94 | 4Q94 | 1994 | 1Q95 |
|---|---|---|---|---|---|---|---|
| Total Revenue | | 51.9 | 61.3 | 71.7 | 82.9 | 267.8 | 86.2 |
| IBM $ | 34.0 | 15.5 | 25.7 | 29.6 | 31.6 | 102.4 | 30.6 |
| IBM % | 21.2 | 29.9 | 41.9 | 41.3 | 38.1 | 38.2 | 35.5 |

(Compl. ¶¶ 81, 85) (percentages supplied.)

Accordingly, Chipcom's total revenues increased. A February 7, 1995 press release announced that the fourth quarter of 1994 and fiscal year 1994 were "the most successful periods in the Company's 11-year history" (Compl. ¶ 84; Appendix, Ex. 3), that fourth quarter 1994 revenues were up 72% from the fourth quarter of 1993, and that earnings for the quarter were up 77%. (Compl. ¶ 84.)

Chipcom's total revenues continued to increase from the fourth quarter of 1994 through the first quarter of 1995. In fact, an April 19, 1995 press release statement reported record first quarter revenues for 1995 of $86.21 million, a 66% increase over the first quarter of 1994. In addition, the company announced quarterly net income of $8 million--or $0.45 per share--a 300% increase over the first quarter of 1994. (Compl. ¶ 111.) IBM's contribution to total revenues dipped only slightly from $31.6 million to $30.6 million. (Compl. ¶ 85.)

Also on April 19, 1995, Chipcom made its first *public projection* for the second quarter, announcing that IBM revenues would be in the $24 million range (20% down from first quarter). Since February, the *internal* projections for second quarter IBM revenues had dropped from $30 million to approximately $22 million throughout March, with the exception of a $32 million

March 17 estimate.  Nevertheless, since early February, the
*yearly* IBM revenue projections remained constant, and the yearly
*total* revenue projections actually increased during early March.
(Appendix, Exs. 1, 2, 15, 16, 20.)

Ultimately, however, sales to IBM suffered a more severe
setback during the second quarter of 1995.  On May 26, 1995,
Chipcom lowered the prediction to $15 million (50% down from
first quarter).  The plaintiffs allege that the defendants knew
of the gravity of the developing "IBM problem," yet misled
investors by failing to disclose the information--while
continuing to make optimistic statements--thereby artificially
inflating stock prices.  In support, plaintiffs' Complaint
identifies numerous statements alleged to have been made by
Chipcom, the individual defendants and other third-parties.  The
statements are derived from various documents--press releases,
internal memos, transcripts of conference calls with analysts,
and transcripts of interviews.[9]  Finally, plaintiffs set forth

_____

[9]I note that defendants too readily reduce the 79-page, 164-
paragraph Complaint to "seven statements."  (Defs.' Mem. in Supp.
of Mot. to Dismiss at 3.)  In contrast, the meandering and
loosely organized Complaint repetitively weaves fragmented
portions of over twenty documents throughout the 164 paragraphs,
creating the illusion of greater quantity.
        At an April 10, 1996 hearing on the motion to dismiss, the
plaintiffs identified as actionable eight dated communications,
captured in identifiable documents, which I find contain sixteen
discrete statements.  I find the proper approach for review is to
demarcate each "discrete unit" of language capable of legal
analysis.  "Statements" for purposes of securities analysis does
not necessarily refer to "documents" or "sentences" but to
identifiable language capable of legal analysis.  See, e.g.,
Shapiro v. UJB Financial Corp., 964 F.2d 272, 284 (3rd Cir.),
cert. denied, 506 U.S. 934 (1992) ("In light of the confusion
that pervades plaintiffs' allegations, we conclude that the
entire complaint must be reorganized. . . . on remand plaintiffs

additional facts consisting of internal projections, and insider
trading figures.

**A.    Alleged Actionable Statements**
       (emphasis added)

[<u>February 7, 1995</u>: 1994 yearly and quarterly results announced.]

1.    <u>February 8, 1995 Press Release</u>:

    a. [Chipcom and IBM] today announced a <u>significant,</u>
<u>multiyear expansion</u> to the existing strategic,
worldwide development and marketing alliance between
the two firms, originally signed in September, 1992,
to now include several new product and technology
areas.
(Appendix, Ex. 4; Compl. ¶ 150(a)(i), 89.)

    b. <u>Held Statement</u>
This extension <u>strengthens</u> our <u>already strong alliance</u>
with IBM. . . . The IBM-Chipcom relationship <u>has been</u>
<u>mutually beneficial from day one</u>, and we are obviously
extremely delighted that IBM has endorsed our Ethernet
and Token Ring stackable hubs and Ethernet switching
technologies as important additions to their product
arsenal.
(Appendix, Ex. 4; Compl. ¶ 91.)

2.    <u>March 6, 1995 Abraham Statement in Business Wire</u>:
[Chipcom, IBM and Ericsson announcing their intention to enter
into a strategic relationship to introduce multimedia networking
solutions to business communication market.]

    a. This three-company relationship <u>builds</u> on Chipcom's <u>already</u>
<u>strong</u> and <u>recently expanded strategic alliance</u> with IBM and
is the next step in deepening and widening our existing
reseller relationship with Ericsson. . . .
(Appendix, Ex. 17; Compl. ¶¶ 99, 150(c)(i).)

---

should rearrange the existing allegations into discrete units
that are, standing alone, each capable of evaluation under the
legal principles we have set forth").
    In addition, at the April 10, 1996 hearing I ordered that
the original documents which plaintiffs contend captured the
actionable statements be promptly submitted to the court as an
appendix to the Complaint.   The reasons for requiring the
Appendix were 1) to allow assessment of the Complaint in light of
Rule 9(b)'s particularity requirement, and 2) to provide context,
completeness, and comparison against plaintiffs' truncation and
paraphrasing in the Complaint.
    I may refer to the full texts of plaintiffs' documents--now
an Appendix to the Complaint itself--under the authority of
<u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993) and <u>San Leandro</u>
<u>Emergency Medical Group v. Philip Morris Companies</u>, 75 F.3d 801,
808-809 (2d Cir. 1996).

b. The broad, complementary technology base of Ericsson, IBM and Chipcom will serve as an <u>excellent foundation for the exciting product development activities ahead of us</u>.
(Appendix, Ex. 17; Compl. ¶¶ 99, 150(c)(i).)

3. <u>March 30, 1995 Held Letter in Annual Report</u>:

[addressing several reasons for the success during 1994 . . . ] Chipcom's <u>third-party relationships were important</u> to the Company's success in 1994, especially our strategic marketing and development alliance with IBM which <u>remains strong and mutually beneficial</u>. IBM's ongoing[10] investments in [ATM] and Token Ring technologies, combined with Chipcom's internal development efforts, <u>will allow us to continue our expansion</u> in these important areas.
(Appendix, Ex. 21; Compl. ¶¶ 75, 83.)[11]

4. <u>April 5, 1995 Business Wire Report</u>:
[preliminary first quarter 1995 revenues announced]

[D]ue to recent heavy trading volumes in its stock [the company decided to announce] preliminary financial results for the first quarter. . . . <u>The company announced that, on the basis of information available to date, revenue for the quarter is expected to be approximately $86 million</u>, and earnings per share are expected to range between $0.44-$0.46.
(Appendix, Ex. 22; Compl. ¶ 104.)

5. <u>April 6, 1995 Radio Interview (Held Statements)</u>:

a. [The] Company <u>expects to have another very good year</u>. We are forecasting <u>for the year</u> . . . analysts are forecasting and we are supporting forecast[s] which would place the Company at the $370 million revenue range and the $2 dollar to maybe a little above range for earnings <u>for the year as a whole</u>. Those

---

[10]Plaintiffs use the adjective "continuing" (<u>see</u> Compl. ¶ 39), while "ongoing" is used in the original document. (Appendix, Ex. 21.)

[11]An almost identical statement by Held appeared in the February 7, 1995 press release announcing 1994 yearly and fourth quarter results:

Chipcom's third-party relationships were also important to the company's success [ ] especially our strategic marketing and development alliance with IBM which <u>remains strong and mutually beneficial</u>. IBM's ongoing investments in ATM and Token Ring technologies will allow us to <u>continue expanding</u> our product lines in these important areas.
(Appendix, Ex. 3, Compl. ¶ 84.)

10

forecasts, are very reasonable. . . .

b. [The] IBM relationship continues to be a very important relationship for Chipcom, in multiple senses. It is both a technology relationship as well as a sales channel.

c. [A]s a sales channel it has been very, very successful for us. We are very happy with the way it's performing overall . . . year to year growth has been very strong. . . .

d. [Chipcom and IBM's transition from ONline to ONcore is] going very well. . . . [T]he exact balance between these two products is always a little hard to forecast. IBM is [] moving through the transition as are we . . . in any transition, you have to be very careful about how you manage the stock [IBM's inventory]. But IBM's actual performance in Q1 for both products [ONline and ONcore] was substantially higher than it was, for example, a year ago. (Appendix, Ex. 24; Compl. ¶¶ 106-108; 35.)[12]

6.  April 11, 1995 Robertson Stephens & Co. Statement: (distributed April 19, 1995)

Chipcom's management preannounced guidance for the quarter that was completely consistent with previous guidance and our expectations for the quarter. As a result, the final results should come as no surprise to anyone. The real issue remains forward guidance. There have been numerous concerns expressed among investors that Chipcom's business with IBM (40% of revenue) may not be growing as fast as it had been in previous quarters and that IBM may have some inventory building throughout its organization. As such investors seem concerned with future earnings potential. Management has indicated that it feels comfortable with the IBM relationship and current demand, and it has not changed financial guidance for the year. (Appendix, Ex. 25; Compl. ¶ 109.)

7.  April 19, 1995 Press Release:

Driven by strong performances in its reseller channels and continued customer acceptance of the company's products and overall technology direction, [Chipcom] today announced record sales for the first quarter of its 1995 fiscal year, ended April 1. [reporting revenues of $86.21 million, a 66% increase over the first quarter of 1994, and net income of $8 million, or $0.45 per share, a 300% increase over the first quarter of 1994.] (Appendix, Ex. 26; Compl. ¶¶ 111, 112.)

---

[12]I note that plaintiffs' Complaint makes material omissions when compared to the original document now supplied in the Appendix.

11

8.    Badavas Statements to Analyst:

    a.  Badavas Statements to Analyst
        Gross margins in the quarter [Q1 1995] of 52.7% was
        fully in line with our expectations and our guidance .
        . . Distribution [to] IBM in the quarter, $30.6
        million [was] fully in line with our guidance as of
        the February conference call . . . .
        (Appendix, Ex. 27; Compl. ¶ 32.)

    b.  I would nominally say at this point that it is our
        expectation based on what we know now that our
        sequential shipment stream to IBM will be down
        approximately 20% from its first quarter level.  To do
        the arithmetic, that says that we are in the $24
        million range in the second quarter.
        (Appendix, Ex. 27; Compl. ¶¶ 36, 116.)

    c.  Held Statements to Analysts
        IBM did get off to a slow start from a sales point of
        view during the early part of the year, that and mix
        issues . . . which result from the transition of
        products from 8250 to 8260 has resulted in an
        imbalance in the IBM inventory position which does
        mean that we do expect that in all probability we will
        be reducing our Q2 IBM shipments to rebalance, to give
        them a chance to rebalance their inventory, a problem
        which we expect to be by us by the end of Q2.
        (Appendix, Ex. 27; Compl. ¶ 114.)

    d.  [T]he product transition from 8250 to 8260
        business has created an imbalanced inventory position
        at IBM.  This will in all probability mean reducing
        our Q2 IBM shipments to rebalance, to give them a
        chance to rebalance their inventory.  We expect by the
        end of Q2 IBM will be back on track and in balance.
        This reduction is being nicely picked up by steady
        healthy growth in our trade channels.
        (Appendix, Ex. 27; Compl. ¶¶ 35, 108.)

## B.    Additional Statements By Defendants

    In addition to the allegedly actionable statements,

plaintiffs refer to the following public statements by

defendants:

    1.  May 12, 1995 10-Q Report:

        [R]evenue derived from IBM during the second quarter
        of 1995 will be below the level reported in the first
        quarter due to an inventory imbalance that currently
        exists within IBM.
        (Compl. ¶ 133.)

    2.  May 26, 1995 Press Release (Held Statement):
        [There will be] lower shipment levels to IBM . . .

12

consequently, Chipcom's <u>revenue expectations</u> for the <u>second quarter</u> <u>and the year</u> will be reduced. (Compl. ¶ 136.)

3.    **May 26, 1995 Conference Call to Analysts:** [Announcing IBM second quarter revenue projection of about $15 million, 50% down from first quarter results, and a yearly earnings projections almost 50% lower than April 6, from $2.00 per share to $1–$1.30 per share.] (Compl. ¶ 138.)

   a.    **Held Statement:** Our revenue shortfall seems to be directly related to a major reorganization that happened in IBM early in 1995 in the field, the networking sales specialists in the U.S. which we had trained in 1993 and 1994 were disbursed throughout the general salesforce and apparently this caused a drop in activity which showed up as a reduction in the pipeline for new order. <u>The pipeline from Q3 to Q4 1994 activity carried us in Q1 [1995], but apparently was quite dry by the end of Q1.</u> (Compl. ¶ 139; 71.)

   b.    **Badavas Statement:** [IBM] does not currently sell ONsemble . . . they will begin selling ONsemble in the second half of the year. (Compl. ¶ 118.)

C.    **Additional Statements By Analysts**

In addition to the allegedly actionable Business Wire (A4) and Robertson Stephens (A6) statements, plaintiffs refer to certain other third-party statements:

1.    **February 10, 1995 Boston Business Journal:**

   [Noting the high percentage of Chipcom sales through IBM was sparking industry speculation that IBM would buyout Chipcom]. (Compl. ¶ 93(a).)

2.    **February 15, 1995 Computergram International:**

   [Chipcom and IBM] are getting so co[z]y [that IBM may be acquiring Chipcom]. (Compl. ¶ 93(b).)

3.    **February 15, 1995 PaineWebber Statement:**

   [Announced an extension of Chipcom's relationship with IBM, IBM's agreement to take Chipcom's new stackable hubs and switching hubs, and a resulting $10 million increase in IBM's contribution to Chipcom's revenues.]

The <u>signing of an extended relationship with IBM . . .</u>
<u>will sustain 30-40% revenue growth in the IBM channel</u>
<u>in 1995.  Non-IBM channels are still very healthy</u>
(estimated 64% growth in 1995) and the faster growth
here would normally lead to improving gross margins. .
. . More important, the extension of the relationship
signals no wavering in IBM's commitment to CHPM . . .
<u>interdependencies are building between both parties</u> .
. . .

(Compl. ¶¶ 150(b), 93(c).)


4.    <u>April 20, 1995 Cowen & Co. Statement</u>:

Chipcom [attributed the inventory imbalance] to IBM's
forecasting process which resulted in orders ahead of
their customer's requirements. . . . Chipcom <u>expects</u>
<u>IBM inventory levels to normalize in 2Q</u> . . . .
(Compl. ¶¶ 37, 130.)


5.    <u>April 20, 1995 NatWest Statement</u>:

The key issue in the quarter was the IBM relationship,
and an <u>inventory problem</u> . . . which will result in
lower sequential shipments to IBM in 2Q.  The company
indicated that inventory of specific modules . . . are
currently in <u>oversupply at IBM</u>, and projects that it
will take several months to work through the
inventory. . . . <u>The company indicated that the reason</u>
<u>for the inventory imbalance was related to IBM's</u>
<u>internal planning</u> over the last two quarters. . . .
Although we are concerned by the buildup of inventory
at IBM, we believe that much of this concern is
already reflected in the price of the stock and that
<u>there is a credible scenario for a turnaround in the</u>
<u>second half.</u>
(Compl. ¶¶ 124, 125, 130.)


6.    <u>April 20, 1995 Robertson Stephens & Co. Statement</u>:

[I]nvestors have been very concerned recently about
Chipcom's relationship with IBM.  The concerns ranged
rom a complete falling apart of the relationship to
too high of inventories in the IBM channel  . . . On
the analysts' conference call . . . <u>management stated</u>
<u>that IBM does have too much inventory of the current</u>
<u>generation intelligent hubs (IBM 8250) and that it</u>
<u>will take at least one full quarter to work through</u>
<u>the problem.</u>
(Compl. ¶ 123.)


7.    <u>April 20, 1995 PaineWebber Statement</u>:

The company indicated that while shipments may be down
as much as 20% in Q2, <u>CHPM felt it could rectify the</u>
<u>IBM problem by the end of Q2.</u>
(Compl. ¶¶ 37, 122.)

8.   <u>May 30, 1995 Robertson Stephens & Co. Statement</u>:

[after stating that they would be lowering their
investment recommendation . . .] It is very hard for
us to conceive of demand for these products dropping
so precipitously in such a short time period.  We can
only conclude that either the shipment levels in 1994
were significantly higher than end demand, therefore
the inventory problem is much greater than described
or IBM's reselling of the next generation 8260
(Chipcom's ONcore) is not going as well as Chipcom
would have hoped.
(Compl. ¶ 144.)

9.   <u>June 7, 1995 Wall Street Journal Article Entitled,
"Chipcom Shares Dumped Prior to IBM's News"</u>:

[Chipcom spokesperson] says the information was
released in a 'timely fashion.' . . . But an IBM
spokesman was less certain.  He said there were
several meetings between IBM and Chipcom officials
'earlier in the year' at which the developing problems
were discussed.
(Sahid Declaration, Ex. 1; Compl. ¶¶ 6, 71, 142-143.)

D.   **Internal Projections**

The Complaint sets forth the following internal projections

for revenues (in millions):

| 1995 | Second Quarter (IBM) | 1995 (IBM) | Total |
|---|---|---|---|
| January 16, 1995 | $37 | 148 | 430.5 |
| February 6, 1995 | $30 | 127.7 | 382 |
| March 3, 1995 | $22 | 128 | 421 |
| March 6, 1995 | $22 | 129.7 | 422.7 |
| March 17, 1995 | $32[13] | 129 | 380 |
| April 19, 1995* | $24 | -- | -- |
| April 26-27, 1995 | $24 ($2.4 from ONsemble) | 109.1 | 370.7 |
| May 26, 1996* | $15 | -- | 330-350 |

*made public

_____

[13]I note that plaintiffs assert in the Complaint that the
March 15 second quarter projection was $22, presumably to bolster
their contention that Chipcom knew throughout March--and failed
to disclose--that IBM's second quarter revenues would be
significantly lower than the first quarter.  (Compl. ¶ 87.)
However, the March 17 internal projection document submitted by
plaintiffs to particularize this allegation shows a figure of $32
million, substantially undermining this argument.  (Appendix, Ex.
20.)

(Appendix, Exs. 1, 2, 15, 16, 20, 33, 35, 42; Compl. ¶ 87.)

In addition, plaintiffs refer to the following non-public statement captured in an April 5, 1995 internal memorandum. The memorandum comments on historical facts, and, in general terms, projections for the first quarter:

1. April 5, 1995 Internal Memorandum:

> We met today with IBM to review Q1 volumes. Since the recent drop in our stock price has been attributed by many to softness in our IBM business, it is important that we understand the real numbers. . . . The 1Q95 numbers are partial because they do not include all March shipments. . . . When shipments to US, Canada, Latin America and Asia/Pacific are added, the 1Q95 results should go up at least 25%. The point is that year-to-year growth is strong. Quarter-to-quarter results show a decline that reflects the normal seasonality of IBM business. The 8250 is on-track against the seasonal plan, while the 8260 is somewhat behind, but not disastrously so. 8260 volumes in 1Q95 were negatively affected by numerous problems in the new token ring products. IBM does not track shipments to internal IBM customers, which were very strong in 1Q95. . . . The point is that IBM's hub business is reasonably healthy. . . . it could be a lot better, it they assign better sales people to networking. We are working hard to convince them to do this.
> (Appendix, Ex. 23; Compl. ¶ 103.)

E.    Alleged Insider Trading

Finally, the Complaint details alleged trading by the individual defendants during the class period:

| Insider | Date | # Shares | Sold Price |
|---|---|---|---|
| Menachem Abraham | 2/10/95 | 17,155 | $45.75 |
| John Held | 2/10/95 | 10,000 | $45.75 |
| Robert Badavas | 2/10/95 | 10,000 | $46.00 |
| John Meyer[14] | 2/10/95 | 10,000 | $46.50 |
| Bruce Cohen | 2/16/95 | 15,000 | $42.875 |
| | | | |
| Jerald Fishman | 3/09/95 | 500 | $42.50 |
| | 3/10/95 | 500 | $43.00 |
| | 3/10/95 | 500 | $43.38 |
| | 3/17/95 | 2,000 | $43.50 |
| | | | |
| Menachem Abraham | 4/26/95 | 12,000 | $30.00 |
| Bruce Cohen | 4/27/95 | 6,000 | $32.00 |
| | 4/27/95 | 9,000 | $32.25 |
| John Held | 4/27/95 | 2,000 | $32.25 |
| | 4/27/95 | 4,000 | $32.00 |
| Robert Badavas | 4/28/95 | 10,000 | $31.88 |
| John Held | 4/28/95 | 4,000 | $31.75 |

| Totals: | Shares Sold | Proceeds | Est. Profits[15] |
|---|---|---|---|
| Menachem Abraham | 29,155 | $1,144,841[16] | |
| Bruce Cohen | 30,000 | $1,250,000 | >$580,000 |
| Robert Badavas | 20,000 | $778,800[17] | >$530,000 |
| John Held | 20,000 | $777,000 | >$475,000 |
| Jerald Fishman | 3,500 | $151,440 | |
| John Meyer | 10,000 | $465,000 | |
| | 112,655 | $4,567,081[18] | |

(Compl. ¶¶ 8, 17-23, 150-51.)

---

[14] I note that John Meyer, Vice President of Human Resources, is *not* a named defendant. Meyer sold 10,000 shares on February 10, 1995 realizing proceeds of $465,000. He then purchased 10,000 shares on the same day for approximately $187,000, a gain at sale of over $278,000. (Compl. ¶ 23.)

[15] (Compl. ¶¶ 17-22.)

[16] This figure is based on the 17,155 figure indicated in ¶¶ 150(a)(ii) and 151 of the Complaint. Elsewhere, it appears that plaintiffs have used the figure 17,500, producing a total number of shares sold of 29,500 and total proceeds of 1,160,625 (see ¶ 8, 20). In addition, the 17,155 figure, which I employ, produces a grand proceeds total of $4,567,081. (Cf. Compl. ¶ 29.)

[17] Plaintiffs inadvertently indicate the total as $778,000.

[18] Cf. $4,517,815 (Compl. ¶ 29.)

III.

In reviewing the motion to dismiss, I "take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (citing Monahan v. Dorchester Counseling Ctr., 961 F.2d 987, 988 (1st Cir. 1992)). Furthermore, I may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Roeder v. Alpha Indus., 814 F.2d 22, 25 (1st Cir. 1987) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

A.    Section 10(b) and Rule 10b-5

Count I alleges violations of § 10(b), and corresponding Rule 10b-5, of the Securities Exchange Act of 1934, against *both* Chipcom and the individual defendants.  Section 10(b) makes it unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  In conjunction, Rule 10b-5, promulgated by the Securities and Exchange Commission, further provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to

18

> defraud,
> (b) To <u>make any untrue statement of a material fact or
> to omit to state a material fact necessary in order to
> make the statements made</u>, in the light of the
> circumstances under which they were made, not
> misleading, or
> (c) To engage in any act, practice, or course of
> business which operates or would operate as a fraud or
> deceit upon any person, in connection with the purchase
> or sale of any security.

17 C.F.R. § 240.10b-5 (emphasis added).

In order to state a claim under § 10(b) and Rule 10b-5, the plaintiffs must show that: (1) the defendants made a misrepresentation or omission of material fact, (2) with scienter, (3) upon which the plaintiffs relied, (4) and that caused damages to the plaintiffs. <u>Van De Velde v. Coopers & Lybrand</u>, 899 F. Supp. 731, 734 (D. Mass. 1995) (citing <u>Basic v. Levinson</u>, 485 U.S. 224, 230-32 (1988)). A material fact is one that is "likely to be viewed by the reasonable investor as significantly altering the total mix of available information." <u>Colby v. Hologic, Inc.</u>, 817 F. Supp. 204, 209 (D. Mass. 1993) (citing <u>TSC Indus., Inc. v. Northway</u>, 426 U.S. 438, 445 (1976)); <u>Lucia v. Prospect St. High Income Portfolio, Inc.</u>, 36 F.3d 170, 175 (1st Cir. 1994). The Supreme Court has defined the scienter requirement as "a mental state embracing intent to deceive, manipulate or defraud." <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 194, n.12 (1976).

In addition, Rule 9(b) of the Federal Rules of Civil Procedure requires that the plaintiffs state all allegations of fraud, such as those presented here, with particularity. Fed. R. Civ. P. 9(b). The First Circuit strictly construes this

19

requirement in the securities fraud context:

> [G]eneral averments of the defendants'
> knowledge of material falsity will not
> suffice.  Consistent with Fed.R.Civ.P. 9(b),
> the complaint must set forth 'specific facts
> that make it reasonable to believe that
> defendant[s] knew that a statement was
> materially false or misleading.'  The rule
> requires that the particular 'times, dates,
> places or other details of [the] alleged
> fraudulent involvement' of the actors be
> alleged.

Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st

Cir. 1994) (citations omitted).[19]  If the allegations of fraud are

based upon information and belief, the complaint must state "the

source of the information and the reasons for the belief."

Romani v. Shearson Lehman Hutton, Inc., 929 F.2d 875, 878 (1st

Cir. 1991).  The plaintiffs must meet these requirements even if

the "fraud relates to matters peculiarly within the knowledge of

---

[19]Contrary to defendants' allegation, plaintiffs do not argue
that "notice pleading" is the correct standard.  Plaintiffs
merely rely on First Circuit cases, such as Wayne Investment,
Inc. v. Gulf Oil Corp., 739 F.2d 11, 13 (1st Cir. 1984), which
link particularity to notice.  For example, Wayne describes the
"special pleading requirement" of "particularity" as "provid[ing]
the defendant with notice of the grounds on which plaintiff's
fraud claim rests."  Id.
    Defendants correctly argue that the roles of the individual
defendants must also be particularized, Manchester Manufacturing
Acquisitions, Inc., v. Sears, Roebuck & Co., 802 F. Supp. 595,
600 (D.N.H. 1992), in order to insure that officers and directors
are not sued solely on the basis of status, Loan v. Federal
Deposit Ins. Corp., 717 F. Supp. 964, 968 (D. Mass. 1989), and so
that each defendant is given notice of his specific alleged role.
Konstantinakos v. Federal Deposit Insurance Corp., 719 F. Supp.
35, 38 (D. Mass. 1989).  Here, unlike the facts in Loan and
Konstantinakos, plaintiffs have attributed specific statements to
defendants Held, Badavas, and Abraham (but not to Cohen or
Fishman.)  However, as discussed below, while individual roles
may be particularized, the statements are not actionable.

20

the opposing party." <u>Id.</u>; <u>Lucia</u>, 36 F.3d at 174. "To survive a motion for dismissal [] a complaint must contain, at a minimum, 'factual allegations that would support a reasonable inference' that 'circumstances adverse' to the defendant's statements 'were known and deliberately or recklessly disregarded' at the time the statements were made." <u>Colby</u>, 817 F. Supp. at 210 (citing <u>Romani</u>, 929 F.2d at 878.)[20]

---

[20]I note, but do not here rely upon the fact, that the pleading standard has recently been heightened by the December 22, 1995 enactment--overriding the President's veto--of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, § 101(b), 109 Stat. 737, 747 (to be codified at 15 U.S.C. § 78u-4). Section 101(b), adding a new section 21D to the Securities Exchange Act of 1934, was designed to conform to Rule 9(b), to resolve differences within the circuits, and to strengthen existing pleading requirements--following but not codifying the pleading standard of the Second Circuit. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995).

Although not applicable to pending actions (<u>see</u> § 108) such as this, Section 101(b) provides that a complaint should be dismissed if the requirements of paragraphs (1) and (2) are not met:

> (1) MISLEADING STATEMENTS AND OMISSIONS--In any private action arising under this title in which the plaintiff alleges that the defendant--
> (A) made an untrue statement of a material fact; or
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
> the <u>complaint shall specify each statement alleged to have been misleading</u>, <u>the reason or reasons why the statement is misleading</u>, and, if an allegation regarding the statement or omission is made on information and belief, the <u>complaint shall state with particularity all facts on which that belief is formed</u>.

> (2) REQUIRED STATE OF MIND--In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint

In this case, plaintiffs argue that a reasonable inference can be drawn from the close relationship with IBM (including the meeting and review process), the internal projections, the extent of insider trading, as well as statements by defendants and outsiders, that defendants knew *before* May 26--as well as before April 19--that second quarter IBM revenue would be significantly lower.  Thus, plaintiffs argue for a contextual analysis of all proffered facts, see McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir. 1990), cert. denied, 501 U.S. 1249 (1991), while defendants analyze and dismiss the statements individually.

1.   Alleged Actionable Statements

As discussed above, the Complaint contains numerous statements of varying types by defendants--historical summaries, predictions, puffery--as well as statements by third parties. However, analyzed individually, I find none of the allegedly actionable statements supports a cause of action.

First, with respect to historical statements, "defendants may not be held liable under the securities laws for accurate

_____

shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

§ 101(b) (emphasis added).
    The Act does not specify the required state of mind, and a Conference Committee amendment was rejected which would have incorporated the Second Circuit's standard of allowing a "strong inference" to be demonstrated by particularized pleadings of motive, opportunity or recklessness.  See, e.g., San Leandro, 75 F.3d at 813; Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995).

reports of past successes, even if present circumstances are less rosy." Serabian, 24 F.3d at 361; Capri Optics Profit Sharing v. Digital Equipment Corp., 950 F.2d 5, 8 (1st Cir. 1991) (accurate past results not actionable). See also In re Caere Corporate Securities Litigation, 837 F. Supp. 1054, 1058 (N.D. Cal. 1993) (historical statements "contain no implicit prediction that those events or conditions will continue in the future").

· Second, "optimistic predictions about the future that prove to be off the mark likewise are immunized unless plaintiffs meet their burden of demonstrating intentional deception." Serabian, 24 F.3d at 361 (citations omitted); Capri Optics Profit Sharing, 950 F.2d at 11 (finding "well poised [for the next quarter]" no promise of future success and thus not actionable). In Serabian, the First Circuit stated that a defendant could, for example, state: "'This is our eighth consecutive quarter in which our gross has increased,' [without the] duty to add, for the benefit of market buyers, 'We are concerned about the next one.'" Id. at 361, n.4. The First Circuit explained, however, that the rule might be different if "defendant's apprehension was of a disaster." Id. (citation omitted.) See also In re Healthcare Compare Corp. Securities Litigation, 75 F.3d 276, 281 (7th Cir. 1996) ("forward-looking statements need not be correct; it is enough that they have a reasonable basis") (citation omitted).[21]

---

[21]The Private Securities Litigation Reform Act of 1995 (see above n. 20) appears also both to clarify and heighten the pleading and proof requirements for forward-looking statements, by adding a new section 21E to the Securities Exchange Act of

Similarly, vague and general positive comments--"puffery"--
concerning the present or future are not actionable. Serabian,
24 F.3d at 361 ("look[ing] to the future with great optimism" is
"clearly inactionable puffing") (citation omitted). See also San
Leandro Emergency Medical Group v. Philip Morris Companies, 75
F.3d 801, 811 (2d Cir. 1996) (vague statements not actionable
because no reasonable investor would rely on them); Gross v.
Summa Four, Inc., No. C-94-364-B, 1995 WL 806823 at *10 (D. N.H.
Nov. 8, 1995) (same); Rand v. Cullinet Software, Inc., 847 F.
Supp. 200, 208 (D. Mass. 1994) (finding statements "optimistic
about the year ahead" and "long term prospects bright" not
actionable) (citing cases).

Analyzed individually none of defendants' statements are
actionable.[22] Historical statements are found in A1(b) ("IBM-
Chipcom relationship has been mutually beneficial from day one");

---

1934. Again, I note--although I do not treat as operative in
this case commenced before the effective date of the Act--that
section 102(b) of the Act creates a "safe harbor" for forward-
looking statements that are:

(A)   (i) identified as forward-looking and accompanied by
      meaningful cautionary statements or
      (ii) immaterial; or
(B)   (i) made by a natural person who did not have actual
      knowledge that the statements were false or misleading;
      or
      (ii) made by a business entity, by or with the approval
      of an executive officer, who did not have actual
      knowledge that the statements were false or misleading.

See § 102(b).

[22]I will refer to the statements by the letter and number
denoting the statements in section II above.

24

A3 ("third-party relationships were important"); A5(c) ("[IBM channel] has been very, very successful" . . . "very happy with [performance] overall" . . . "year-to-year growth has been very strong"); A5(d) ("performance [in 1Q95] for both products was substantially higher [than 1Q94]"); A7 and A8(a) (reporting 1995 first quarter results); and A8(c) (transition "has resulted in an imbalance in the IBM inventory position").

Future-oriented comments are found in A4 ("revenue for [1Q95] expected to be approximately $86 million"); A5(a) ("expects to have another very good year" . . . "forecasting . . . $370 million revenue range. . . for the year"); A8(b) ("our expectation . . . $24 million range in the second quarter"); A8(c) ("expect to be by [inventory problem] by the end of Q2"); and A8(d) ("by the end of Q2 IBM will be back on track and in balance . . . reduction is being nicely picked up by steady healthy growth in our trade channels").[23]

Finally, general, positive statements, describing the present and future relationship with IBM are found in A1(a) ("significant multiyear expansion"); A2(b) ("excellent foundation" . . . "exciting product development activities"); A3 ("important" . . . "continue our expansion"); A5(b) ("continues to be a very important relationship"); A5(d) ("[transition to new products] going very well . . . in any transition you have to be

---

[23]Moreover, based on Chipcom's internal projection charts submitted by plaintiffs in the Appendix, Chipcom believed that 1995 would, generally, be a successful year, consistent with the $370 million public projection.  (See above section II(D).)

very careful about how you manage the stock"); and A6

("management has indicated that it feels comfortable with the IBM

relationship and current demand").[24]

  Plaintiffs argue that defendants' use of the word "strong"

---

[24]Moreover, the analyst statement (A6), is also not
actionable because there is insufficient allegation of
entanglement.  In general, where "defendants are alleged only to
have authorized or acquiesced in [statements] . . . or they are
attributed no role at all in the dissemination of the
statements," the requirements of Rule 9(b) have not been met.
Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 368 (1st
Cir. 1994).  Similarly, the Second Circuit has concluded that
dismissal of imputed statements is appropriate unless a defendant

        sufficiently entangled itself with the
        analysts' forecasts to render those
        predictions attributable to it . . . [by
        placing] its imprimatur, expressly or
        impliedly, on the analysts' projections.

Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir.
1980).  See also Raab v. General Physics Corp., 4 F.3d 286, 287
(4th Cir. 1993) ("The securities laws require [the company] to
speak truthfully to investors; they do not require the company to
police statements made by third parties for inaccuracies, even if
the third party attributes the statement to [the company]"); In
re Caere Corporate Securities Litigation, 837 F. Supp. 1054,
1059-60 (N.D. Cal. 1993) (sufficient entanglement occurs, for
example, when a defendant has reviewed the analysts' statements
and made an implied representation that the information is true).
  Plaintiffs assert that defendants routinely communicated
with several securities firms including PaineWebber, Robertson
Stephens & Co., NatWest Securities, and Cowen & Co. (Compl. ¶
30), and that routine conference calls followed a "standard
format" of giving "pre-release" guidance on operations and
financial prospects.  (Compl. ¶¶ 31-33.)  Plaintiffs argue that
"defendants made these communications in order to cause or
encourage them to issue favorable reports concerning Chipcom and
. . . to falsely present the operations and prospects of Chipcom
to the marketplace in a favorable light and to artificially
inflate the market price of Chipcom's common stock."  (Compl. ¶
31.)  However, while plaintiffs have alleged facts of "guidance"
(see Compl. ¶¶ 30-33, 37, 109), they have alleged facts of
ratification only in A5(a).

in certain future-oriented statements goes beyond mere puffery:
A1(b) (multiyear extension "strengthens our already strong
alliance with IBM"); A2(a) ("three-company relationship builds on
Chipcom's already strong and recently expanded strategic alliance
with IBM"); and A3 ("alliance with IBM [ ] remains strong and
mutually beneficial").

Not surprisingly, the adjective "strong" frequently appears
in challenged statements, but the weight of authority finds that
such language is mere puffery in a context like that alleged
here.  See, e.g., San Leandro, 75 F.3d at 805-807, 811
("expecting a strong year" . . . "Marlboro is still very strong
in the face of very low pricing" . . . "the tobacco business is
strong and growing" . . . "We expect 1993 to mark another year of
strong growth in earnings per share" . . . "we expect to maintain
a strong competitive position in the discount category"); Searls
v. Glasser, 64 F.3d 1061, 1067 (7th Cir. 1995) ("[we] anticipate
continued strong demand for tire products") (quoting Cione v.
Gorr, 843 F. Supp. 1199, 1205 (N.D. Ohio 1994)); Capri Optics,
950 F.2d at 11 ("international business . . . remains strong");
Fisher v. Acuson Corp., No. C93-20477RMW, 1995 WL 261439 at *4
(N.D. Cal. April 26, 1995) ("[the new product establishes] a
strong platform"); Gross, 1995 WL 806823 at ** 2-3, 8 ("strong
financial position" . . . "business is very strong" . . .
"business remains strong"); In re Syntex Corp. Securities
Litigation, 855 F. Supp. 1086, 1096 (N.D. Cal. 1994) ("[we
expect] a very strong fiscal 1993"); In re Ross Systems

27

<u>Securities Litigation</u>, No. C-94-0017-DLJ, 1994 WL 583114 at *8

(N.D. Cal. July 21, 1994) ("strong" . . . is example of "vaguely

worded expectation"); <u>In re Caere Corporate Securities</u>

<u>Litigation</u>, 837 F. Supp. at 1057-1058 ("continuing strong

sales").[25]

Plaintiffs urge consideration of <u>McCarthy v. C-Cor</u>

<u>Electronics, Inc.</u>, 909 F. Supp. 970 (E.D. Pa. 1995). In

<u>McCarthy</u>, the plaintiffs alleged that the following press release

was actionable:

> Looking ahead, we expect strong revenues for
> the second half of the year, although in the
> third quarter, the earnings are expected to
> reflect the start-up costs for Reedsville.
> We anticipate a strong fourth quarter and
> continue to have a record backlog.

909 F. Supp. 974-75. Judge Pollak denied the motion to dismiss,

finding that the reference to "strong revenues" there was *not*

inactionable "puffing." However, while rejecting the approach of

the Fourth and Fifth Circuits--that predictions are immaterial

unless worded as guarantees, <u>id.</u> at 976-77 (citing <u>Raab v.</u>

<u>General Physics Corp.</u>, 4 F.3d 286, 290 (4th Cir. 1993); <u>Krim v.</u>

<u>BancTexas Group, Inc.</u>, 989 F.2d 1435, 1446 (5th Cir. 1993))--the

<u>McCarthy</u> court explained that each prediction must be given

independent analysis. The court listed factors to consider,

---

[25]<u>Cf.</u> <u>Serabian</u>, 24 F.3d at 364-365 (denying motion to dismiss
when sufficient facts showed internal knowledge of problems
*combined with* public statements describing capabilities as
"strong"); <u>Shapiro</u>, 964 F.2d at 283 (finding collection of
statements which specifically addressed loan loss reserves--
including "adequate," "adequately maintained," "strong," and
"solid"--properly stated claim).

e.g.: 1) the specificity of the prediction ("strong demand" being more vague than "strong revenues"); 2) how far into the future the prediction extends ("long term predictions are necessarily less reliable"); and 3) the degree to which the prediction is inherently difficult or unreliable, for example the success of a merger. McCarthy, 909 F. Supp at 977.  Judge Pollak found that the statement at issue--which specifically addressed "strong revenues," looked into the future only three to six months, and involved the prediction of revenues which are "susceptible to somewhat reliable prediction"--was sufficient to state a claim. Id.

In sharp contrast, defendants' alleged statements incorporating the word "strong" are much less specific, each relating to the vague word "alliance."[26]  Second, the statements look much farther into the future ("multiyear expansion") (see A1(a)).  Third, the success of an "alliance" is inherently more difficult to measure with specificity than is the success of revenues.  Thus, I find McCarthy supports defendants' argument that the statements here involving "strong" are not actionable.[27]

---

[26]In fact, the only references to "strong" as applied to "revenues" are found in arguably historical statements:  D1 ("[Y]ear-to-year growth is strong; "shipments to internal IBM customers [] were very strong in 1995"); and A7 (1Q95 results "driven by strong performances in its reseller channels").

[27]Moreover, as in Rand, defendants' claim of a "strong alliance," without guaranteeing the future, rested on solid evidence of a very close relationship.  Rand v. Cullinet Software, Inc., 847 F. Supp. 200, 212 (D. Mass. 1994) ("customer acceptance of our products remains strong").

29

Plaintiffs also urge consideration of <u>Virginia Bankshares,</u> <u>Inc. v. Sandberg</u>, 501 U.S. 1083, 1090-95 (1991) (holding that knowingly false statements of belief or opinion, such as "high" value or "fair" price, may be actionable under 10(b)). However, as <u>Rand</u> has noted, <u>Virginia Bankshares</u> does not automatically transform puffery into an actionable statement. <u>Rand</u>, 847 F. Supp. at 208 (D. Mass. 1994). The key factor is whether a reasonable investor would have considered the statement important in initiating or continuing the investment. <u>Id.</u> Similarly, <u>McCarthy</u> recognized that even if language is as vague as that in <u>Virginia Bankshares</u>, a *case-by-case* analysis should be employed. <u>McCarthy</u>, 909 F. Supp. at 976. Thus, <u>Virginia Bankshares</u> holds only that if a reasonable investor would rely on the prediction then it would be actionable if false or misleading. Here, because the statements were so vague, they cannot, in turn, be actionable. See <u>Gross</u>, 1995 WL 806823 at * 10; <u>Capri Optics</u>, 950 F.2d at 10; <u>Cione</u>, 843 F. Supp at 1203.

Furthermore, in connection with certain of the allegedly actionable statements, the defendants did provide cautionary statements on April 6, 1995 ("[T]he exact balance between these two products is always a little hard for forecast. IBM is [] moving through the transition as are we . . . in any transition [you] have to be careful how you manage the stock") (see A5(d)), and on April 19, 1995 ("it is our expectation based on what we know now that our sequential shipment stream to IBM will be down

approximately 20% from its first quarter level" . . . "IBM did
get off to a slow start" . . . "resulted in an imbalance in the
IBM inventory" . . . "in all probability we will be reducing our
Q2 IBM shipments") (see A8(b)(c)).  Even the statement "we are
very happy with the way it's performing overall" (see A5(c)),
implies a consideration of the "whole picture"--both positive and
negative factors--and was fully consistent with yearly
projections.  Thus, as the Second Circuit explained in San
Leandro:

> the forward looking statements regarding
> projected [ ] earnings reflect hope,
> adequately tinged with caution, and that the
> total mix of information available to the
> market cannot reasonably be found to be
> misleading. . . . In any event, even the most
> positive statements by Philip Morris
> representatives at that time consisted of
> relatively subdued general comments . . .
> such puffery is not actionable.

San Leandro, 75 F.3d at 811.

    2.    Duty to Disclose

    Ultimately, plaintiffs argue that it is the failure *to
disclose information in conjunction with the above statements*
which is actionable.  A duty to disclose "does not arise from the
mere possession of nonpublic market information." Chiarella v.
United States, 445 U.S. 222, 235 (1980).  But companies must
disclose material information if there is a duty to disclose it.
Roeder, 814 F.2d at 26.  "When a corporation does make a
disclosure--whether it be voluntary or required--there is a duty
to make it complete and accurate." Id. (citing SEC v. Texas Gulf
Sulphur Co., 401 F.2d 833, 860-61 (2d Cir. 1968), cert. denied,

394 U.S. 976 (1969)).  Thus, even statements that are literally

true may be actionable because of a failure to disclose:

> Some statements, although literally accurate,
> can become, through their context and manner
> of presentation, devices which mislead
> investors.  For that reason, the disclosure
> required by the securities laws is measured
> not by literal truth, but by the ability of
> the material to accurately inform rather than
> mislead prospective buyers.

Lucia, 36 F.3d at 175 (citation omitted).

However, when a duty to disclose arises, only material

information must be disclosed, pursuant to the requirements of a

§ 10(b) action.  This is information which "a reasonable investor

might have considered important in the making of [the investment]

decision."  Roeder, 814 F.2d at 25.  This "does not mean that by

revealing one fact about a product, one must reveal all others

that, too, would be interesting, market-wise . . . ."  Backman v.

Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990).

Furthermore, it is axiomatic that there can only be a duty

to disclose if there is knowledge of something requiring

disclosure.  This brings the analysis back to the threshold issue

of particularity:  whether there are facts sufficient to show

knowledge.  It is clear in this connection that knowledge may be

inferred from other facts.  Serabian, 24 F.3d at 365 (finding

auditor's and consultants' reviews permitted inference that the

bank knew, or should have known, that its statements were

inconsistent); Steiner v. Unitrode Corp., 834 F. Supp. 40, 44-45

(D. Mass. 1993) (denying motion to dismiss due to inference of

knowledge).  See also Goldman v. Belden, 754 F.2d 1059, 1070 (2d

Cir. 1985) (finding complaint stated claim where knowledge could be inferred from a variety of facts).

Defendants argue that there was no duty to disclose because defendants had no direct *or* indirect knowledge, and that plaintiffs are relying solely on the "hindsight theory."  It is "well established that plaintiffs in a securities action have not alleged actionable fraud if their claim rests on the assumption that the defendants *must have known* of the severity of their problems earlier because conditions *became so bad later on*." Serabian, 24 F.3d at 367 (emphasis added).  See also Greenstone v. Cambex Corp., 975 F.2d 22, 25-26 (1st Cir. 1992); Berliner v. Lotus Development Corp., 783 F. Supp. 708, 710 (D. Mass. 1992) (finding conclusionary allegations of knowledge insufficient to state claim).

Plaintiffs steadfastly argue that they are not relying on the hindsight theory, but rather on *facts* which show a reasonable inference that defendants had the requisite knowledge before April 19, 1995.  These facts consist of 1) the alleged actionable statements, 2) defendants' internal projections, 3) insider trading, 4) additional statements by third-parties, and 5) the meeting and review process with IBM.  I decline to accept plaintiffs' argument.

First, the allegedly actionable statements, as analyzed above, have been shown not to be actionable when considered separately.  Second, defendants have no duty to reveal internal

33

projections or marketing plans.[28]  <u>Wilensky v. Digital Equipment</u>

<u>Corporation</u>, 903 F. Supp. 173, 177, 181 (D. Mass. 1995);  <u>Vaughn</u>

<u>v. Teledyne</u>, 628 F.2d 1214, 1221 (9th Cir. 1980) (finding no duty

to disclose projections).[29]  <u>But</u> <u>see</u> <u>San Leandro</u>, 75 F.3d at 810

---

[28]The defendants similarly have no duty here to disclose
known trends, despite securities regulations cited by plaintiffs.
(Compl. ¶¶ 24, 88.)  For example, Rule 303 states that in filing
periodic reports with the SEC, the company must:

> Describe any known trends or uncertainties
> that have had or that the registrant
> reasonably expects will have a material
> favorable or unfavorable impact on net sales
> or revenues or income from continuing
> operations.  If the registrant knows of
> events that will cause a material change in
> the relationship between costs and revenues .
> . . the change in the relationship should be
> disclosed.

17 C.F.R. § 229.303(a)(3)(ii).  <u>But</u> <u>see</u> 17 C.F.R. § 229.303(a)
(Instruction 7) ("Registrants are encouraged but not required to
supply forward looking information. . . .")
    These requirements do not on their own support plaintiffs'
private cause of action.  <u>Wilensky v. Digital Equipment</u>
<u>Corporation</u>, 903 F. Supp. 173, 181 (D. Mass. 1995) (finding that
even the "relevance of Item 303 violation to a 10b-5 suit remains
subject to some dispute").  <u>See</u> <u>also</u> <u>Greenstone v. Cambex Corp.</u>,
975 F.2d 22, 26-27 (1st Cir. 1992) (finding plaintiff did not
adequately specify facts to find liability on known trend grounds
where complaint alleged company's knowledge in only general
terms).

[29]Although a partial disclosure of a projection may require
additional disclosures to ensure completeness and accuracy,
<u>Vaughn v. Teledyne</u>, 628 F.2d 1214, 1221, n.7 (9th Cir. 1980),
defendants made no public projections for the second quarter of
1995 *before* April 19, 1995.  The April 6, 1995 statements by Held
(A5)--limited to a yearly projection and other vague
puffery--avoided making a prediction for the second quarter.  In
fact, cautionary statements were made concerning the product
transition.  A favorable longterm projection does not require
disclosure of an upcoming quarter.  <u>See</u>, <u>e.g.</u>, <u>In re Caere</u>
<u>Corporate Securities Litigation</u>, 837 F. Supp. at 1058.  Moreover,
I do not find these general future predictions actionable because
there are no facts which indicate deception (e.g., that the

34

(cautioning that marketing plans are not *per se* immaterial, rather "duty to disclose" is the critical question). In any event, I do not find that the internal projection of $22 million for Q295 during early March--notwithstanding the March 17 estimate of $32 million--was materially different from the April 19, 1995 projection of "the $24 million range." Plaintiffs have offered no facts to show that the defendants had knowledge *prior to May 26* that the projection would dip to $15 million.[30]

Third, as discussed above, the statements allegedly made by analysts are not separately actionable because they are either repetitive of defendants' statements, equally vague, or because they are not attributable to the defendants. More particularly, the statement quoted in the <u>Wall Street Journal</u> (C9), despite being referred to six times by plaintiffs in their Opposition Memorandum and numerous times in the Complaint, is not actionable because the statement notably fails to meet the particularity standard. Not only is the statement unattributed to an

_____

defendants knew that the second quarter of 1995 was going to be a "disaster"). <u>Serabian</u>, 24 F.3d at 361, n.4. The April 5, 1995 internal memorandum (D1), discussing "numerous problems," is not sufficiently particular to equate with "disaster." Indeed, plaintiffs unfairly truncate the statement from the original document, omitting language such as "reasonably healthy," and that while quarter-to-quarter results showed a decline, it was "not disastrously so." Moreover, the memorandum labels the figures as "partial" for various reasons. (Appendix, Ex. 23.)

[30]Plaintiffs' reliance on <u>Kirby v. Cullinet Software, Inc.</u>, 721 F. Supp. 1444, 1451-53 (D. Mass. 1989), is inapposite. Moreover, in contrast to <u>In re Lotus Development Corp.</u>, 875 F. Supp. 48, 52 (D. Mass. 1995), on which plaintiffs also rely, here the defendants admitted rather than denied potential problems, and adjusted projections accordingly.

identifiable person, but it is anonymously attributed to an IBM, rather than Chipcom, official. See Time Warner Inc. Securities Litigation v. Ross, 9 F.3d 259, 265-66 (2d Cir. 1993), cert. denied sub nom. 114 S. Ct. 1397 (1994) (finding caselaw supports dismissal of completely unattributed statements).

Fourth, I recognize that "insider trading in suspicious amounts or at suspicious times, of course, could help the [plaintiffs]." Greenstone, 975 F.2d at 26 (citing In Re Apple Computer Securities Litigation, 886 F.2d 1109, 1117 (9th Cir. 1989), cert. denied, 496 U.S. 943 (1990) (trading may be probative when "dramatically out of line with prior trading practices")); Topogna v. Egan, 141 F.R.D. 370, 373 (D. Mass. 1992) (sale of stock may support inference of fraud). However, plaintiffs fail to plead with particularity--or even generally-- the amount of trading normally conducted by these individuals, including the sale of exercised options. Thus, comparisons with prior practices are impossible.

Finally, plaintiffs set forth the organizational structure for meetings between Chipcom and IBM, as called for in the original Alliance Agreements. (See above, section II.) However, plaintiffs again rely on conclusory statements, without facts and particularity. Apart from stating that meetings occurred on February 20-21, 1995 (Compl. ¶ 96) and May 2, 1995 (Compl. ¶ 132), plaintiffs have alleged no facts showing that a meeting took place wherein defendants received the requisite knowledge-- i.e., what would later be reported on May 26, 1995--*apart from*

36

*what was already disclosed* on April 19, 1995.

Thus, I find that even considering the totality of the figures, facts, and statements, plaintiffs' synergistic argument must fail. In each area, plaintiffs have either failed to set forth facts with sufficient particularity to support their "failure to disclose" argument, or, as in the case of the allegedly actionable statements, they are simply not actionable standing alone. Here, the sum of the parts does not make plaintiffs' case whole. Reasonable inferences may be drawn in securities cases, but here the inferences are not sufficient to make out a cause of action.

B.   "Control Person" Liability under Section 20(a)

Count II alleges a violation of Section 20(a) of the 1934 Act against the individual defendants. Section 20(a) provides that:

> Every person who, directly or indirectly, <u>controls any person liable under any provision of this title</u> or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (emphasis added).

The First Circuit has held that "in the securities context, control means 'the possession, direct or indirect, of the power to direct or to cause the direction of the management and policies of [an entity], whether through the ownership of voting

37

securities, by contract, or otherwise.'" <u>Sheinkopf v. Stone</u>, 927 F.2d 1259, 1270 (1st Cir. 1990) (citations omitted).

Here, because I find that Chipcom is not liable, the individual defendants cannot be held liable pursuant to § 20(a), and therefore the Complaint fails to state a "controlling person" claim.

### IV.  <u>Conclusion</u>

· For the reasons set forth more fully above, I hereby ALLOW defendants' motion to dismiss.  The plaintiffs having been afforded sufficient opportunity to put their pleadings as well as they can, this grant of the motion to dismiss is without leave to amend.

*Douglas P. Woodlock*

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

38

# EXHIBIT 6



DEMOS | SEARCH

bcgi **ACCESS MANAGEMENT**

bcgi **BILLING**

bcgi **PAYMENT**

bcgi **NETWORK**

Service & Support

Markets

About Us

Corporate

Investor

➔ News & Events

>> Releases

Events

Press Kit

Careers

bcgi **ABOUT US**

**Press: Releases**

**Investor Alert**

**Boston Communications Group Announces First Quarter Financial Results**

*-- Pro forma earnings of $0.03 per share, ahead of initial guidance and in line w*
*increased guidance issued on April 1st -- Company raises second quarter 2002*
*earnings estimates to $0.03 to $0.04 per share and reaffirms 2002 guidance --*
*Billed record number of minutes, resulting in average monthly minutes of use*
*(MoUs) growing to 87, a 78% increase over the first quarter of 2001 -- Added*
*228,000 net new subscribers, bringing the total to 1.98 million at March 31, 20(*
*-- Prepaid Wireless Services pro forma gross margin improved to 68% from 66*
*last quarter -- Repurchased 172,000 shares under Stock Repurchase Program*

WOBURN, Mass., Apr 17, 2002 /PRNewswire-FirstCall via COMTEX/ -- Boston
Communications Group, Inc. (Nasdaq: BCGI) today announced that, including non-
recurring charges, its consolidated net loss for the first quarter ended March 31, 2002 w
$1.5 million or $(0.09) per share. Pro forma earnings (excluding an additional pre-tax
charge of $3.3 million) for the first quarter ended March 31, 2002 were $466,000, or $0
per share, compared to pro forma earnings of $37,000 or $0.00 per share for the fourth
quarter of 2001. Pro forma earnings are in line with expectations announced by the
Company on April 1, 2002 and are slightly ahead of previously given guidance. Total
revenues for the quarter were $15.0 million, compared to $14.3 million for the fourth
quarter of 2001, reflecting growth of Prepaid Wireless Services revenues, partially offset
lower revenues from the Company's Roaming Services businesses.

Pro forma results for the three months ended March 31, 2002 exclude an additional pre-
charge of $3.3 million for legal expenses the Company expects it will incur to defend the
patent infringement suit brought by Freedom Wireless. bcgi believes that the claims mac
by Freedom Wireless are without merit and that the Company has meritorious defenses
the action, and bcgi will continue to vigorously defend the action.

Prepaid Wireless Services

During the quarter, the Company billed a record number of prepaid minutes, resulting in
average MoUs per subscriber increasing to 87 minutes per month, a 78% increase over t
first quarter of 2001 and a 10% sequential increase. Higher usage was generated
principally due to a continued influx of new, higher quality digital subscribers on carrier
programs with more competitive pricing and features. The Company added 228,000 net
subscribers during the quarter, a marked increase over the prior quarter and at the high
end of guidance. The increase in MoUs and subscribers resulted in a 9% increase in prep
revenues to $12.1 million compared to the previous quarter. Coupled with the Company'
fixed cost business model and continued focus on managing its costs effectively, the
increase in prepaid wireless services revenues resulted in pro forma gross margin
improving to 68% compared to 66% for the fourth quarter ended December 31, 2001.

"As our results attest, bcgi's ability to leverage our unique real-time wireless subscriber management capabilities to develop a new standard for quality in prepaid wireless has created real value for our carrier customers, as it has enabled them to attract new subscribers and weather the competitive industry environment. Further, the well position and fiscally sound programs of our carrier customers provide us with a solid base from which to deliver profitable new growth opportunities for U.S. wireless carriers using our robust platform," commented E.Y. Snowden, President and CEO.

Continued Strong Financial Position

bcgi's balance sheet continues to remain strong with over $55 million in cash and short-term investments. The Company's cash balance decreased from $60.3 million at December 31, 2001, principally due to the timing of capital expenditures that were deferred from the fourth quarter 2001 to the first quarter 2002, the repurchase of the Company's stock for $1.5 million, and an increase in the Company's days sales outstanding.

Outlook

As announced in the Company's April 1, 2002 press release, bcgi reaffirmed its earnings estimates for the full year 2002 of between $0.19 and $0.23 per share. For the second quarter of 2002, the Company has raised it guidance and anticipates earnings of $0.03 to $0.04 per share. Commented E. Y. Snowden, "We are off to a solid start for 2002 and we are confident about the balance of the year. As a leader in real-time transaction processing solutions, we believe we are strongly positioned for future growth opportunities, particularly as the U.S. wireless industry continues to shift its focus for growth towards new segments. By serving as strategic partners with our carrier customers, we are able leverage our infrastructure to provide customers with high quality products that give the a competitive advantage in the marketplace."

The Company will be holding a conference call and Webcast at 5:00PM today to discuss this release. The Company's President and CEO, E.Y. Snowden, and Chief Financial Officer Karen A. Walker, will host the call. Parties interested in listening to the call should dial 1-800-423-5972 at least 10 minutes prior to the start of the call. The conference call and replay can also be accessed via the web at www.bcgi.net .

ABOUT THE COMPANY

Boston Communications Group, Inc., (Nasdaq: BCGI), bcgi, an S&P Small Cap 600 Index company and Russell 2000 index company, is a leader in transaction processing solution for real-time wireless subscriber management, delivering prepaid wireless, mobile commerce and other billing and payment services. Founded in 1988, bcgi provides solutions to carriers through a combination of industry-leading proprietary software applications, a highly scalable transaction processing platform and its Intelligent Voice Services Network (IVSN). Through this nationwide real-time infrastructure, bcgi provides one or more of its services to approximately 70 wireless carriers and resellers, including four out of the six national carriers. bcgi's software, transaction processing platform and IVSN support bcgi's Prepaid Wireless service offering, a market leader in one of the high growth segments of the wireless communications industry. bcgi handles approximately 2 billion minutes of service a year. Please visit the bcgi web site at http://www.bcgi.net .

CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This press release contains, in addition to historical information, forward-looking statements that involve risks and uncertainties, including statements regarding the Company's earnings estimates, ability to leverage its infrastructure and confidence about future growth opportunities. Such statements are based on management's current expectations and are subject to a number of uncertainties and risks that could cause act results to differ materially from those described in the forward-looking statements. Among the important factors that would cause actual results to differ materially from those indicated by such forward-looking statements are the number of new subscribers added the Company's prepaid service and the speed at which they are obtained, lower minutes use generated by subscribers, significant decreases or loss of business from major customers, declines in demand for the Company's Prepaid Wireless Services and Prepaid Connection services, the inability of the Company to successfully support its Intelligent Voice Services Network (IVSN) and transaction processing platform, unforeseen outages the Company's prepaid services, the inability of the Company's carrier customers to successfully market and sell prepaid service to subscribers, expenses to defend the Freedom Wireless suit in excess of the Company's estimate, an unfavorable judgment in the Freedom Wireless suit, general global economic conditions and the risk factors detail

in the Company's Form 10-K for the year ended December 31, 2001 filed with the
Securities and Exchange Commission.

BOSTON COMMUNICATIONS GROUP, INC. AND SUBSIDIARIES
PRO FORMA (A) CONSOLIDATED STATEMENTS OF OPERATIONS
(In thousands, except per share amounts)

|  | Pro Forma Three Months Ended | |
| --- | --- | --- |
|  | 3/31/02 | 3/31/0: |
|  | (Unaudited) | |
| Revenues: | | |
| Prepaid wireless services | $12,139 | $14,02! |
| Roaming services | 1,583 | 3,34: |
| Prepaid systems | 2,447 | 2,42! |
| Eliminations | (1,127) | (80( |
|  | 15,042 | 18,98! |
| Expenses: | | |
| Cost of prepaid wireless services revenues | 3,869 | 3,93< |
| Cost of roaming services revenues | 1,452 | 2,89< |
| Cost of prepaid systems revenues | 703 | 72: |
| Engineering, research and development | 1,973 | 2,27: |
| Sales and marketing | 1,129 | 1,44< |
| General and administrative | 1,418 | 1,71! |
|  | 10,544 | 12,98: |
| Income before depreciation, amortization, interest and taxes | 4,498 | 6,00: |
| Depreciation and amortization | 4,128 | 3,86( |
| Operating income | 370 | 2,13( |
| Interest income | 411 | 75( |
| Income before income taxes | 781 | 2,89: |
| Provision for income taxes | 315 | 1,15( |
| Net income | $466 | $1,73( |
|  | | |
| Diluted Income Per Share: | | |
| Net income per common share | $ 0.03 | $ 0.1( |
| Shares used in computing net income per common share | 17,486 | 17,69! |

Notes to Pro Forma Consolidated Statements of Operations:

(A) The above pro forma consolidated statements of operations exclude t
effects of the following:

For the three months ended March 31, 2002, a one-time pre-tax charg
of $3.3 million for legal expenses that represents the estimated f
the Company will incur to defend the patent infringement suit brou
by Freedom Wireless.

BOSTON COMMUNICATIONS GROUP, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS
(In thousands, except per share amounts)

|  | Three Months Ended | |
| --- | --- | --- |
|  | 3/31/02 | 3/31/0: |
|  | (Unaudited) | |
| Revenues: | | |
| Prepaid wireless services | $12,139 | $14,02! |
| Roaming services | 1,583 | 3,34: |
| Prepaid systems | 2,447 | 2,42! |
| Eliminations | (1,127) | (80( |
|  | 15,042 | 18,98! |
| Expenses: | | |
| Cost of prepaid wireless services revenues | 3,869 | 3,93< |
| Cost of prepaid wireless services revenues - special charge | 3,297 | -- |
| Cost of roaming services revenues | 1,452 | 2,89< |
| Cost of prepaid systems revenues | 703 | 72: |
| Engineering, research and development | 1,973 | 2,27: |
| Sales and marketing | 1,129 | 1,44< |
| General and administrative | 1,418 | 1,71! |
|  | 13,841 | 12,98: |
| Income before depreciation, amortization, interest and taxes | 1,201 | 6,00: |
| Depreciation and amortization | 4,128 | 3,86( |

```
Operating income (loss)                          (2,927)        2,13(
Interest income                                      411          75(
Income (loss) before income taxes                (2,516)        2,89:
Provision (benefit) for income taxes             (1,006)        1,15(
Net income (loss) from continuing operations  $ (1,510)       $1,73(

Basic Income (Loss) Per Share:
Net income (loss) per common share               $(0.09)       $ 0.1(
Shares used in computing net income (loss)
  per common share                                17,157       17,01(
Diluted Income (Loss) Per Share:
Net income (loss) per common share               $(0.09)       $ 0.1(
Shares used in computing net income (loss)
  per common share                                17,157       17,69!
```

SEGMENT INFORMATION
($ in thousands and excluding special charges)

| Quarter ended March 31, 2002 | Prepaid Wireless Services | Roaming Services | Prepaid Systems | Elim. | Total |
|---|---|---|---|---|---|
| Revenues | $12,139 | $1,583 | $2,447 | $(1,127) | $15,04: |
| Gross margin | 8,270 | 131 | 994 | (377) | 9,01( |
| Gross margin percentage | 68% | 8% | 41% | | 60! |
| 2001 | | | | | |
| Revenues | $14,025 | $3,341 | $2,429 | $(806) | $18,98! |
| Gross margin | 10,091 | 447 | 1,213 | (313) | 11,43( |
| Gross margin percentage | 72% | 13% | 50% | | 60! |

CONSOLIDATED BALANCE SHEET DATA
(in thousands)

| ASSETS | March 31, 2002 (Unaudited) | December 2001 |
|---|---|---|
| Current assets: | | |
| Cash and short-term investments | $55,169 | $60,25: |
| Accounts receivable, net of allowance for billing adjustments and doubtful accounts of $1,074 in 2002 and $1,169 in 2001 | 13,981 | 10,78: |
| Inventory | 862 | 1,03( |
| Prepaid expenses and other assets | 1,682 | 1,49( |
| Deferred income taxes | 3,358 | 2,35: |
| Total current assets | 75,052 | 75,91: |
| Property and equipment, net | 39,877 | 38,79! |
| Goodwill and other assets | 1,850 | 1,84! |
| Total assets | $116,779 | $116,55: |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $19,154 | $15,94: |
| Current maturities of capital lease obligations | 427 | 74( |
| Total current liabilities | 19,581 | 16,68: |
| Deferred income taxes | 3,040 | 3,04( |
| Shareholders' equity: | | |
| Common stock and additional paid-in capital | 97,938 | 99,10( |
| Accumulated deficit | (3,780) | (2,27( |
| Total shareholders' equity | 94,158 | 96,83( |
| Total liabilities and shareholders' equity | $116,779 | $116,55: |

SOURCE Boston Communications Group, Inc.

CONTACT: Investor Relations - bcgi, Dan Brosnan, +1-781-904-5410, dbrosnan@bcgi.n
or General Inquiries, Amy Glynn, +1-212-445-8470, Media Inquiries, Judith Sylk-Siegel,
+1-212-445-8431, or Investor Inquiries, Peter Seltzberg, +1-212-445-8457, all of FRB
Weber Shandwick



# EXHIBIT 7



## Thomson StreetEvents℠

### BCGI - Q1 2002 Boston Communications Group Earnings Conference Call

Event Date/Time: Apr. 17. 2002 / 5:00PM ET



THOMSON     streetevents@thomson.com  |  617.603.7900  |  www.streetevents.com     

© 2004 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# FINAL TRANSCRIPT

BCGI - Q1 2002 Boston Communications Group Earnings Conference Call

## CORPORATE PARTICIPANTS

**E.Y. Snowden**
*Boston Communications Group - President and CEO*

**Karen Walker**
*Boston Communications Group - Chief Financial Officer*

## CONFERENCE CALL PARTICIPANTS

**Peter felksburg (ph)**

**Carpenter Cato (ph)**

**Steve Levensen (ph)**

**Tim Clarion (ph)**

**Tavis McCourt (ph)**

**Howard Smith**

**Greg Probertenko (ph)**

**David Mantel (ph)**

**Omar Rosenbaum**

## PRESENTATION

**Operator**

Good afternoon. My name is Heather and I will be your conference facilitator today. At this time I would like to welcome everyone to the first quarter 2002 earnings conference for Boston Communications. All lines have been placed on mute to prevent any background noise. After the speaker's remarks there will be a question and answer period. If you would like to ask a question during this time simply press star and the number one on your telephone keypad and questions will be taken in the order they are received. If you would like to withdraw your question please press star and the number two. Thank you. I will now turn the call over to Mr. P e t e r F e l k s b u r g (ph) . Thank you, sir. You may begin.

**Peter felksburg**

Good afternoon, everyone and thank you again for joining us today for Boston Communication Group's conference call to discuss 2002 first quarter results. By now you should have the release but if anyone still needs a copy please call R o b H y m a n (ph) at 212 445-8469. That's at Financial Relations for W e b e r   S h a n w i c k (ph) or view and download at the Boston Communications Group corporate Web site www.bcgi.net. On the line today with us are E. Y. Snowden,

President and CEO; and Karen Walker, Chief Financial Officer with Boston Communications Group. I'd also like to caution everyone that today's call discusses Boston Communications Group's business outlook and may contain forward-looking statements. Particular forward-looking statements and all other statements that may be made on this earnings conference call that are not historical facts are subject to a number of risks and uncertainties and actual results may differ materially. Please refer to the Safe Harbor Statement in today's press release and all filings with the SEC for more information on facts that could cause actual results to differ and now without further delay I'd like to turn the call over to E. Y. Snowden. Please go ahead, E. Y.

**E.Y. Snowden** - *Boston Communications Group - President and CEO*

Thanks, Peter, and again welcome to the Boston Communications Group first quarter conference call. We're very happy to be reporting on a strong quarter. Better yet we're happy to see the beginning of the favorable effects from the positive core trends we cited in our investment community conference calls at the end of last quarter. Carrier programs on our platform targeted at the attractive teen, young adult market segment continue to be strong attracting a much higher quality prepaid subscriber and generating a healthy proportion of the growth for the largest carriers in America. This quality of subscriber has engendered increasing support from the carriers evidenced by broader advertising campaigns, feature enhancements, more competitive pricing and promotion. This quality improvement is clear as we saw growth in our pre-paid minutes of use to new record levels with the average subscriber talking for 87 minutes a month this quarter, up 10 percent from last quarter and up nearly 80 percent from a year ago.

And it's not just one carrier driving this growth. As we said in our April 1 press release the average MRUs per month per subscriber increased for every one of our major carriers this quarter. It's particularly nice to be talking about these good results during relatively tough times for the industry. In fact, it's not so much that we did well in spite of the tougher environment as it is that we did well because of the challenges that are driving carriers to seek new avenues for growth. We've laid the solid foundation for success in one of the highest growth segments of wireless. We've executed well on a plan for proving in the attractiveness of the prepaid wireless business. We've demonstrated the superior functionality, flexibility and end-to-end economics of BCGI's

THOMSON

streetevents@thomson.com | 617.603.7900 | www.streetevents.com



© 2004 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# FINAL TRANSCRIPT

BCGI - Q1 2002 Boston Communications Group Earnings Conference Call

so it just seemed kind of-- I expected that number to go down a little bit.

---

**E.Y. Snowden** - *Boston Communications Group - President and CEO*

Did you do a function of the valuation and formulas used on options or something--? I believe it's the price of the stock that drives the recognition of shares to be counted in that formula out of shares that are options outstanding or other assets and I apologize. I'm not an expert but as the price of the stock actually dropped, the corresponding divisible number of shares into a fully diluted formula shrank as well.

---

**Greg Probertenko**

Okay so it's like a treasury stock method thing or something?

---

**Karen Walker** - *Boston Communications Group - Chief Financial Officer*

What number are you showing? I'm trying to figure out what number you're comparing it to, Greg.

---

**Greg Probertenko**

At the end of fourth quarter I saw 17,182 and now this quarter I've been seeing 17,486.

---

**Karen Walker** - *Boston Communications Group - Chief Financial Officer*

Yeah, which is principally just due to the pricing of the shares.

---

**Greg Probertenko**

Okay, then I'll leave it at that. Thanks.

---

**Operator**

There are no further questions at this time. Do you have any closing remarks?

---

**E.Y. Snowden** - *Boston Communications Group - President and CEO*

Yes, we do. Thank you all for joining us today. As you can hear we are energized over the exciting role we've carved out for ourselves in enabling the largest carriers in America that use our platform to position prepaid products as mainstays of their business relying upon us for the new growth opportunities they seek. The success that our customers are having with these new products and the developments that we have underway for new capabilities, services and customer relationships gives us confidence in the future ahead for BCGI. We look forward to sharing our success and executing on this plan with you. Thank you for your time.

---

**Operator**

This concludes this afternoon's teleconference. You may now disconnect.

---

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2004, Thomson Financial. All Rights Reserved.

 
© 2004 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# EXHIBIT 8

| Boston Communications Group Daily Stock Price | | | | | |
|---|---|---|---|---|---|
| **Date** | **Open** | **High** | **Low** | **Close** | **Volume** |
| 18-Aug-04 | 8.3 | 8.87 | 8.3 | 8.69 | 138,900 |
| 17-Aug-04 | 8.25 | 8.58 | 8.25 | 8.38 | 115,800 |
| 16-Aug-04 | 7.91 | 8.3 | 7.85 | 8.25 | 130,500 |
| 13-Aug-04 | 7.72 | 7.9 | 7.72 | 7.87 | 315,100 |
| 12-Aug-04 | 7.85 | 8.12 | 7.78 | 7.78 | 128,600 |
| 11-Aug-04 | 8.17 | 8.24 | 7.87 | 8.1 | 231,900 |
| 10-Aug-04 | 8.3 | 8.31 | 8.1 | 8.23 | 135,500 |
| 9-Aug-04 | 8.25 | 8.46 | 8.18 | 8.28 | 279,200 |

# EXHIBIT 9
# (1 of 2)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE CYTYC CORP.                    CIVIL ACTION NO.
SECURITIES LITIGATION                02-12399-NMG


REPORT AND RECOMMENDATION RE:
DEFENDANTS' MOTION TO DISMISS THE CORRECTED
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
(DOCKET ENTRY # 30)

March 1, 2005

BOWLER, U.S.M.J.

Pending before this court is a motion to dismiss (Docket
Entry # 30) filed in this consolidated class action by defendants
Cytyc Corporation ("Cytyc"), Patrick Sullivan ("Sullivan"),
Cytyc's President and Chief Executive Officer throughout the
class period,[1] and Robert Bowen ("Bowen"), Cytyc's Chief
Financial Officer and Vice President throughout the class period.
After conducting a hearing, this court took the motion (Docket
Entry # 30) under advisement.


PROCEDURAL BACKGROUND

The gravamen of the corrected amended complaint (henceforth:
"the complaint") (Docket Entry # 27) filed by lead plaintiffs
Plumbers and Pipefitters National Pension Fund and Deka
Investment GMBH ("plaintiffs") is that Sullivan and Bowen ("the
individual defendants") and Cytyc, a company that produces and
manufactures medical devices that screen for cervical and breast

---

[1] Sullivan also took on the role of Chairman of the Board
of Directors on November 20, 2001, a role he maintained
throughout the remainder of the class period.

cancers, engaged in channel stuffing throughout the class period (July 25, 2001 to June 25, 2002). Channel stuffing is the practice of "inducing purchasers to increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company." <u>Greebel v. FP Software, Inc.</u>, 194 F.3d 185, 202 (1st Cir. 1999). It has "the result of shifting earnings into earlier quarters, quite likely to the detriment of earnings in later quarters." <u>Greebel v. FP Software, Inc.</u>, 194 F.3d at 202.

The channel stuffing, which purportedly occurred at the end of each quarter, concerned Cytyc's principal product, the ThinPrep system ("ThinPrep"). ThinPrep competes with the more traditional Pap smear test as a means of screening women for cervical cancer.

Plaintiffs submit that the individual defendants and Cytyc (collectively: "defendants") failed to disclose or only partially disclosed the channel stuffing during the class period. Statements made by Sullivan, various third parties or contained in the company's SEC filings were false or materially misleading regarding the deep discounts that Cytyc offered customers near the end of every quarter. As a result, reported revenues, earnings and market share were artificially inflated. Defendants thereby mislead investors about earnings and the reasons for the company's growth and increased sales. In addition, defendants violated the company's internal revenue recognition policy, SEC regulations and generally acceptable accounting principles

2

("GAAP") by shipping unordered product to customers and engaging in channel stuffing.

The two count, 62 page complaint, which includes 187 paragraphs, alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendants move to dismiss the complaint under Rule 12(b)(6), Fed. R. Civ. P. ("Rule 12(b)(6)"), for failing to plead fraud with particularity under Rule 9(b), Fed. R. Civ. P. ("Rule 9(b)"), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. Defendants additionally seek dismissal on the basis that the statements are inactionable corporate puffery, neither false or misleading, not material and lack the necessary strong inference of scienter. Defendants also rely on the safe harbor provision of the PSLRA pertaining to forward looking statements. See 15 U.S.C. § 78u-5(c)(1)(A)(i); 17 C.F.R. § 240.3b-6.

## STANDARD OF REVIEW

In reviewing the motion to dismiss, this court accepts the factual allegations in the complaint as true and draws all reasonable inferences in favor of plaintiffs. See Alternative Energy v. St. Paul Fire & Marine, 267 F.3d 30, 33 (1st Cir. 2001) (on motion to dismiss, court accepts all allegations in complaint as true and construes "all reasonable inferences in favor of the plaintiffs"). Without crediting unsubstantiated conclusions, Rodi v. Southern New England School of Law, 389 F.3d 5, 10 (1st

Cir. 2004) (ignoring "'bald assertions, periphrastic

circumlocutions, unsubstantiated conclusions, [and] outright

vituperation'"), dismissal is appropriate "only if it 'appears to

a certainty that the plaintiff would be unable to recover under

any set of facts.'"  <u>State Street Bank and Trust Company v.</u>

<u>Denman Tire Corporation</u>, 240 F.3d 83, 87 (1st Cir. 2001); <u>accord</u>

<u>Blackstone Realty LLC v. FDIC</u>, 244 F.3d 193, 197 (1st Cir. 2001)

(dismissal proper "only if, under the facts alleged," plaintiffs

"cannot recover on any viable theory;" internal quotation marks

omitted).

The pleading standards under the PSLRA do not alter this

standard of review.  <u>Aldridge v. A.T. Cross Corporation</u>, 284 F.3d

72, 78 (1st Cir. 2002).  Facts, drawn primarily from the

complaint as well as certain public and integral documents

referred to in the complaint,[2] are as follows.

---

[2]    <u>In Re Stone & Webster</u>, 253 F.Supp.2d 102, 128 & n. 11
(D.Mass. 2003) (considering copies of SEC Forms 4 without
converting motion to dismiss into motion for summary judgment);
<u>In Re Millstone Scientific Securities Litigation</u>, 103 F.Supp.2d
425, 450-451 & n. 15 (D.N.J. 2000); <u>see</u> <u>Alternative Energy v. St.</u>
<u>Paul Fire and Marine</u>, 267 F.3d 30, 33-34 (1st Cir. 2001);
<u>Blackstone Realty, LLC v. FDIC</u>, 244 F.3d at 195 n. 1 (exhibits
attached to complaint properly considered for purposes of Rule
12(b)(6)); <u>Shaw v. Digital Equipment Corporation</u>, 82 F.3d 1194,
1206 n. 13 & 1220 (1st Cir. 1996) (inasmuch as complaint alleged
nondisclosure in registration statement and prospectus, court may
examine text of filings and any incorporated SEC filings);
<u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993); <u>In Re</u>
<u>Parametric Technology Corporation Securities Litigation</u>, 300
F.Supp.2d 206, 213 n. 7 (D.Mass. 2001) (considering "full text of
the Form 10-Q," including "parts not relied on by the
plaintiffs," on a motion to dismiss inasmuch as complaint refers
to the document); <u>see also</u> <u>Clorox Company Puerto Rico v. Proctor</u>
<u>& Gamble</u>, 228 F.3d 24, 32 (1st Cir. 2000) ("'when a written
instrument contradicts allegations in the complaint to which it
is attached, the exhibit trumps the allegations'").

4

<u>BACKGROUND</u>

Cytyc develops, manufactures and markets the sample preparation system known as ThinPrep.  ThinPrep is an automated system for preparing cervical cell specimens on microscope slides.  In May 1996, Cytyc received premarket approval from the Food and Drug Administration ("FDA") to market ThinPrep as a screening system for cervical cancer.  The product directly competes with the conventional Pap smear test.  In November 1996, the FDA allowed Cytyc to label and market ThinPrep as "significantly more effective in detecting cervical cancer than the Pap smear."  (¶ 34).[3]

The company, which has a plant in Boxborough, Massachusetts, began selling ThinPrep nationwide in 1997.  It is the company's chief or principal product.  In September 1997, the FDA gave Cytyc premarket approval to use specimen collected in ThinPrep solution to test for the presence of the human papillomavirus.  The company markets ThinPrep to healthcare providers, insurance companies and clinical laboratories.  In 1998, it began marketing ThinPrep selectively overseas in international markets.

Net sales for the year ending in December 2000 reached $142,337,000 before the start of the class period.  Cytyc's reported share of the cervical testing market prior to the class period ranged from 50% to 60%.

--------

[3]    Unless otherwise noted, citations to paragraphs only refer to paragraphs in the complaint, Docket Entry Number 27.

A.   <u>Customer Complaints, Discounts and Unordered Products</u>

According to an unnamed, former medical and sales representative ("Cytyc sales representative"), "Beginning in at least 1999, . . . Cytyc 'typically engaged in channel stuffing at the end of each quarter.'" (¶ 38).  This sales representative dealt directly with physicians concerning ThinPrep and describes, in general terms, that "Cytyc overloaded laboratories with inventory" in order to drive up profitability and sales.  (¶ 38). With slightly greater specifically, he or she identifies Onco, located in Gaithersburg, Maryland as "a frequent victim of Cytyc's channel stuffing."[4]  (¶ 47).  Also according to this sales representative, certain unidentified "Cytyc account executives" told him or her that "Cytyc occasionally sent merchandise to laboratories, despite requests from those customers to refrain from shipping any more product." (¶ 49).

An unnamed former managed care executive ("Cytyc managed care executive") who dealt directly with laboratories and physicians states that, Cytyc offered special discounts to customers "towards the end of each quarter." (¶ 50).  He or she does not identify the customer, the amount of the discount or the relationship of the amount shipped to Cytyc's revenues.  Instead, the managed care executive posits that if a customer, again unidentified, "needed only one thousand tests a month, the customer still knew that if it took three thousand tests in the

---

[4]   The representative does not provide any additional detail such as the amount of product stuffed and the dates of the shipments.

last month of a quarter, Cytyc would offer a much bigger discount." (¶ 50).

Another unnamed, former regional sales manager who became a senior representative ("Cytyc senior representative") and dealt directly with customers in six western states describes that, "from at least July 1999, Cytyc shipped additional product to its customers, above what had been ordered" until the customer complained that it had too much inventory.[5] (¶ 44). Labcorp was one of the Cytyc customers that complained to the Cytyc senior representative about the company's sales practices.[6] (¶ 49).

A former Cytyc account executive who covered the northwest region ("Cytyc NW account executive") and had direct customer contact relates that customers complained about storing the excess product on "pallets in their hallways."[7] (¶ 43). Likewise, an unnamed, former Cytyc electrotechnical technician ("Cytyc technician") relates, again at an undetermined time and in an undetermined amount, seeing "stockpiles of inventory lying unused" when he visited customers in the New England region to fix technical problems. (¶ 51).

---

[5] The complaint does not identify when these shipments occurred, the amount and the amount's relation to Cytyc's overall business. There is no indication that the shipments were returned.

[6] The complaint does not attribute this assertion to a particular individual. The source of the statement is thus unknown. There is also no indication when the complaint[s] occurred or the amount of the shipment[s] involved.

[7] Again, no detail is provided regarding the identity of the customers and when and how much pallet storing occurred.

Another former, unnamed Cytyc account executive for
California ("Cytyc CA account executive") notes that in December
2000, Cytyc shipped the Palo Alto Medical Foundation ("Palo Alto
Medical") "a year's worth of product without having received an
order to do so."[8]  (¶ 45).  There is no indication that Palo Alto
returned the shipment.  It was, however, given a 50% discount,
which exceeded the typical 20% end of quarter discount.[9]

The Cytyc CA account executive also identifies Stockton
Pathology, located in Stockton, California, as receiving "six
months' worth of product," albeit at an unidentified time.
Although not returned,[10] the excess product "lay unused, piled
floor-to-ceiling in the customer's offices."  (¶ 45).   At an
undetermined time, "Stanford University Hospital and Marin
Pathology cancelled their agreements with Cytyc because they were
fed up with being shipped unwanted merchandise," according to
this executive.  (¶ 157).

"Management" encouraged channel stuffing to meet unrealistic
quarterly quotas, according to the Cytyc CA account executive.
(¶¶ 46 & 47).  Channel stuffing occurred at the end of every
quarter, according to both this executive and the Cytyc managed

---

[8]  A "year's worth" of ThinPrep would, of course, extend
into the class period which began in June 2001.

[9]  The complaint fails to articulate the amount of the
shipped product discounted and/or the relation to Cytyc's overall
revenues.

[10]  Although not expressly stated in the complaint, this is
the only reasonable inference inasmuch as the complaint depicts
how the excess product lay unused at the customer's offices.

care executive (¶¶ 111 & 123) and was well known in the company
(¶ 150).  During the last quarter of 2001, the company increased
its channel stuffing practices by offering "extra incentives" to
customers and created a "'war room'" to field the daily telephone
calls from sales representatives giving updates of sales figures,
according to an unnamed human resources representative at Cytyc
who describes Sullivan and Bowen as "very involved" in daily
management.[11]  (¶¶ 40 & 101).  As a result of the channel
stuffing, the market share described to analysts by Sullivan and
other management officials was allegedly overstated.  (¶ 47).

Cytyc disclosed the use of discounts in the December 2000
Form 10-K annual report, signed by Sullivan and Bowen, in the
following terms:

> The Company's success and growth will depend on market
> acceptance of the ThinPrep System among healthcare
> providers, third-party payors and clinical laboratories.
> The Company will continue to sell the ThinPrep Processor to
> customers and charge separately for related disposable
> reagent filters and supplies.  *In the past, the Company has*
> *offered discounts to stimulate demand for the ThinPrep*
> *System and may elect to do so in the future, which discounts*
> *could have a material adverse effect on the Company's*
> *business, financial condition and results of operations.*

(Docket Entry # 32, Ex. B, p. 8; emphasis supplied).  Cytyc
repeated this disclosure in the company's 2001 Form 10-K annual

---

[11]  The company was highly focused on meeting the sales
quotas which were "set by Cytyc's management" (¶ 153) and,
according to an unnamed manufacturing manager ("Cytyc
manufacturing manager"), top executives met frequently with
employees "to discuss sales strategies." (¶ 39).  Cytyc senior
management also closely managed the everyday business of Cytyc
and attended meetings with the salesforce.  (¶¶ 41 & 150).

report.[12]   (Docket Entry # 32, Ex. J, pp. 8-9).

Cytyc also shipped "significant" amounts of "additional product" above and beyond what customers ordered.   (¶ 61).   As noted above, Cytyc's senior representative describes shipments of unknown quantities of ThinPrep to unknown customers "from at least July 1999."   (¶ 44).   At Cytyc, shipping more product than ordered to increase sales occurred near the end of the financial reporting periods.   (¶¶ 5 & 7; see also ¶ 49).


B.   Specific Company Statements During Class Period

1.   July 25, 2001 Press Release

At the outset of the class period on July 25, 2001, Cytyc's stock was trading for $24.79.   (¶ 9).   On that day, Cytyc issued a press release reporting "record" revenue and earnings for the second quarter of 2001.   (Docket Entry # 32, Ex. A).   The release accurately reported $52,997,000 of revenue for the quarter or net income of $.13 per diluted share.[13]   (¶ 67; Docket Entry # 32, Ex. D, p. 4; Docket Entry # 32, Ex. J, p. F-22).

Plaintiffs take issue with the following statements, the first historical and the others forward looking, made by Sullivan

---

[12]   Like the 2000 Form 10-K annual report, the 2001 Form 10-K annual report discloses that, "In the past, the Company has offered discounts to stimulate demand for the ThinPrep System and may elect to do so in the future, which discounts could have a material adverse effect on the Company's business, financial condition and results of operations."   (Docket Entry # 32, Ex. J, pp. 8-9).

[13]   There is no indication that these numbers were subsequently restated.   (Docket Entry # 32, Ex. J, p. F-22).

in the press release:[14]

> "We are pleased to report record revenues and earnings,"
> said Patrick Sullivan, Cytyc's president and chief executive
> officer.  "In addition, we increased our U.S. market share
> by five percentage points for the second consecutive
> quarter.  Our U.S. market share has grown substantially to
> approximately 46 percent at June 30 from 36 percent at the
> end of 2000, and we expect to exceed 50 percent domestic
> market conversion by year-end.  *This growth has been driven
> by the combination of our proven marketing strategy, best-
> in-class sales team, and superior technology.*"
>
> In conclusion, Mr. Sullivan stated, "As Cytyc continues to
> achieve record results in the marketplace, I am confident in
> our ability to *continue the momentum established in the
> first half of the year.*  We look forward to *continuing our
> consistent quarter to quarter growth* and *delivering a record
> financial performance* for 2001."

(¶¶ 67 & 69-70; emphasis in complaint).  Defendants purportedly

knew that the stated reasons ("proven marketing strategy, best-

in-class sales team, and superior technology") were not the real

reasons for the historical growth.  Instead, the real reasons

were the channel stuffing of products at the end of every quarter

and the shipments of unordered product.  Cytyc then improperly

recognized the revenue on these products at the expense of future

sales and in contravention of the company's stated revenue

recognition policy, GAAP and SEC rules.  (¶ 68).

With respect to the forward looking statements, plaintiffs

submit that defendants knew that the "momentum" and "consistent

quarter to quarter growth" were the result of channel stuffing,

including the steep, end-of-quarter discounts, and that the

momentum could not continue without continuing the channel

_____

[14]    The press release was relatively short, consisting of
two pages of text and two pages of a company balance sheet.

11

stuffing practices. (¶¶ 69-70). It is worth noting, however,

that the relatively short press release contains the following

cautionary language:

> Investors are cautioned that statements in this press
> release which are not strictly historical statements,
> including, without limitation, statements regarding
> management's expectations for future growth, profitability,
> and objectives for future management and operations, as well
> as statements regarding the management and operations . . .
> constitute forward-looking statements which involve risks
> and uncertainties which could cause actual results to
> differ, including, without limitation, risks associated with
> the Company's dependence on a single product, uncertainty of
> market acceptance and additional cost, dependence on
> proprietary technology, dependence on timely and adequate
> levels of third-party reimbursement, dependence on key
> personnel, management of growth, limited marketing, sales,
> and private equity investment experience, and limited number
> of customers and lengthy sales cycle . . . and other risks
> detailed in the Company's filings with the Securities and
> Exchange Commission, including under the heading "Certain
> Factors Which May Affect Future Results" in its 2000 Form
> 10-K filed with the Commission.

(Docket Entry # 32, Ex. A). The language in the Form 10-K under

the referenced caption provides added detail about the above risk

factors. Regarding the "Limited Marketing and Sales Experience"

factor, the Form 10-K warns that:

> No assurance can be given that the Company's direct sales
> force or strategic marketing relationships will succeed in
> promoting the ThinPrep System to healthcare providers,
> third-party payors or clinical laboratories, or that
> additional marketing and sales channels will be successfully
> established . . . Failure to successfully expand its
> marketing and sales capabilities in the United States . . .
> would have a material adverse effect on the Company's
> business, financial condition and results of operations.

(Docket Entry # 32, Ex. B). With respect to the "Limited Number

of Customers and Lengthy Sales Process" factor, the Form 10-K

explicitly states that, "Due in part to a recent trend toward

consolidation of clinical laboratories, the Company expects that

12

the number of potential domestic customers for its products will decrease."  (Docket Entry # 32, Ex. B).

The press release notes that management would discuss the results and future expectations at a 5:00 p.m. conference call later that day.  After the conference call, accessed by the public through the company's website, analysts projected the company's market share as soon reaching 50%.  (¶ 72).

2.  Bloomberg News Interview August 2, 2001

On August 2, 2001, Bloomberg News interviewed Sullivan and published a transcript of the interview.  Whereas on July 25, 2001, Sullivan attributed past growth as driven by the company's "proven market strategy" and "sales team," he forecasted that similar factors of the company's "unique sales and marketing strategy" would allow the company to increase its market share in the future.  (¶ 73).  Referring to the July 25, 2001 conference call, he projected annual revenues in 2001 as between $210,000,000 and $220,000,000 and between $275,000,000 and $300,000,000 for the following year.

The text of the interview reads, in pertinent part, as follows:[15]

> [Bloomberg News]:  Mr. Sullivan, taking a look at your revenue numbers, this past quarter, they grew at 12% sequentially and they were up about 60% from a year ago. *Can you maintain that kind of growth in terms of revenue?*
>
> Sullivan:  *We believe so.*  If you look at the market opportunity.  We believe we're getting started and hitting our stride.  In the sweet spot of the curve.  If you look at the 50 million Pap smears, it represents for us about a $500

---

[15]  Punctuation is taken from the transcript.

13

million to $700 million market opportunity.

[Bloomberg News]:  *Well, how will you increase, though market share and be aggressive in gaining market share [in] this?*

Sullivan:  *We have a unique sales and marketing strategy in that we have a direct sales force that calls on the OB/GYN's who perform the procedure in their office.  In addition we have a sales force calling on the laboratory.  It is creating the demand at the physician's office.  And we have also started some direct consumer advertising campaigns . . .*

[Bloomberg News]:  *Give investors some sort of landmarks that they should sort of watch out for or milestones, if you will that they should watch for from your company over the next six to eight months to see that you're certainly on track in terms of exceeding or meeting your growth goals?*

Sullivan:  Well, *we've guided the street in our conference call* that we believe we're going to finish this year somewhere between $210 million and $220 million in top line revenue, [we] believe that we will be at the top end of that range.  Next year we expect to be in the $275 million to $300 million range.  In addition we have these additional products that we're currently working on that we expect to have completed by the end of this year.[16]

(¶¶ 73 & 75, emphasis in complaint; Docket Entry # 32, Ex. C).

   3.  August 8, 2001 Second Quarter Form 10-Q

   On August 8, 2001, Cytyc issued the Form 10-Q for the

quarter ending June 30, 2001.  All defendants, including Bowen,

signed the form.  The form reflects the following method for

recognizing revenue:

---

[16]  Like the July 25, 2001 statements, defendants submit that the statements are corporate puffery and do not denote marketing strategy and the sales force as the only factors effecting growth.  They also maintain that the projections, which reference the conference call, were not material inasmuch as they did not alter the total mix of information available to the investing public.  Plaintiffs characterize Sullivan's stated reasons as false and materially misleading inasmuch as channel stuffing was and would continue to have an adverse impact on future sales.

The Company recognizes product revenue upon shipment,
provided that there is persuasive evidence of an
arrangement, there are no uncertainties regarding
acceptance, the sales price is fixed or determinable,
collection of the resulting receivable is probable and only
perfunctory Company obligations included in the arrangement
remain to be completed.

(¶¶ 58 & 78; accord Docket Entry # 32, Ex. B & J, pp. F-7).

Cytyc therefore recognized revenue upon shipment.[17]

This second quarter Form 10-Q for 2001 portrays net sales of

$100,464,000, an increase from the $62,303,000 reported during

the corresponding period in 2000.   The Form 10-Q advises that

certain factors may affect future results, refers to additional

factors disclosed in the Form 10-K for 2000 and cautions that,

"past financial performance should not be considered an indiction

of future performance."   (Docket Entry # 32, Ex. D, p. 13).

In describing the company's liquidity and capital resources,

the form notes that, "Net inventories decreased approximately

$1.3 million during the six months ended June 30, 2001 primarily

due to improved inventory management and production control."   (¶

81; Docket Entry # 32, Ex. D, p. 11).   The release of the August

8, 2001 Form 10-Q caused a one day increase in the price of Cytyc

stock from $24.20 to $25.90.

4.   October 19, 2001 Boston Herald Article

On October 18, 2001, Cytyc announced that it would acquire

Pro-Duct Health, Inc. ("Pro-Duct"), a private company that makes

_____

[17]   As explained in greater length infra, plaintiffs allege
that Cytyc departed from this stated policy by recognizing the
revenue upon shipping the unordered product and by offering the
deep discounts offered customers at the end of every quarter or
otherwise engaging in channel stuffing.   (¶ 79).

15

a breast cancer screening device, for $38,000,000 in cash and
5,000,000 shares of Cytyc common stock.  Sullivan described the
acquisition as an "ideal fit" with "an annual potential U.S.
market of $1.5 billion, growing to $4.0 billion."  (¶ 84).  The
acquisition was scheduled to close and did close in the fourth
quarter of 2001.  Cytyc's stock increased from $25.79 on October
17 to $26.55 on October 18, 2001.  (¶ 84; Docket Entry # 32, Ex.
E).

On October 19, 2001, the Boston Herald ran an article
quoting Sullivan as saying, "'*We feel confident in our success
based on our track record with the ThinPrep Pap Smear, which has
made this acquisition possible.*'"[18]  (¶ 87, emphasis in
complaint; Docket Entry # 32, Ex. E).  Cytyc stock closed at
$28.03 on October 19, 2001.  (¶ 86).

### 5.  October 24, 2001 Press Release

On October 24, 2001, Cytyc issued a press release reporting
record revenues for the third quarter of 2001.  Third quarter
revenue "was $57.2 million, . . . a 54 percent increase from the
$37 million reported in the comparable quarter last year."[19]  (¶

---

[18]  Plaintiffs describe the statement as misleading because
it omits the fact that Cytyc's "track record" is based upon
undisclosed channel stuffing.  Plaintiffs also point out that
Cytyc's stock would have been worthless and the acquisition
therefore costlier if the company had not artificially inflated
the company's stock through channel stuffing.  (Docket Entry #
36).  Defendants, in turn, assert that the statement amounts to
inactionable corporate puffery and there is no connection between
the statement, i.e., the efficacy of ThinPrep, and the omitted
information of channel stuffing.

[19]  The Form 10-K for 2001, released in March 2002, reflects
these same figures.  (Docket Entry # 32, Ex. J, p. F-22).

89; Docket Entry # 32, Ex. F).  Sullivan glowingly described the
Pro-Duct acquisition as "'provid[ing] an excellent opportunity
for significant revenue and earnings growth.'"  (¶ 89; Docket
Entry # 32, Ex. F).

Plaintiffs take issue with Sullivan's historical description
of the company's consistent revenue growth as emanating from
"'*the effectiveness of [Cytyc's] sales and marketing
strategy.*'"[20]  (¶ 89, emphasis in complaint; Docket Entry # 32,
Ex. F).  According to the complaint, the statement is misleading
because the reported growth arose from the "systemic and
continuous channel stuffing" as well as shipping unordered
products to customers, a practice that alienated such customers
and caused them to cease doing business with Cytyc.  (¶ 90).
Further, Cytyc did not experience "consistent revenue and
earnings growth" because the Cytyc sales and marketing strategy
of channel stuffing pushed sales into earlier quarters at the
expense of later periods.  (¶ 91).

---

[20]  The complete statement in the press release is as
follows:

> "We believe the superior clinical performance of the
> ThinPrep Pap Test and *the effectiveness of our sales and
> marketing strategy have provided Cytyc with consistent
> revenue and earnings growth and financial performance,*" said
> Patrick Sullivan, Cytyc's president and chief executive
> officer.  "Last week we announced that Cytyc has entered
> into a definitive merger agreement to acquire Pro-Duct
> Health, Inc., an acquisition that we expect will expand our
> product line to include breast cancer and provide an
> excellent opportunity for significant revenue and earnings
> growth."

(¶ 89, emphasis in complaint; Docket Entry # 32, Ex. F).

17

6.  <u>January 14, 2002 Press Release</u>

On January 14, 2002, Cytyc issued a press release reiterating the company's comfort level with the estimate of "approximately $0.13 per diluted share" for the 2001 fourth quarter and "approximately $0.45 per diluted share" for the full year.  (¶ 95; Docket Entry # 32, Ex. G).  Cytyc also forecasted 2002 per share earnings as "approximately $0.64 to $0.66."  (¶ 95; Docket Entry # 32, Ex. G).  The latter forecast did not materialize.

Like the July 25, 2001 press release, the January 14, 2002 press release cautions investors not to rely on the forecasts and that current expectations "are subject to risks and uncertainties which could cause the outcomes to differ materially from [the forward-looking] statements."  (Docket Entry # 32, Ex. G).  The press release identifies various risk factors and refers investors to the company's SEC filings.

The complaint depicts the falsity of the statements insofar as the revenue numbers, inflated because of the company's channel stuffing practices, contravene the company's stated revenue recognition policy as well as GAAP and SEC rules.  (¶ 100).

7.  <u>January 23, 2002 Press Release</u>

On January 23, 2002, Cytyc announced "record" revenues for the 2001 fourth quarter and for the year.  The press release shows revenues "of $63 million for the quarter" representing a "49% increase over the fourth quarter 2000 revenues, and" net income of $0.13 per share.  (¶ 96).  Revenues grew to $221

18

million for the year.   (¶ 96).   As set forth in the complaint,

these earnings include ThinPrep sales resulting from the channel

stuffing and shipments of unordered product thereby violating the

company's stated revenue recognition policy, GAAP and SEC rules.

(¶ 100).

The complaint highlights and complains about two statements,

the first being historical and the second forward looking, that

Sullivan made in the press release.   The statements, italicized

below, are as follows:

> "This was an outstanding year for Cytyc Corporation," said
> Patrick Sullivan, Cytyc's president and chief executive
> officer.   *"We have now reported fifteen consecutive quarters
> of revenue growth.*   In addition, we acquired Pro-Duct
> Health, expanding our product line to include breast cancer
> risk assessment."   Mr. Sullivan continued, "We believe the
> success of the company was further demonstrated by Cytyc's
> recent addition to the S & P Midcap 400 Index and The
> Nasdaq-100 Index."   Mr. Sullivan concluded, *"We believe the
> achievements of 2001 put Cytyc in a solid position to build
> on the momentum of the past year* and the success of
> ThinPrep(R) System, to continue domestic and international
> market conversion to the ThinPrep(R) PapTest(TM), and to
> launch Cytyc's ductal lavage procedure for patients at high
> risk for breast cancer."

(¶ 96, emphasis in complaint).

As the complaint alleges, plaintiffs submit that the first

statement is misleading and false because Cytyc achieved the

historical growth by resort to undisclosed channel stuffing.[21]

(¶ 100).   Again, the reported growth improperly includes sales

from the channel stuffing at the end of each quarter and the

shipments of unordered products.   (¶ 100).   In light of this

---

[21]   Plaintiffs do not take issue with the veracity of the
numbers as reflecting what Cytyc achieved.   (Docket Entry # 36).

improper revenue recognition, the assertion that Cytyc was "'in a solid position'" to build upon previous "'momentum'" was false and misleading. (¶ 100). The press release contains cautionary statements similar to those in previous press releases.

8. <u>Bloomberg News Interview January 24, 2002</u>

The day after the January 23, 2002 press release, Bloomberg News interviewed Sullivan about the reported fourth quarter profits. Without referring to the January 23, 2002 press release or the cautionary statements therein, Sullivan forecasted revenues "'in the $295 to $305 million range'" and an increase in earnings per share to "'between 64 and 66 cents.'"[22]  (¶ 99).

---

[22] Defendants submit that the complaint fails to identify which remarks in the interview are false. To the contrary, however, paragraph 99 not only quotes the above forecast but also repeats the forecast by stating that, "Sullivan raised Cytyc's expected revenues for 2002 to between $295 million-$305 million, up from the $275 million-$300 million range originally given on August 2, 2001." (¶ 99). The next paragraph alleges that, "Defendants knew that the statements in paragraphs 95-97, 99, were false." (¶ 100). Defendants' additional challenge that the forecast is inactionable puffery (Docket Entry # 39, n. 3, referring to "the January 24, 2002 press release [sic]") is unavailing given the explicit nature of the forecast. The statement, to the extent based on a current projection, provides the revenue range and expected earnings per share for the time frame of one year.

As explained <u>infra</u> with respect to the August 2, 2001 projection and argued in general by defendants in their memorandum (Docket Entry # 31, p. 39) and at the hearing, however, the complaint fails to show sufficient facts to support the information and belief that Sullivan knew the forecast was either false or materially misleading. Neither the opinion by the former human resources employee (¶ 154) nor his or her characterization of Sullivan and Bowen as "'hands-on'" managers (¶ 40) is enough. As to materiality, disclosing the use of discounts as effecting the projection would not alter the total mix of information inasmuch as the SEC filings already disclosed such discounts. Alternatively, the projection fails to warrant liability given the absence of a strong inference of scienter.

Shortly after this forecast, the following exchange took place:

> [Bloomberg News]:  *What keeps growth moving forward?*
>
> Sullivan:  *Well, we're very focused on continued conversion of the ThinPrep Pap Test in the market, from 57 percent to- we believe we could capture-100 percent of the market.*[23] There's no reason for a physician to use a conventionally prepared Pap smear, when you have a much more effective test that's in the ThinPrep PapTest . . . In addition, we have acquired a company that puts us into breast cancer screening called Product Health [sic], that we have just launched with our sales force at the beginning of this year.  And we expect somewhere between $9 and $15 million of revenue from that product, to kick in 2002.

(¶ 99, emphasis in complaint; Docket Entry # 32, Ex. I).  Two market analysts repeated Sullivan's statement that the company's current market share was 57%.  (¶ 102).

In February 2002, Cytyc announced a definitive merger agreement to acquire Digene Corporation ("Digene"), a publicly held manufacturer of a cervical cancer diagnostic screening system.  Subject to regulatory approval and a tender of over 50% of Digene stock, the deal proposed Cytyc purchasing Digene "for $76.9 million in cash, plus 23 million shares of Cytyc common stock."[24]  (¶ 103).  Shortly after the announcement, Cytyc shares

---

[23]  Defendants characterize this statement as inactionable puffery.  Although the statement that Cytyc could capture 100% of the market is corporate puffery, the statement that Cytyc had 57% of the market is not puffery.  The statement quantifies market share and two analysts repeated the statement.  (¶ 102); see In Re Scientific Atlanta, 239 F.Supp.2d 1351, 1361 n. 6 (N.D.Ga. 2002).  The 57% market share statement is nonetheless not actionable given the absence of a strong inference of scienter. See n. 65.

[24]  The 2001 Form 10-K released in March 2002 warns investors that, "Although [Cytyc] expects that its acquisition of Digene will close during the second quarter of 2002, [Cytyc] may

increased by $2.00. (¶ 104). Although Digene shareholders tendered more than 50% of outstanding Digene shares, the Federal Trade Commission ("FTC") eventually voted to block the acquisition on June 25, 2002.

On March 1, 2002, Cytyc filed the company's 2001 Form 10-K with the SEC. The form repeats the statement in the 2000 Form 10-K that Cytyc has offered discounts in the past to stimulate demand "and *may elect* to do so in the future" and that such discounts "*could have* a material adverse effect on the Company's business, financial condition and results of operations."[25] (¶ 110, emphasis in complaint; Docket Entry # 32, Ex. J). The 2001 Form 10-K shows 2001 net sales of $220,993,000 or "an increase of 55.6%" over 2000 net sales of $142,065,000. (¶ 115; Docket Entry # 32, Ex. J, p. F-4).

9.   April 24, 2002 Conference Call

In an April 24, 2002 press release, Cytyc again announced "record" earnings for the first quarter of 2002. Cytyc reported net sales "of $68 million and net income of $17.6 million" or "increases of 43% and 58%, respectively, over the numbers for the

---

not be able to complete the acquisition during the second quarter, or at all." (Docket Entry # 32, Ex. J).

[25]   Plaintiffs contend that a reasonable inference from this statement is that Cytyc only offered a one time discount. They point to the April 24, 2002 conference call as supporting this inference. On its face, however, the statement refers to "discounts," not "a discount." Thus, the language of the statement, which refers to the plural "discounts" when describing the discounting in the past, coupled with the fact that the 2000 Form 10-K also notes that Cytyc has offered "discounts" in the past to stimulate demand makes the inference unreasonable.

first quarter 2001."  (¶ 117; Docket Entry # 32, Ex. K).  It also
reported a market share of 64%.  (¶ 117).  The company scheduled
a conference call after the close of trading.

The conference call began by cautioning listeners not to
rely on forward looking statements.  (Docket Entry # 32, Ex. L).
During the conference call, Bowen noted that the company's
current estimate for the year 2002 is "between $0.55 and $0.60
per share" (Docket Entry # 32, Ex. L, p. 11), a downward
departure from the $0.64 to $0.66 estimate forecast by Sullivan
during the January 24, 2002 Bloomberg News interview.

The complaint states that during the conference call, Cytyc
explained that "its larger customers were 'tightening
inventory'"[26] and "that the inventory problem had manifested
itself only in the first quarter of 2002."  (¶¶ 124 & 125).  The
actual transcript reveals the following statements regarding
inventory:

> Bowen:  . . . Selected large lab ordering patterns shifted
> lower in the first quarter due to what we believe was an
> imbalance in physician demand versus existing lab inventory
> levels or a change in inventory management practice at the
> lab.
>
> Also during the quarter we implemented a promotional program
> directed at smaller labs, which was well received.  Although
> we believe that underlying demand at large and small labs
> continues to increase, in light of first quarter actions by
> selected large labs, consolidation in the lab industry and
> the response to our first quarter and promotional program at
> smaller labs, we anticipate a decline in near term shipment
> levels.

---

[26]  See footnote 28.

(Docket Entry # 32, Ex. L, p. 10).[27]

Thus, with regard to the inventory problem manifesting "itself *only* in the first quarter of 2002" (¶ 125, emphasis supplied), the actual transcript shows that both Bowen and Sullivan noted a change or shift in ordering patterns in the first quarter. The complaint alleges that the statement was false or misleading because it fails to disclose the "systemic and continuous channel stuffing" as well as the shipment of unordered product and customer alienation. (¶ 126).

When asked to "flush out" this sales promotion, Sullivan explained that Cytyc introduced the sales promotion as a response to "a change in ordering pattern at selected larger labs. That change in ordering pattern we believe was either due to an imbalance at the lab in physician demand versus their existing inventory levels at that time or a change in the way in which they choose to manage their ThinPrep Pap Test inventory levels." (Docket Entry # 32, Ex. L, p. 13). In essence, both Bowen and Sullivan disclosed that selected larger laboratories had an inventory "imbalance" and "ordering patterns shifted lower in the first quarter."[28] (Docket Entry # 32, Ex. L, pp. 10 & 13). As a

_____

[27] Plaintiffs do not expressly object to considering the transcript of the conference in defendants' appendix and referred to in the complaint. See Shaw v. Digital, 82 F.3d at 1220; Watterson v. Page, 987 F.2d at 3.

[28] The complaint describes the "tightening inventory" statement, which originates from a Bloomberg News report, as misleading because Cytyc omitted that the inventory tightening stemmed from the channel stuffing. (¶ 124; "Cytyc failed to state that its largest customers had been stuffed with so much extra inventory that there was no need for those customers to

result, the company offered a promotional program to smaller
laboratories during the first quarter.

During the conference call, Sullivan explicitly advised the
audience that, "This is not the first time-the first quarter that
we've ever had promotional type programs." (Docket Entry # 32,
Ex. L, p. 16). Bowen gave a more positive description explaining
that, "We don't expect to have promotional programs in the small
labs going forward, and what we expect to do is have our pricing
patterns return to what we would consider to be the norm."[29]
(Docket Entry # 32, Ex. L, p. 16).

After the conference call, a number of analysts made
statements that plaintiffs seek to attribute to Cytyc. One such
third party statement derives from a UBS Warburg report wherein
the analyst states that Cytyc stated during the conference call

---

order any more product for a long time to come").
The Bloomberg News article, dated April 25, 2002, reads as
follows:

> Big laboratories are tightening inventory, and Cytyc offered
> incentives to smaller labs, analysts said. "The big concern
> is there's an inventory pushback on the part of large labs,"
> said Banc of America Securities analyst Kurt Kruger, who
> rates Cytyc 'buy.' "The company scrambled to provide some
> discounts to small labs to offset this."

(¶ 119, quotation marks taken from complaint). Defendants argue,
_inter alia_, that the report fails the entanglement test.

[29] Sullivan's remark not only shows that Cytyc disclosed,
again, the discounts, but also militates against a finding of
scienter. Given Sullivan's description, Bowen's description
shows at most negligence and the attempt to put a good face on
the disclosure. The forward looking remark, which in any event
is _not_ particularized in the complaint, also falls under the safe
harbor provision of the PSLRA. The market was not fooled
inasmuch as Cytyc stock dropped precipitously the following day.

that it had "'instituted a one-time promotion for the smaller
labs to drive conversion at these customers in the quarter.'"[30]
(¶ 121).  During the conference call, however, Sullivan
explicitly disclaimed that the promotion was a one time offer.
(Docket Entry # 32, Ex. L, p. 16).

In addition to the Bloomberg News article and the UBS
Warburg analyst's comments, an April 25, 2002 Pacific Growth
Equities analyst report states that, "a 'change in the ordering
and inventory practices of Cytyc's large lab customers
necessitated a special promotion targeting smaller labs in order
for Cytyc to meet Q1 expectations.'"[31]  (¶ 120).  As a result,
the report explains, "'Cytyc lowered forward guidance.'"[32]  (¶
120).

In response to the April 24, 2002 disclosure, Cytyc common
stock fell from $24.80 per share on April 24 to $15.73 per share

---

[30]  Plaintiffs seek to hold Cytyc responsible for this third
party statement of the promotion as a "'one-time'" event.  They
submit the description is misleading inasmuch as Cytyc engaged in
a continuous pattern of channel stuffing throughout the class
period.

[31]  There is nothing false or misleading about the statement
that Cytyc offered a "special promotion."  Cytyc did offer a
special promotion.  There was no duty to also add, "as we've done
a number of times in the past."  As argued by defendants (Docket
Entry # 31, pp. 22-25 & n. 14), the complaint fails to
sufficiently pled why the statement was false or misleading.  The
third party statement attributing the statement to "Cytyc" also
fails the entanglement test described infra.

[32]  In particular, the report states that, "Cytyc's recent
experience with shifting laboratory inventory practices led to
lowered guidance for Q2 and the remainder of 2002."  (Docket
Entry # 32, Ex. N).

at the close of trading on April 25.  (¶ 129).  In May and June,
members of Cytyc's sales force discussed whether the stock "would
plummet further."  (¶ 132).

During the April 24, 2002 conference call, Sullivan
intimated that Cytyc was going to try to cue its business more
closely to physician demand.  According to Sullivan, Cytyc would
try to have a leaner "supply chain" and a better understanding of
inventory at the laboratories.  (Docket Entry # 32, Ex. L, p.
24).  In May and June 2002, Cytyc executives informed the
salesforce "that 'they were changing the market strategy to have
more stable shipments so that we wouldn't be flooded at the end
of the quarters,'" according to the former Cytyc manufacturing
manager.  (¶ 131; see also ¶ 156).  The company, however,
continued to pressure the sales force to meet the quotas,
according to the former Cytyc CA account executive.[33]  (¶ 131).

At least one market analyst viewed the Cytyc issue as short
term.  According to his or her June 21, 2002 report, "'We believe
that some of the short term issues, mainly inventory in the

---

[33]  The former Cytyc manufacturing manager related that in
May and June 2002:

> I heard that the stock is probably going to take a
> downswing, because of the fact that the channels are
> flooded.  I asked, well how did the channels get that
> flooded?  That became the first time that someone in
> distribution explained to me that the sales people were
> under pressure to make deep discounts [in order to convince
> customers] to buy bigger quantity at the end of quarters in
> order to meet the goals to keep the revenues up so that the
> stock price could be maintained.

(¶ 132).

channels . . . will be resolved over the next six weeks.'"  (¶ 134).  On June 24, 2002, however, Cytyc issued a press release further lowering the company's expected revenues for 2002 to a "'range of $230 million to $245 million, with pro forma earnings of $0.40 to $0.44 per share.'"  (¶ 137).

During the conference call the following day, "Cytyc representatives explained that the downward revision was necessitated because of the method of gauging demand for ThinPrep that Cytyc had been using, which had been based on shipments to laboratories, overestimated end-user demand."  (¶ 138).  Cytyc also announced a change in revenue recognition "to a system that was more reflective of end-user demand."  (¶ 138).

The market negatively reacted to the news and the price of Cytyc shares feel from $11.46 per share on June 24 to $6.88 per share at the close of trading on June 25, 2002.  In contrast to the 64% market share Cytyc reported for the first quarter of 2002 in the April 24, 2002 press release, a Thomas Weisel Partners LLP analyst posited that, "'we believe the ThinPrep Test had a 50.0% market share at the end of 1Q02.'"  (¶¶ 117 & 140).  Another market analyst likewise depicted "'an inventory overhang of $32-35 million that needs to work its way through the lab channel for Cytyc to put this issue behind it."  (¶ 141).

As a further means to infer scienter, the complaint notes that Sullivan and Bowen controlled the content of Cytyc press releases and SEC filings and could therefore falsify information about Cytyc's performance and products.  (¶ 147).  Intimately

involved in the company, both Sullivan and Bowen were kept informed "on an ongoing basis" about the company's problems. (¶¶ 148-149).[34]  Both Sullivan and Bowen, described as "very hands-on managers," attended sales meetings where Cytyc management stressed the importance of meeting sales expectations, according to the former Cytyc CA account executive and the unnamed human resources representative. (¶¶ 153 & 154).

Sullivan also purchased Cytyc stock during the class period. More specifically, on December 6, 2001, Sullivan sold 55,000 shares of Cytyc common stock at a price of $24.90 per share.  He sold an additional 20,000 shares the following day, also for $24.90 per share.  Gross proceeds totaled $1,867,500 or approximately four times Sullivan's annual salary.

The amount, however, represents approximately 10% of Sullivan's Cytyc holdings.  The $24.90 share price was not the high during the class period, which briefly hovered around $30.00 per share in October 2001. (Docket Entry # 32, Ex. R).[35]  Even more significant, Sullivan's sales during the class period are less than his sales both prior to and after the class period.

---

[34]  The complaint does not attribute the statement to anyone or provide a time frame.

[35]  Although the data is attached to defendants' opposition, it is appropriate to take judicial notice of the sales price during the class period on a motion to dismiss.  In Re NAHC, Inc. Securities Litigation, 306 F.3d 1314, 1331 (3rd Cir. 2002) (affirming lower court's decision to take judicial notice of stock price data on motion to dismiss).  Plaintiffs did not object to the submission.  In any event, the complaint reflects a class period high of $27.52 (¶ 10), a price still in excess of the price Sullivan sold his shares.

For example, Sullivan sold 130,800 shares or approximately 15% of

his holdings in April 2001 and 189,930 shares or approximately

22% of his holdings in December 2002.   (Docket Entry # 32, Ex.

Q).[36]


C.   Cytyc's Revenue Recognition Policy

As a result of the end of quarter discounts, Cytyc pushed

sales into earlier quarters than normally would have occurred.

Customers also accumulated inventory in amounts that they did not

immediately use.   Improper recognition of revenue materially

inflated the company's reported results making the financial

statements misleading or false, according to the complaint.

Plaintiffs allege that the channel stuffing as well as the

shipments of additional and unordered product violated the

company's revenue recognition policy, GAAP and SEC regulations[37]

--------

[36]   Where, as here, plaintiffs raise an allegation of
insider trading (see Docket Entry # 36, p. 43) and do not
challenge the authenticity of the public documents, this court
may consider the entirety of the Form 4 filings without
converting the motion to dismiss into a motion for summary
judgment.   See In Re Stone & Webster, 253 F.Supp.2d at 128 & n.
11 (considering copies of SEC Forms 4 without converting motion
to dismiss into motion for summary judgment); In Re Millstone
Scientific Securities Litigation, 103 F.Supp.2d at 450-451 & n.
15 (considering numerous SEC public filing documents without
converting motion to dismiss into motion for summary judgment and
noting that court may consider "matters of public record" and
"documents referred to in the complaint"); see also Blackstone
Realty, LLC v. FDIC, 244 F.3d at 195 n. 1 (exhibits attached to
complaint properly considered for purposes of Rule 12(b)(6), Fed.
R. Civ. P.); Watterson v. Page, 987 F.2d at 3.

[37]   The complaint (¶ 55) correctly notes that under an SEC
regulation, 17 C.F.R. § 210.4-01(a)(1), "filings that do not
comply with GAAP "'will be presumed to be misleading and
inaccurate.'"   In Re Cabletron Systems, Inc., 311 F.3d 11, 34

thereby evidencing a strong inference of scienter.  Plaintiffs
maintain that Cytyc's channel stuffing violates certain
provisions of the Financial Accounting Standards Board ("FASB"),
SEC Staff Accounting Bulletin 101 ("SAB 101"), FASB Statement of
Financial Accounting Standards ("SFAS") and an opinion of the
Accounting Principles Board ("APB").[38]  The complaint alleges
that during the class period, the financial statements of Cytyc
violated the following principles of fair financial reporting:

(1) the principle that financial reporting should provide
accurate, reliable and useful information concerning an entity's
performance and that investors commonly use the company's
performance in the past as a reliable indicator of the company's
performance in the future (¶¶ 54 & 61, citing FASB Concepts
Statement No. 1; ¶¶ 34, 42 & 58-59);[39]

(2) the principle that revenues should not be recognized
until "realized or realizable and earned" (¶ 56, citing FASB
Concepts Statement No. 5, ¶ 83; SAB 101; FASB Concepts Statement

_____

(1st Cir. 2002) (citing to 17 C.F.R. § 210.4-01(a)(1)).

[38]    GAAP "'are the official standards adopted by the
American Institute of Certified Public Accountants (the "AICPA"),
a private professional association, through three successor
groups that it established, the Committee on Accounting
Procedure, the Accounting Principles Board (the "APB"), and the
Financial Accounting Standards Board (the "FASB").'"  In Re Enron
Corporation Securities, 235 F.Supp.2d 549, 572 n. 11 (S.D.Tx.
2002).  The complaint cites inter alia to FASB Concepts
Statements 2, 5, 33, 34, 41, 42, 58, 59 and 83.

[39]    In relation to this category, the complaint further
notes that by pulling in revenues from future quarters into
earlier quarters, defendants violated FASB Concepts Statement
Number One because reported revenues in the earlier quarters were
not reliable representations of revenues.  (¶ 62).

No. 2; SFAS No. 48;[40] Accounting Research Board No. 43; APB

opinion 10; ¶¶ 57, 59 & 80, all citing SAB 101);[41] and

(3) the principle requiring companies to "describe known

trends or uncertainties" that have a material effect on sales and

revenues in all Form 10-K and 10-Q reports, particularly those

events known to management that would cause reported financial

information not to be reflective of future operating results (¶¶

63-66, citing 17 C.F.R. § 229.303).[42]

---

[40] SFAS 48 circumscribes declaring revenue when a right of
return exists. See generally Aldridge v. A.T. Cross Corporation,
284 F.3d at 79. There are no particular allegations that
ThinPrep shipments were returned or that such shipments amounted
to contingent sales. Moreover, under SFAS 48 allowing a right of
return in a particular transaction "does not per se mean that
revenue cannot be recognized at the time of sale." In Re Focus
Enhancements, Inc. Securities Litigation, 309 F.Supp.2d 134, 151
(D.Mass. 2001).
    Alternatively, the complaint's brief reference to the
regulation, without more, is conclusory and lacks the necessary
pleading detail required under the PSLRA. See Fitzer v. Security
Dynamics Technologies, Inc., 119 F.Supp.2d 12, 35 (D.Mass. 2000).

[41] Although revenue does not have to be received before
recognized, there should be "persuasive evidence of an
arrangement." (¶ 56). In other words, there should be evidence
of delivery and a fixed price such that "collectability of the
sales price is reasonably assured." (¶ 56). There must be
sufficient evidence of an arrangement. (¶ 80, quoting SAB 101).

[42] The pertinent SEC regulation imposes a duty on
registrants to:

> Describe any known trends or uncertainties that have had or
> that the registrant reasonably expects will have a material
> favorable or unfavorable impact on net sales or revenues or
> income from continuing operations. If the registrant knows
> of events that will cause a material change in the
> relationship between costs and revenues (such as known
> future increases in costs of labor or materials or price
> increases or inventory adjustments), the change in the
> relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii).

The company's financial statements during the class period
and the 2001 Form 10-K contain the company's stated policy for
revenue recognition.   The policy corresponds to SAB 101 and reads
as follows:

> The Company recognizes product revenue upon shipment,
> provided that there is persuasive evidence of an
> arrangement, there are no uncertainties regarding
> acceptance, the sales price is fixed or determinable,
> collection of the resulting receivable is probable and only
> perfunctory Company obligations included in the arrangement
> remain to be completed.

(¶¶ 58 & 78; _accord_ Docket Entry # 32, Ex. J, p. F-7).   The 2001
Form 10-K elsewhere describes Cytyc's policy in a similar manner:

> The Company follows very specific and detailed guidelines in
> measuring revenue; _however, certain judgments affect the_
> _application of its revenue policy.   For example, revenue is_
> _not recognized from sales transactions unless the collection_
> _of the resulting receivable is reasonably assured.   The_
> _Company assess[sic] collection based on a number of factors,_
> _including past transaction history with the customer and the_
> _credit-worthiness of the customer._   If it is determined that
> the collection fee is not reasonably assured, the fee is
> deferred and revenue is recognized at the time collection
> becomes reasonably assured, which is generally upon receipt
> of cash.

(¶ 112, emphasis in complaint; Docket Entry # 32, Ex. J, p. 20).

Cytyc's channel stuffing purportedly improperly pulled
revenue from future quarters into previous quarters.   (¶ 62,
citing FASB Concepts Statement No. 1; ¶¶ 33, 41 & 58-59).
Because of Cytyc's practice of channel stuffing, the Forms 10-K
and 10-Q covering the class period failed to disclose that
current revenues were achieved at the expense of future revenues.
(¶ 66).   The forms thereby mischaracterized current financial
growth and failed to disclose known trends in violation of 17
C.F.R. § 229.303, according to the complaint.   (¶ 66).

33

<u>DISCUSSION</u>

A.  <u>Essential Elements of Securities Fraud Liability</u>

Liability under Section 10(b), 15 U.S.C. § 78j(b), and Rule
10b-5, 17 C.F.R. § 240.10b-5, requires the plaintiff to plead
with particularity that, in connection with the sale or purchase
of a security, the defendant:  (1) "made a false statement or
omitted a material fact;" (2) "with the requisite scienter;" and
that (3) the "plaintiff relied on the statement or omission;"
(4) "with resultant injury."  <u>In Re Boston Technology, Inc.</u>
<u>Securities Litigation</u>, 8 F.Supp.2d 43, 52 (D.Mass. 1998); <u>accord</u>
<u>Gross v. Summa Four, Inc.</u>, 93 F.3d 987, 992 (1st Cir. 1996) (the
"plaintiff must plead, with sufficient particularity, that the
defendant made a false statement or omitted a material fact, with
the requisite scienter, and that the plaintiff's reliance on this
statement or omission caused the plaintiff's injury").  The
circumstances in the case at bar primarily concern the first and
second elements.

Under the first element, the plaintiff must allege that a
defendant either:  "'(A) made an untrue statement of a material
fact; or (B) omitted to state a material fact necessary in order
to make the statements made, in the light of the circumstances in
which they were made, not misleading.'"  <u>Baron v. Smith</u>, 380 F.3d
49, 52 (1st Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)(1)).  The
falsity or untruth of the various statements presents a
relatively straight forward analysis.  The misleading nature of
the statements poses a more exacting inquiry.

34

In order to create liability for an omission, as opposed to an affirmatively stated falsehood, there must be a duty to disclose the omitted nonpublic information. <u>Gross v. Summa Four, Inc.</u>, 93 F.3d at 992 ("corporation must first have a duty to disclose the nonpublic material information"); <u>Shaw v. Digital Equipment Corporation</u>, 82 F.3d at 1202 ("silence, absent a duty to disclose, cannot be actionably misleading"). Simply reporting past historical earnings or successes does not give rise to a duty to report present circumstances which are less rosy. <u>Suna v. Bailey Corporation</u>, 107 F.3d 64, 68 (1st Cir. 1997). For example, if a corporation accurately reports that, "'This is our eighth consecutive quarter in which our gross has increased,'" there is not duty to add, "'We are concerned about the next one.'" <u>Serabian v. Amoskeag Bank Shares, Inc.</u>, 24 F.3d 357, 361 n. 4 (1st Cir. 1994) (further noting the rule may be different if the defendant apprehends "'a disaster'").

Where, however, "a corporation does make a disclosure-- whether it be voluntary or required--there is a duty to make it complete and accurate." <u>Gross v. Summa Four, Inc.</u>, 93 F.3d at 992; <u>Backman v. Polaroid Corporation</u>, 910 F.2d 10, 16 (1st Cir. 1990) ("voluntary disclosure that a reasonable investor would consider material must be complete and accurate"); <u>In Re Boston Technology, Inc. Securities Litigation</u>, 8 F.Supp.2d at 54 ("when an issuer opts to make a statement, that statement must be 'complete and accurate'"); <u>see also</u> <u>Lucia v. Prospect Street High Income Portfolio, Inc.</u>, 36 F.3d 170, 175 (1st Cir. 1994)

(recognizing that statement can be literally accurate but
nonetheless misleading).  A duty thus arises where, for instance,
"a corporation has previously made a statement of material fact
that is either false, inaccurate, incomplete, or misleading in
light of the undisclosed information." Gross v. Summa Four,
Inc., 93 F.3d at 992; see Carney v. Cambridge Technology
Partners, Inc., 135 F.Supp.2d 235, 242 (D.Mass. 2001) ("'duty to
disclose arises only where both the statement made is material,
and the omitted fact is material to the statement in that it
alters the meaning of the statement'"); see also Shaw v. Digital
Equipment Corporation, 82 F.3d at 1202-1203 ("task depends, in
essence, on conceptions of materiality").

It is equally well settled that the false or omitted fact
must be "material."  An omitted or misrepresented fact is
"considered material only if a reasonable investor would have
viewed the misrepresentation or omission as 'having significantly
altered the total mix of information made available.'" Gross v.
Summa Four, Inc., 93 F.3d at 992; accord In Re Cabletron, 311
F.3d at 33 ("fact is material if it is substantially likely that
the disclosure of the omitted fact would have been viewed by the
reasonable investor as having significantly altered the 'total
mix' of information made available").  "Information which would
have assumed actual significance in the deliberations of a
reasonable shareholder is material." Baron v. Smith, 380 F.3d at
52.  Issues of materiality are normally left for the "jury rather
than resolved by the court on a motion to dismiss." In Re

<u>Cabletron</u>, 311 F.3d at 34.

In addition to a materially false statement or the omission of a material fact, the plaintiff must show that the defendant acted with scienter.  Scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'"  <u>Greebel v. FTP Software</u>, 194 F.3d at 194 (quoting <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n. 12 (1976)).  It can be proven with knowing or reckless conduct.  <u>Geffon v. Micrion Corporation</u>, 249 F.3d 29, 35 (1st Cir. 2001).  Under the former, the plaintiff must show that the defendant "knew (i) that the statement was false or misleading, and (ii) that it was made in reference to a matter of material interest to investors."  <u>Geffon v. Micrion Corporation</u>, 249 F.3d at 35.  Under the latter, there must be a showing of "more than mere negligence."  <u>Geffon v. Micrion Corporation</u>, 249 F.3d at 35.  Recklessness, which is more akin to a lesser form of intent than ordinary negligence, <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d at 199, consists of "'a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'"  <u>Geffon v. Micrion Corporation</u>, 249 F.3d at 35; <u>Orton v. Parametric Technology Corporation</u>, 344 F.Supp.2d 290, 299 (D.Mass. 2004) (same).

B.  <u>Pleading Requirements</u>

<u>Greebel</u> is the seminal case in this circuit with respect to

# EXHIBIT 9
# (2 of 2)

pleading a securities action under Rule 9(b), Fed. R. Civ. P.

("Rule 9(b)"), and the PSLRA.  Greebel v. FTP Software, 194 F.3d

at 193-194; In Re Allaire Corporation Securities Litigation, 224

F.Supp.2d 319, 325 (D.Mass. 2002).  As explained in Greebel, the

pleading standards under the PSLRA are congruent to the First

Circuit's strict and rigorous application of Rule 9(b) prior to

the 1995 enactment of the PSLRA.  Greebel v. FTP Software, 194

F.3d at 192.

The pleading requirements under the PSLRA, as well as First

Circuit caselaw interpreting Rule 9(b), first require the

plaintiff to specify in the complaint "each allegedly false or

misleading statement 'including its time, place and content.'"

In Re Allaire Corporation Securities Litigation, 224 F.Supp.2d at

324 (quoting Greebel v. FTP Software, 194 F.3d at 193-194).

Second, the complaint must "'specify the reason or reasons why

the statement is misleading.'"  Greebel v. FTP Software, 194 F.3d

at 193 (quoting statute with internal brackets omitted).  In

other words, the complaint must explain and provide factual

support as to "why the challenged statement or omission is

misleading."  Greebel v. FTP Software, 194 F.3d at 193; see In Re

Allaire Corporation Securities Litigation, 224 F.Supp.2d at 324

("[e]very claim that a statement or omission was fraudulent must

be supported by facts showing exactly why it was misleading").

Third, if a claim rests on information and belief, the plaintiff

must "'set forth the source of the information and the reasons

for the belief.'"  Greebel v. FTP Software, 194 F.3d at 194; In

Re Allaire Corporation Securities Litigation, 224 F.Supp.2d at 324; see also In Re Cabletron, 311 F.3d at 28 (discussing inconsistency in definitions of what constitutes a statement made upon "information and belief").

Fourth, the complaint must state "with particularity facts that give rise to a 'strong inference' of scienter rather than merely a reasonable inference." In Re Cabletron, 311 F.3d at 28 (quoting statute). Although pleading scienter may and often is established through inference, the inference must be strong. In Re Cabletron, 311 F.3d at 28 (further explaining how this framework alters "the usual contours" of Rule 12(b)(6) analysis); Greebel v. FTP Software, 194 F.3d at 195 (same).[43]

Before exploring the absence of a strong inference of scienter with respect to any remaining statements, this court examines and rejects the revenue recognition allegations and the misleading nature of the discounting statement set forth in the financial statements as well as the allegations based upon unordered or additional product. Proceeding along a statement by statement analysis, see Carney v. Cambridge Technology Partners, Inc., 135 F.Supp.2d at 243; In Re Boston Technologies Securities Litigation, 8 F.Supp.2d at 55, this court then culls the actionable statements in the complaint as distinguished from the nonactionable statements of corporate puffery and those that fall within the safe harbor provision of the PSLRA for forward looking

---

[43] As also explained in Greebel, the PSLRA does not alter the pre-existing substantive definition of scienter employed in the First Circuit. Greebel v. FTP Software, 194 F.3d at 200.

statements.

C.  Revenue Recognition

In support of pleading a strong inference of scienter as well as setting forth this material element, plaintiffs point to defendants' purported violations of SEC rules, GAAP and Cytyc's own revenue recognition policy.[44]  (Docket Entry # 36, pp. 37-40).  Separate and apart from the fact of this case, plaintiff's legal position is accurate.  See Aldridge v. A.T. Cross Corporation, 284 F.3d at 83 (paraphrasing Geffon v. Micrion Corporation, 249 F.3d at 35, that "'accounting shenanigans' may be evidence of scienter"); In Re Cabletron, 311 F.3d at 39 ("[s]ignificant GAAP violations also 'could provide evidence of scienter'"); Greebel v. FTP Software, Inc., 194 F.3d at 203 ("[v]iolations of GAAP standards . . . could provide evidence of scienter"); In Re Galileo Corporation Shareholders Litigation, 127 F.Supp.2d 251, 266 (D.Mass. 2001) ("'a violation of a company's own policies supports an inference of scienter'").

Plaintiffs identify statements in the Forms 10-K regarding discounts as materially misleading (¶¶ 110-111 & 116) as well as the company's stated policy of recognizing revenue as materially misleading because the company engaged in channel stuffing.  (¶¶ 112-114 & 116); see, e.g., In Re Cabletron, 311 F.3d at 34 (noting the allegation of financial report filings as materially

---

[44]  Plaintiffs additionally contend that the violations of GAAP, SEC regulations and Cytyc's policy show the falsity or misleading nature of the statements made during the class period because revenue should not be recognized until realized or realizable.  (See, e.g., ¶¶ 60-62).

misleading).  Plaintiffs further complain that the company's
financial statements were materially false and misleading because
they inflated or overstated revenues, accelerated revenues into
earlier quarters and failed to disclose known trends such as
channel stuffing.  (See, e.g.,[45] ¶¶ 52, 53, 56 & 66).
Unfortunately for plaintiffs, none of these allegations survive
defendants' motion.

Turning to the first two aforementioned global categories of
revenue recognition violations, it is true that systemically
recognizing revenues before earned and accounting for such
premature revenues contravene GAAP principles set forth in FASB
Concepts Statement Number One.  See In Re Daou Systems, Inc.
Securities Litigation, 2005 WL 237645 at * 8 (9th Cir. Feb. 2,
2005) ("premature recognition . . . could violate other GAAP
principles such as" FASB Concepts Statement No. 1); (¶¶ 34 & 58-
59; ¶ 61, citing these principles).  It is also true that the
cited regulations in the second category generally require that a
company not recognize revenue in financial statements until
"realized or realizable and earned."[46]  (¶ 56; see also ¶¶ 57 &
79-80).  For example, SAB 101, repeatedly referenced in the
complaint (¶¶ 56, 57, 59 & 80), "requires that "'revenue should
not be recognized until it is realized or realizable and

---

[45]  To state the obvious, the cited list of paragraphs is
not exhaustive.

[46]  Plaintiffs' citation to a litany of SEC regulations and
accounting principles is conclusory and fails to explicitly tie
the violation to a particular duty and accounting regulation.

earned.'" <u>In Re BellSouth Securities Litigation</u>, 2005 WL 327178

at * 16 (N.D.Ga. Feb. 8, 2005) (quoting SAB 101) <u>Barrie v.</u>

<u>Intervoice-Brite, Inc.</u>, 2005 WL 57928 at * 3 (5th Cir. Jan. 12,

2005) (further noting that SEC adopted SAB 101 "to guide

companies in applying SEC Rules and GAAP to revenue recognition

issues"). SEC regulations additionally state that filings that

do not conform with GAAP are presumed to be misleading or

inaccurate. (¶ 55); 17 C.F.R. § 210.4-01(a)(1); <u>In Re Seque</u>

<u>Software, Inc. Securities Litigation</u>, 106 F.Supp.2d 161, 164 n. 4

(D.Mass. 2000).

The class period Forms 10-Q and 10-K, however, do not

evidence improper revenue recognition under these regulations.

The channel stuffing allegations (<u>see</u>, <u>e.g.</u>, ¶¶ 68(f)) are not

within the reach of the aforementioned regulations inasmuch as

there is no evidence that ThinPrep shipments were returned or

that Cytyc engaged in contingent sales, a pattern of undisclosed

price protection and take back guarantees or reported revenue

from fictitious sales. <u>Cf. Aldridge v. A.T. Cross Corporation</u>,

284 F.3d at 79 (involving price protection policy and contingent

sales as opposed to only channel stuffing).[47] As aptly explained

---

[47] The <u>Aldridge</u> case is distinguishable for the reasons set
forth by defendants in their reply brief. (Docket Entry # 39, p.
16). Although defendants exaggerate the absence of specific
statements, there remains the absence of contingent or fictitious
sales, returned product or a pattern of price protection and take
back guarantees in the case at bar. The facts fail to indicate
that the discounts resulted in revenue not being realized, as
reported. <u>See Gross v. Summa Four, Inc.</u>, 93 F.3d at 994. Thus,
there is an absence of factual support for the necessary element
of falsity or material omissions with respect to the innocuous
channel stuffing alleged in this action as applied to the alleged

by a court in this district:

> [P]ull-ins or deep discounts are not the nefariously
> manipulative scheme that plaintiffs make them out to be.
> Pull-ins do not result in the improper recognition of
> revenue under generally accepted accounting principles
> ("GAAP").  They are actual sales which are treated no
> differently than any other sale.

In Re Peritus Software Services, Inc., 52 F.Supp.2d 211, 223 n. 3

(D.Mass. 1999) (internal quotation marks, brackets and citations

omitted).  The facts fail to indicate that the discounts resulted

in revenue not being realized, as reported and in accordance with

the Cytyc's stated accounting or revenue recognition policy.  See

Gross v. Summa Four, Inc., 93 F.3d at 994.  Stated otherwise, the

excessive discounting did not prevent transactions from being

completed.  The financial statements accurately reflect earnings

made upon and after persuasive evidence of an arrangement.

In any event, contrary to plaintiffs' position, the

discounting was adequately disclosed.  The Forms 10-K and 10-Q

recognize the use of discounts and that such discounts could have

a material adverse effect on Cytyc's financial condition.

(Docket Entry # 32, Ex. B & J, "In the past, the Company has

offered discounts to stimulate demand for the ThinPrep System and

may elect to do so in the future, which discounts could have a

---

GAAP, SEC and company policy violations.
    Thus, while the number of former unnamed employees is
sufficient and they occupy positions that give them a strong
basis for possessing the information about the company's channel
stuffing, see In Re Cabletron Systems, 311 F.3d at 30; Fitzer v.
Security Dynamics Technologies, Inc., 119 F.Supp.2d at 22, the
stories themselves lack the necessary facts to support the
allegation that Cytyc violated the aforementioned GAAP, SEC and
its own revenue recognition rules.

material adverse effect on the Company's business, financial
condition and results of operations;" Docket Entry # 32, Ex. D,
incorporating risks detailed in the 2000 Form 10-K and that such
risks "may have a material adverse effect upon on the Company's
business, financial condition and results of operations").

Accordingly, Cytyc's stated accounting or revenue
recognition policy as well as the statement regarding discounts
(¶¶ 110-116) in the financial statements neither contravenes the
aforementioned regulations in the first and second categories nor
amounts to a false or misleading statement.[48]  Also in this
respect, there is no inference of scienter due to the absence of
a violation of the foregoing GAAP and SEC provisions and Cytyc's
revenue recognition policy or otherwise.[49]

The final category of allegedly improper revenue recognition
which arises under Item 303 of 17 C.F.R. § 229.303 is likewise
unavailing.[50]  First, although the complaint expressly complains
about the failure of the Forms 10-K and 10-Q to disclose the use

---

[48]  Additional reasons explaining why the discount statement
is not misleading or false are discussed infra.

[49]  Even if such activity gave rise to a weak inference of
scienter, without more, the complaint fails to pled the strong
inference of scienter now required under the PSLRA.

[50]  The regulation,  17 C.F.R. § 229.303(a) and (b),
commonly referred to as "Item 303," governs Form 10-K and 10-Q
filings.  Item 303 "requires corporate management to disclose,
inter alia, 'any known trends or uncertainties that have had or
that the registrant reasonably expects will have a material
favorable or unfavorable impact on net sales or revenues or
income from continuing operations . . ..'"  Kafenbaum and
Schulman v. GTECH Holdings Corporation, 217 F.Supp.2d 238, 249
(D.Mass. 2002).

of discounts as a known trend "'that would cause reported
financial information not to be necessarily indicative of future
operating results'" (¶¶ 64 & 66, quoting instructions to Item
303), the rule in "Item 303, 17 C.F.R. § 229.303(a)(3)(ii), . . .
has to be read in light of the SEC's instruction to this
paragraph which expressly states that forward-looking information
need not be disclosed.   17 C.F.R. § 229.303(a), Instruction 7."
Glassman v. Computervision Corporation, 90 F.3d 617, 631 (1st
Cir. 1996); accord Romine v. Acxiom Corporation, 296 F.3d 701,
708 n. 3 (8th Cir. 2002) ("While § 229.303(a)(3)(ii) provides
that 'known trends or uncertainties' be disclosed in certain SEC
filings, another SEC regulation, which expressly addresses
forecasts, states that forward-looking information need not be
disclosed.   17 C.F.R. § 229.303(a)").

Second, it is not objectively unreasonable to omit the fact
that the discounts, or channel stuffing, "would" as opposed to
"could" have a material adverse effect on the company's future
earnings.   See, e.g., Oxford Asset Management, Limited v.
Jaharis, 297 F.3d 1182, 1191 (11th Cir. 2002) ("failure to allege
facts from which the objective unreasonableness of Kos
management's decision not to include the prescription information
. . . could be inferred forecloses reliance upon Item 303 as a
source of a duty to disclose that information"), cert. denied,
540 U.S. 872 (2003).   In addition, the import of the language was
obvious making the distinction between "could" and "would"
immaterial.   See Baron v. Smith, 285 F.Supp. 96, 104 (D.Mass.

2003) ("where company disclosed that largest customer began 'trial' of service product, it was not necessary also to disclose that customer had not committed to purchasing service, since uncertainty of commitment to purchase was obvious from word 'trial'") (paraphrasing In Re Boston Technologies Securities Litigation, 8 F.Supp.2d at 61), aff'd, 380 F.3d 49 (1st Cir. 2004). Finally, although the information regarding discounts appears in the Forms 10-K under "marketing and sales" as opposed to under "results of operations," the placement, without more, is not actionable.[51]

Third, the Forms 10-K directly and the Form 10-Q by incorporation adequately disclosed the use of discounts. See, e.g., Shaw v. Digital Equipment Corporation, 82 F.3d at 1206 (disclosure of marketing strategy in reducing prices adequately disclosed in SEC filings thereby obviating alleged violation of 17 C.F.R. § 229.303); Baron v. Smith, 380 F.3d at 54-56.

D. Unordered and Additional Product

Recognizing as revenue unordered product or shipping additional product without an order, as distinguished from channel stuffing through the use of deep discounts, is more egregious and poses a more forceful argument that Cytyc engaged in conduct in violation of its own or SEC and GAAP revenue recognition requirements. With respect to unordered or additional product, however, the complaint falls well short of

---

[51] The Form 10-Q refers to the risk factors in the annual Form 10-K report without expressly listing the use of discounts.

providing sufficient detail to satisfy Rule 9(b) and the PSLRA.
See In Re Galileo Corporation, 127 F.Supp.2d at 268 (generally
alleging that revenues in second quarter were false and failing
to provide details about amount of warranty reserve
understatement made pleading deficient under Rule 9(b) and
PSLRA); Fitzer v. Security Dynamics Technologies, 119 F.Supp.2d
at 35-36 (channel stuffing allegations deficient under Rule 9(b)
and PSLRA); Lirette v. Shiva Corporation, 27 F.Supp. 268, 278
(D.Mass. 1998).

In contrast to the repeated and numerous allegations of
channel stuffing on the part of former Cytyc employees,[52] the
complaint provides few particulars about the when, where, amount
and nature of the transactions of unordered product and the
relationship between the amount of unordered product shipped and
the company's total revenues.  The two instances of shipment of
additional product related by the former Cytyc senior
representative (¶ 44) and the former Cytyc sales representative
(¶ 38) are too general and lack repeated corroboration to satisfy
PSLRA pleading.  Cf. In Re Cabletron, 311 F.3d at 30-31.  Thus,
the instances of unordered product or shipment of additional
product above what had been ordered (see ¶¶ 5, 7, 44, 49, 61 &
82(c)), as distinguished from the deep discounting at the end of
every quarter and/or "channel stuffing," lack detail and
corroboration by other employees.  Eschewing a categorical
approach, see In Re Cabletron, 311 F.3d at 32 (rejecting

---

[52]    See footnote number 47, ¶ 2.

"categorical approach" and noting that "'Congress was concerned
with the quantum, not type, of proof'"), the complaint lacks the
"quantum" of proof and particularity to satisfy the PSLRA with
respect to the shipments of unordered or additional product.
Accordingly, such allegations cannot support a finding that
Cytyc's stated revenue recognition policy or the use of discounts
or other channel stuffing activity was false or misleading or
that defendants acted with scienter.

E.   Specific Statements

       Defendants attack a number of the statements in the
complaint as nonactionable corporate puffery or falling within
the PSLRA's safe harbor provision for forward looking statements.

       As to the former, "Vague and loosely optimistic statements"
are "nonactionable as a matter of law." Gross v. Summa Four,
Inc., 93 F.3d at 987 (affirming dismissal of complaint).  This
rule applies to statements concerning both current affairs and
future prospects.  Orton v. Parametric Technology Corporation,
344 F.Supp.2d at 300 ("corporate puffery rule 'covers loose
optimism about both an issuer's current state of affairs and its
future prospects'"); In Re Boston Technology, Inc. Securities
Litigation, 8 F.Supp. at 54 (same).  "Rosy affirmation[s]
commonly heard from corporate managers," such as we "expect
another year of strong growth" or "the company is on target
toward achieving the most profitable year in its history," are
"numbingly familiar." Shaw v. Digital Equipment Corporation, 82
F.3d at 1217-1218 (internal quotation marks and citations

omitted). Consequently, "no reasonable investor could find" such
"optimistic" or "vague" statements "important to the total mix of
information." Shaw v. Digital Equipment Corporation, 82 F.3d at
1217. In the parlance of common law fraud, such statements
amount to "'puffing' or 'sales talk.'" Shaw v. Digital Equipment
Corporation, 82 F.3d at 1217 n. 32.

The more specific, definite or concrete the outward
statement is, however, the greater the likelihood the statement
is material and not mere puffery. See Gross v. Summa Four, Inc.,
93 F.3d at 995 (distinguishing the actionable statements in Alfus
v. Pyramid Technology Corporation, 764 F.Supp. 598 (N.D.Cal.
1991), from inactionable statements in that case because
"statements in Alfus dealt with definite projections," such as a
forecast of 40% revenue growth). For example, the inclusion of
"a market share figure" might push a nonactionable statement
beyond the realm of "mere optimistic corporate puffery." Fitzer
v. Security Dynamics Technologies, 119 F.Supp.2d at 26 (finding
phrase "'continued market demand'" vague and optimistic in part
because phrase did not specify "market share figure").
Similarly, more cautious or subdued statements are less likely to
be actionable than more strongly optimistic or concrete
statements that contrast sharply with internal reality. See
Glassman v. Computervision Corporation, 90 F.3d at 635-636 (duty
to disclose problems with new product "may arise where a company
makes strongly optimistic or concrete statements . . . in stark
contrast to its internal reports" as opposed to "subdued

generally optimistic statements" that amount to "puffery," citing
San Leandro Emergency Medical Group Profit Sharing Plan v. Philip
Morris Companies, Inc., 75 F.3d 801, 811 (2nd Cir. 1996)).
"[M]ild statements of hope, couched in strongly cautionary
language," are not materially misleading.  Glassman v.
Computervision Corporation, 90 F.3d at 636.

Defendants also rely on the PSLRA's safe harbor provision
with respect to a number of the forward looking statements in the
complaint.  Generally speaking, forecasts or other forward
looking statements are not exempt from liability.  Suna v. Bailey
Corporation, 107 F.3d at 70.  They are, however, only actionable
"if the forecast might affect a reasonable investor in
contemplating the value of a corporation's stock."  Suna v.
Bailey Corporation, 107 F.3d at 70 (internal quotations marks and
citation omitted).  In addition, there must be a showing that the
forecast was false or misleading, in other words, that facts
known by the forecaster at the time of the forecast (as
distinguished from simply fraud by hindsight) made the
anticipated forecast or success unlikely.  See Suna v. Bailey
Corporation, 107 F.3d at 70 (had the plaintiff "presented facts
known by Bailey, and contemporaneous with the statements above,
that would show that Bailey's anticipated success was unlikely,
such facts would have adequately alleged a claim of securities
fraud").

The PSLRA provides a safe harbor provision for forward
looking statements that include cautionary warning[s].  Analogous

50

to the "bespeaks caution" doctrine, see H.R. Conf. Rep. No. 104-369, * 44 (1995) ("[t]he Conference Committee safe harbor, like the Senate safe harbor, is based on aspects of SEC Rule 175 and the judicial created 'bespeaks caution' doctrine"), the relevant provision in 15 U.S.C. § 78u-5(c)(1)(A)(i) "shelters forward-looking statements that are accompanied by meaningful cautionary statements." Greebel v. FTP Software, Inc., 194 F.3d at 201; 15 U.S.C. § 78u-5(c)(1)(A)(i).  The statutory language precludes liability for a forward looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or is "immaterial."[53]  15 U.S.C. § 78u-5(c)(1)(A)(i) & (ii).  The Conference Committee's discussion clarifies that "'[i]mportant' factors means [that] the stated factors identified in the cautionary statement must be relevant to the projection."[54]  H.R. Conf. Rep. No. 104-369, * 44

---

[53]  The inclusion of the latter language simply clarifies that, "Courts may continue to find a forward-looking statement immaterial-and thus not actionable under the 1933 Act and the 1934 Act-on other grounds" irrespective of the statutory safe harbor provision." H.R. Conf. Rep. No. 104-369, * 43 (1995).

[54]  The following parts of the committee's discussion are illuminating:

> The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business.  As part of the analysis of what constitutes a meaningful cautionary statement, courts should consider the factors identified in the statements. "Important" factors means the stated factors identified in

51

(1995) (further noting that "boilerplate warnings will not
suffice").  On the other hand, the cautionary statement does not
necessarily have "to include the particular factor that
ultimately causes the forward-looking statement not to come
true."[55]  H.R. Conf. Rep. No. 104-369, * 44 (1995).

---

> the cautionary statement must be relevant to the projection
> and must be of a nature that the factor or factors could
> actually affect whether the forward-looking statement is
> realized.
>
> The Conference Committee expects that the cautionary
> statements identify important factors that could cause
> results to differ materially-but not all factors.  Failure
> to include the particular factor that ultimately causes the
> forward-looking statement not to come true will not mean
> that the statement is not protected by the safe harbor.  The
> Conference Committee specifies that the cautionary
> statements identify "important" factors to provide guidance
> to issuers and not to provide an opportunity for plaintiff
> counsel to conduct discovery on what factors were known to
> the issuer at the time the forward-looking statement was
> made.
>
> The use of the words "meaningful" and "important factors"
> are intended to provide a standard for the types of
> cautionary statements upon which a court may, where
> appropriate, decide a motion to dismiss, without examining
> the state of mind of the defendant.  The first prong of the
> safe harbor requires courts to examine only the cautionary
> statement accompanying the forward-looking statement.
> Courts should not examine the state of mind of the person
> making the statement.

H.R. Conf. Rep. No. 104-369, * 44 (1995).

[55] The April 24, 2002 conference call fits comfortably
within this framework.  Although plaintiffs complain that the
warnings in the conference call were simply boilerplate, the
warnings were specific, detailed and relevant to the projection.
Contrary to plaintiffs' position, the omission of the discounts
and inventory does not dispel the specificity of the warning and
prevent it from being sufficient under the PSLRA.  This is
particularly true where, as here, the warning refers the investor
to the company's SEC filings and the 2001 Form 10-K expressly
advised the investor about the company's use of discounts.  The
forward looking statements in the conference call therefore lie

52

The safe harbor provision also extends to oral statements in
a less exacting manner.  It allows a company to rely on this safe
harbor when making an oral statement by simply referring to the
written document containing the cautionary language.  15 U.S.C. §
78u-5(c)(2); see H.R. Conf. Rep. No. 104-369, * 45 (1995).

The analogous "bespeaks caution" doctrine precludes
liability for forecasts and projections where the context of the
forecast bespeaks caution.  Shaw v. Digital Equipment
Corporation, 82 F.3d at 1213-1214.  Under this doctrine, the
forward looking statement is not materially misleading if
"accompanied by adequate cautionary disclosures."  In Re Focus
Enhancements, Inc. Securities Litigation, 309 F.Supp.2d at 162.
Like the statutory safe harbor provision, the cautionary language
under the bespeaks caution doctrine must be "'sufficiently
related in subject matter'" as opposed to "merely boilerplate."
In Re Focus Enhancements, Inc. Securities Litigation, 309
F.Supp.2d at 162.  Summarily stated, the doctrine "embodies the
principle that when statements of 'soft' information such as
forecasts, estimates, opinions, or projections are accompanied by
cautionary disclosures that adequately warn of the possibility
that actual results or events may turn out differently, the

---

within the safe harbor.
    Furthermore, although not argued or addressed by the
parties, the conference call was an oral warning at the time it
was given even though it is now reduced to a transcript.  As
explained in the next paragraph, such oral statements do not
require the level of specificity required for written statements.
In any event, the warning is sufficient for either a written or
oral forward looking statement.

'soft' statements may not be materially misleading under the securities laws." <u>Shaw v. Digital Equipment Corporation</u>, 82 F.3d at 1213.

With the foregoing principles in mind, including the adequacy of the pleading under Rule 9(b) and the PSLRA, this court turns to the statements in the complaint.

The July 25, 2001 statement that growth is "driven by our proven market strategy, best-in-class sales team, and superior technology" is not actionable due to the failure to articulate or establish a basis for the statement's false or misleading nature. See <u>Orton v. Parametric Technology Corporation</u>, 344 F.Supp.2d at 300 (distinguishing the actionable fueling growth statement in <u>In re Allaire Corporation Securities Litigation</u>, 224 F.Supp.2d at 331-332). Plaintiffs fail to allege that the market strategy or the sales team or the superior technology is not "without any positive impact on [Cytyc's] performance." <u>Orton v. Parametric Technology Corporation</u>, 344 F.Supp.2d at 299 (statement that credited "company's separation of business units and focus on product sales for Parametric's financial performance" as opposed to undisclosed improper revenue recognition deemed inactionable because "[p]urchasers . . . have not alleged that Parametric's strategic business decisions were without any positive impact on their performance"). Nowhere does the complaint particularize with the requisite specificity that Cytyc's growth was not assisted by the company's market strategy, sales team and superior technology. See also <u>Orton v. Parametric Technology</u>

<u>Corporation</u>, 344 F.Supp.2d at 301-302 (statement that "we executed well this quarter" and "believe our strategic efforts in this past year in developing software solutions, expanding distribution and improving customer satisfaction are helping us to expand our leadership position as the product development company" lacked "requisite specificity" because "the plaintiffs have not alleged . . . that Parametric had executed its software development, product distribution, or customer service poorly").

Moreover, defendants correctly point out that the statement does not present an exhaustive list of all the reasons for the growth. <u>See</u>, <u>e.g.</u>, <u>In Re Boston Technology, Inc. Securities Litigation</u>, 8 F.Supp.2d at 69 ("paragraph B is not reasonably construed to attribute the shortfall to an exclusive cause, and it was therefore immaterial to the investment decision"). As noted by the court in <u>Polaroid</u>, "Statements discussing how some market factors (like mergers among retail drug chains) are affecting business are not false or misleading simply because they do not implicate other negative market influences as well." <u>In Re Polaroid Corporation Securities Litigation</u>, 134 F.Supp.2d 176, 185 (D.Mass. 2001). Thus, the omission of the extensive end of quarter discounting does not render the statement materially misleading. <u>See Gross v. Summa Four, Inc.</u>, 93 F.3d at 992 (revealing one fact about a product does not require corporation to "reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be 'so incomplete as to

mislead'")

The statement is also inactionable corporate puffery.  See, e.g., Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 24 (classifying as puffery statement that "Our eleventh straight quarter of record revenues is the result of continued market demand for our enterprise network and data security solutions").  Indeed, it is strikingly similar to the following statement in Orton that the court considered puffery: "Although we are not immune to the weakening economy in the near-term, we feel confident that the combination of our motivated workforce, solid infrastructure and total commitment to product development which is intended to deliver a high return on investment for customers, positions us for long-term growth." Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 300 (discounting statement as puffery and not "material to any reasonable analysis of the company's prospects").  The court in Orton rejected the foregoing statement as puffery against the contention that the statement failed to disclose that "long-term growth was unlikely because of Parametric's improper recognition of revenue in earlier periods."  Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 300.  The other portions of the statement pertaining to the continuation of "momentum" and the company's "consistent quarter to quarter growth" is likewise mere puffery and sales talk.  See, e.g., In Re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 220-221 (characterizing as puffery statements that company was "well

positioned for growth" and that it "expects more revenue growth in opportunities in Asia in the coming years").[56]

The same reasoning applies to the similar statements in the August 2, 2001 Bloomberg news article. When asked how Sullivan would increase or aggressively gain market share, Sullivan lists Cytyc's "unique sales and marketing strategy" as "creating the demand at the physician's office." (¶ 73). Although the complaint adequately pleads the time, place and content of the communication, the statement itself is not false or misleading. Like the July 25, 2001 statement, the list is not exhaustive or otherwise materially false or misleading. There is no indiction that the direct sales force was not creating, at least in part, the demand. In addition, the nondisclosure of the use of discounts did not significantly alter the total mix of information inasmuch as the 2000 Form 10-K filing discloses the use of such discounts. Alternatively, the self directed comment is puffery as is Sullivan's mildly optimistic prediction about the company's ability to maintain similar growth ("We believe so") (¶ 73).[57]

In the interview, however, Sullivan also quantifies revenue projections. (¶ 75). The quantification provides sufficient

---

[56] As explained *infra* with respect to these and other statements, the omission of the deep discounting at Cytyc falls significantly short of reckless when placed in context and the complaint as a whole fails to demonstrate a strong inference of scienter.

[57] Like the July 25, 2001 comments, this court's decision obviates the need to address the applicability of the PSLRA's safe harbor provision to these comments.

specificity to avoid defendants' assertions of puffery.
Sullivan's revenue projections in the interview, bereft of
cautionary language or a reference to document[s] identified as
containing cautionary statements,[58] do not fall within the reach
of the safe harbor provision or the bespeaks caution doctrine.
See 15 U.S.C. § 78u-5(c)(2); H.R. Conf. Rep. No. 104-369, * 45
(1995) ("Companies who want to make a brief announcement of
earnings or a new product would first have to identify the
statement as forward-looking").

   Contrary to defendants' position that the information does
not alter the total mix of information, the forecast gives a
specific range for 2002 revenues.  Cf. Suna v. Bailey
Corporation, 107 F.3d at 70 (discounting projections as not
actionable in part because they "do not project specific numbers
that the company will certainly attain").  Projections and the
company's ability to meet financial targets are "certainly
material to any sensible evaluation of [a] company's
performance." Orton v. Parametric Technology Corporation, 344
F.Supp.2d at 302.  Theoretically, the projection was materially
misleading when made because the preexisting and continuous deep
discounting and over-stuffing of customers would prevent Cytyc
from meeting the forecast.  Existing revenue growth was achieved
at the expense of future sales.  (¶ 82).

   The issue therefore devolves into whether Sullivan had

---

   [58]  Instead, during the televised exchange Sullivan simply
refers to a conference call.

information known to him at the time that would show that the
anticipated or projected earnings for 2001[59] and/or 2002 were
unlikely. See generally Suna v. Bailey Corporation, 107 F.3d at
70. This is where the complaint falters. First, the complaint
fails to plead sufficient facts to support the information and
belief that Sullivan knew that the projection was false when
made. See 15 U.S.C. § 78u-4(b)(1). The facts alleged fail to
adequately show that Sullivan had knowledge of specific facts
regarding the channel stuffing and the magnitude or extent of the
end of quarter discounting in August 2001 that would make
Sullivan's projection unreasonable. See In Re Boston Technology,
Inc. Securities Litigation, 8 F.Supp.2d at 54 ("Absent bad faith,
a defendant must have had--at the time the statement was
made--knowledge of specific facts making the statement
unreasonable"); see also Serabian v. Amoskeag Bank Shares, Inc.,
24 F.3d at 361. Furthermore, under the facts alleged there is
absolutely no bad faith or intentional deception reasonably
inferred.

Sullivan also had no knowledge that the projection was
materially misleading. See Serabian v. Amoskeag Bank Shares,
Inc., 24 F.3d at 361 (under Rule 9(b), "complaint must set forth
'specific facts that make it reasonable to believe that
defendant[s] knew that a statement was materially false or
misleading'"). To the contrary, there was little reason to

---

[59] Cytyc met the 2001 projection. (¶¶ 96 & 115). This is
true with respect to both the earnings projection on August 2,
2001 and on January 14, 2002.

believe that the failure to disclose the discounting was
materially misleading and would alter the total mix of
information inasmuch as the 2000 Form 10-K already disclosed the
use of discounts.  Similarly, there was no duty to disclose the
discounting under the circumstances.  The projection is therefore
not actionable under the facts alleged.[60]

Sullivan's equally glowing repetition of 2002 projected
earnings on January 14, 2002, as "approximately $0.64 to $0.66"
(¶ 95) is not puffery but nonetheless fails for identical
reasons.  It is true that the complaint notes that the continuous
channel stuffing was and would continue to have an adverse impact
on future sales and/or the market share was overstated because of
the channel stuffing, not to mention that customers were ceasing
to do business with Cytyc because of such practices.  (¶ 100).
The complaint fails, however, to provide facts to support the
information and belief regarding Sullivan's knowledge that the
projection was false or misleading when made.  In any event, the
strong inference of scienter is notably absent.[61]

---

[60]  Alternatively, as discussed _infra_, there is an absence
of a strong inference of scienter.

[61]  The January 14, 2002 press release contains an adequate
cautionary proviso that the projections are forward looking
statements and sufficiently warns investors of the risks,
including those identified in the 2000 Form 10-K filing.
Consequently, although defendants neglect to expressly rely on
the safe harbor provision or the bespeaks caution doctrine as
applied to this statement, it is highly likely that the statement
is not actionable.  Given the absence of an explicit argument to
this effect, however, this court rests its decision with respect
to this statement on the conclusion that plaintiffs fail to plead
a strong inference of scienter.  Defendants present the scienter
argument (as well as the corporate puffery, materiality and Rule

The October 19, 2001 comment by Sullivan that the company feels "confident in our success based on our track record" with ThinPrep is sales talk. See, e.g., In Re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 217 (statement that "we continue to have confidence in the fundamental strength of our business and in our strong competitive position" considered puffery); Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 24 (classifying as puffery statement that, "There are very few companies that are positioned as well as us and have the track record, the experience and the management"). Unaccompanied by any specifics regarding the company's "track record," see Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 24 (finding phrase "continued market demand" vague inasmuch as it failed to "specify a particular market demand [or] a market share figure"), no reasonable investor would consider the statement material to an investing decision.

For the same reasons that apply to the July 25, 2001 statement, the strikingly similar statement in the October 24, 2001 press release ("We believe the superior clinical performance of the ThinPrep Pap Test and the effectiveness of our sales and marketing strategy have provided Cytyc with consistent revenue and earnings growth and financial performance") is not actionable. The statement does not purport to identify all of

---

9(b)/PSLRA pleading shortcomings) universally as applied to all the allegations in the complaint. (Docket Entry # 31, § Introduction & § I(C)(2)).

the factors effecting growth and performance.  Alternatively, for
reasons expressed with respect to the July 24, 2001 statement,
the statement amounts to puffery.  See, e.g., Suna v. Bailey
Corporation, 107 F.3d at 70 ("While the company states that it
believes [emphasis supplied] the opportunities will be
comparable, the statement contains no promise to that effect").

Plaintiffs next challenge in a January 23, 2002 press
release that Cytyc had "now reported fifteen consecutive quarters
of revenue growth." (¶ 96).  Although plaintiffs contend and
plead that the statement is false because of the failure to
disclose the channel stuffing which numerous former employees
articulate, the statement was an accurate portrayal of past and
present earnings.  It was not false.  Serabian v. Amoskeag Bank
Shares, Inc., 24 F.3d at 361 & n. 4 ("defendants may not be held
liable under the securities laws for accurate reports of past
successes, even if present circumstances are less rosy").  As to
the misleading nature of the statement, defendants had no duty to
disclose the channel stuffing with respect to this statement.
The omitted disclosure of channel stuffing did not cause what
Sullivan did say, to wit, 15 past quarters of growth, to be
misleading.  See Shaw v. Digital Equipment Corporation, 82 F.3d
at 1212 ("reports of past successes do not themselves give rise
to a duty to inform the market whenever present circumstances
suggest that the future may bring a turn for the worse").  In
contrast to a similar statement deemed actionable in Orton v.
Parametric Technology Corporation, 344 F.Supp.2d at 302 ("we met

the third quarter targets we set in April"),[62] plaintiffs cannot,

as explained <u>supra</u>, empirically show that Cytyc did not meet the

earnings for the quarters in violation of the cited regulatory

provisions and the company's revenue recognition policy.  <u>Cf.</u>

<u>Orton v. Parametric Technology Corporation</u>, 344 F.Supp.2d at 302

(above statement actionable because, in theory, "the Purchasers

could empirically disprove Harrison's statement by demonstrating

that Parametric did not actually meet the financial targets set

in April under GAAP and under the company's own accounting

policies").

The remaining objectionable portion of the statement ("We

believe the achievements of 2001 put Cytyc in a solid position to

build on the momentum of the past year") is puffery.  <u>See</u>, <u>e.g.</u>,

<u>Suna v. Bailey Corporation</u>, 107 F.3d at 70 ("While the company

states that it *believes* [emphasis supplied] the opportunities

will be comparable, the statement contains no promise to that

effect"); <u>Orton v. Parametric Technology Corporation</u>, 344

F.Supp.2d at 302 (after stating that company met the target for

the April quarter, the further statement that "[s]olid execution

of our cost reduction programs and consistent focus on our key

initiatives will position us for enhanced earnings potential once

the economy improves" was puffery); <u>In Re Parametric Technology</u>

---

[62]  Like the entire objectionable portions of the January
23, 2002 statement, the statement in <u>Orton</u> reads in full as
follows:  "[W]e met the third quarter targets we set in April . .
. Solid execution of our cost reduction programs and consistent
focus on our key initiatives will position us for enhanced
earnings potential once the economy improves." <u>Orton v.</u>
<u>Parametric Technology Corporation</u>, 344 F.Supp.2d at 302.

Corporation Securities Litigation, 300 F.Supp.2d at 220-221

(characterizing as puffery statements that company was "well

positioned for growth" and that it "expects more revenue growth

in opportunities in Asia in the coming years").  Such general

optimism regarding the elusive concept of "momentum" building for

an indeterminable amount of time into the future is not

actionable.

As already explained,[63] the forecast in the January 24, 2002

Bloomberg news interview ("$295 to $305 million" and earnings per

share "of between 64 and 66 cents" for upcoming year) is not

puffery but nonetheless fails to constitute an actionable

statement.

Sullivan's additional statement that "we believe" that Cytyc

could capture "100 percent of the market" is, to a large degree,

so unrealistic that no reasonable investor would give it

credence.  Put another way, a reasonable investor would not

consider such a prophesy material to an investing decision.   It

also amounts to inactionable corporate puffery.  See, e.g., Suna

v. Bailey Corporation, 107 F.3d at 70; Orton v. Parametric

Technology Corporation, 344 F.Supp.2d at 302; In Re Parametric

Technology Corporation Securities Litigation, 300 F.Supp.2d at

220-221.  Alternatively, as explained in connection elsewhere,

the statement is not actionable because of the absence of a

strong inference of scienter.

Plaintiffs next identify various statements in the April 24,

---

[63]   See footnote number 22.

64

2002 press release and conference call as actionable.   The
forward looking statements (see, e.g., ¶ 118; ¶ 119, 2002
revenues) fall easily within the parameters of the PSLRA's safe
harbor.[64]

The historical recitation of earnings in the April 24, 2002
press release (¶ 117), without more, was not false.[65]   The
statement also did not give rise to a duty to disclose the deep
discounts or channel stuffing and was therefore not misleading.
The press release did not present the statement of past earnings
as a basis to forecast future growth but, instead, advised that
Cytyc management would discuss future expectations at the
conference call.   See Shaw v. Digital Equipment Corporation, 82
F.3d at 1212 ("reports of past successes do not themselves give
rise to a duty to inform the market whenever present
circumstances suggest that the future may bring a turn for the
worse").

The tightening inventory statement is not actionable for a
number of reasons.   First, the statement (¶¶ 119 & 124) fails the
so-called "entanglement test."   Under this test, recently adopted
by the First Circuit, "liability may attach to an analyst's
statements where the defendants have expressly or impliedly
adopted the statements, placed their imprimatur on the

---

[64]   See footnote 55.

[65]   To the extent the market share (¶¶ 47, 68, 82, 90, 100,
102, 109 & 117) or conversion rate stated at various times in the
complaint was not accurate (see, e.g., ¶ 127), there is an
absence of a strong inference of scienter.

statements, or have otherwise entangled themselves with the
analysts to a significant degree." In Re Cabletron, 311 F.3d at
37-38; accord Stone & Webster, Inc. Securities Litigation, 253
F.Supp.2d at 113 (same).[66]  Second, the conclusory assertions
that defendants intended analysts to rely upon and repeat various
statements (¶ 76), that the company provided guidance to analysts
and that the company used analysts, as a conduit to provide false
and misleading information (¶¶ 167-172) do not satisfy Rule 9(b).
See Stone & Webster, Inc. Securities Litigation, 253 F.Supp.2d at
113 ("Suna also rejects the notion that general statements
regarding a company's 'practice' of 'communicat[ing] regularly
with securities analysts . . . and [of] provid[ing] detailed
"guidance" to these analysts' are sufficiently particularized to
survive a motion to dismiss" under Rule 9(b)).  The article
itself does not quote a company source or imply that Cytyc
adopted the statements therein.  See, e.g., Suna v. Bailey
Corporation, 107 F.3d at 74 (rejecting under 9(b) allegation
attributing statements to company inasmuch as "reports do not
appear to quote any Bailey officer or employee, nor do they imply
that the forecasts were supplied or confirmed by any Bailey
officer or employee").

The assertion that Cytyc falsely represented in the
conference call that the inventory problem manifested itself
"only in the first quarter of 2002" (¶ 125) or that, as reflected

---

[66] Plaintiffs' reliance on Stone & Webster (Docket Entry #
36, p. 30) is misplaced for reasons set forth in defendants'
reply (Docket Entry # 39, pp. 13-14).

in a UBS Warburg report, the company "'instituted a one-time promotion'" (¶¶ 121 & 122) is belied by the transcript.  See In Re Computervision Corporation Securities Litigation, 914 F.Supp. 717, 719 (D.Mass. 1996) (noting "fundamental and fatal defect[]" in securities fraud action that, with respect to the allegedly actionable statements, "the Company simply did not say what the plaintiffs say it said").  Sullivan explicitly stated that this was not the first time for company promotions.  The 2000 and 2001 Forms 10-K also both note the use of "discounts" (plural) "[i]n the past."  (Docket Entry # 32, Ex. B & J).

Having addressed various statements, this court turns to the issue of scienter or, more accurately, the absence thereof.

E.  Scienter

Having already defined the concept of scienter, this court simply notes that there is no one fact pattern that predominates the calculus.  Instead, the fact pattern presented in each individual case is analyzed to determine if the allegations are sufficient to support a strong inference of scienter.  Geffron v. Micrion Corporation, 249 F.3d at 36 ("this Court does not 'categoriz[e] patterns of facts as acceptable or unacceptable to prove scienter,' but instead 'analyze[s] the particular facts alleged in each individual case to determine whether the allegations [are] sufficient to prove scienter'"); Greebel v. FTP Software, 194 F.3d at 196.

What consistently strikes this court in reading and rereading the complaint and other relevant and properly

67

considered documents is the absence of the strong inference of

scienter now required under the PSLRA.  First, there is nothing

inherently wrong with discounts or pressing for sales to be made

in earlier quarters or at the end of a quarter.  Greebel v. FTP

Software, 194 F.3d at 202 ("[t]here is nothing inherently

improper in pressing for sales to be made earlier than in the

normal course");[67] accord Johnson v. Tellabs, Inc., 262 F.Supp.2d

937, 950 (N.D.Ill. 2003) ("[i]n the business world, there

certainly is nothing inherently wrong with offering incentives to

customers to purchase products").  Nor is there any additional

suggestion of inventory parking, contingent sales or other

improper activity.[68]

Second, throughout the class period, the company's SEC

filings disclosed the use of discounts, albeit not to the degree

plaintiffs insist was necessary.  Given the fact that Cytyc's

public documents disclosed the use of discounts, i.e., the

company's "channel stuffing practices," see In Re Seque Software,

---

[67]  There is nevertheless a line between offering discounts
or encouraging earlier than normal sales versus knowingly hiding
low earnings in the earlier quarters by artificially inflating
revenues through improper revenue recognition.  See Greebel v.
FTP Software, 194 F.3d at 202; accord In Re Focus Enhancements,
Inc. Securities Litigation, 309 F.Supp.2d at 149.  The latter
provides a weak inference of scienter.  Greebel v. FTP Software,
194 F.3d at 202-203; accord In Re Focus Enhancements, Inc.
Securities Litigation, 309 F.Supp.2d at 149-150.  Given the
absence of improper revenue recognition, even this weak inference
is missing.

[68]  The three cases outside this circuit prominently cited
by plaintiffs (Docket Entry # 36, pp. 1-2) are distinguishable
for reasons stated by defendants in their reply memorandum
(Docket Entry # 39, pp. 3-4 & n. 2) and eloquently expressed at
the hearing.

Inc. Securities Litigation, 106 F.Supp.2d at 168 (allegation of
improperly booking contingent sale to boost revenue and not
disclosing the right of return in the large and identified
million dollar sale to named customer not fraudulent given the
Form 10-K disclosure);[69] see also Fitzer v. Security Dynamics
Technologies, Inc., 119 F.Supp.2d at 35-36 (finding list prices
in Form 10-K not fraudulent inasmuch as the disclosure was made
that the prices were "[s]ubject to volume discounts and other
licensing terms and conditions"), the record fails to reflect a
strong inference that defendants knew that the statements were
false or materially misleading by omitting the information
regarding the extent of the discounting at Cytyc.  See Geffon v.
Micrion Corporation, 249 F.3d at 36 ("[e]ven if the statements at
issue were material and false or misleading, the evidence does
not support a finding that defendants knew the statements would
materially mislead the investing public").  Indeed, during the
April 24, 2002 conference call, Sullivan forthrightly sought to
provide investors with the information that this was not the
first time the company had used promotions.  See Geffon v.

---

[69]  Indeed, the disclosure in the Form 10-K in Seque was
even less forthcoming that the ones in the case at bar.  In
Seque, the Form 10-K affirmatively stated the contrary, to wit,
that, "The Company typically does not grant to its customers a
contractual right to return software products."  In Re Seque
Software, Inc. Securities Litigation, 106 F.Supp.2d at 168.  The
form then gave the impression that rights of return were the
exception and not contained in typical, if any, contracts with
customers.  The relevant language was that, "When approved by
management, however, the Company has accepted returns of certain
software products and has provided an allowance for those
specific products."  In Re Seque Software, Inc. Securities
Litigation, 106 F.Supp.2d at 168.

Micrion Corporation, 249 F.3d at 37 (noting that "Micrion sought to provide investors with adequate warnings of the possibility that not all seventy-five units would be purchased").

Third, as already explained, the allegations of insider trading and revenue recognition or accounting violations lack merit.  Although insider trading may provide evidence of scienter, see Greebel v. FTP Software, 194 F.3d at 196 (noting the "many different types of evidence as relevant to show scienter," including insider trading), the inference is nonexistent in the case at bar.  Bowen never traded during the class period.  Sullivan's trading was less during the class period than prior to or after the class period.  Likewise and also as previously explained, violations of GAAP, SEC or company policy may give rise to an inference of scienter, see Aldridge v. A.T. Cross Corporation, 284 F.3d at 83 ("'accounting shenanigans' may be evidence of scienter"); In Re Cabletron, 311 F.3d at 39 ("[s]ignificant GAAP violations also 'could provide evidence of scienter'"); In Re Galileo Corporation Shareholders Litigation, 127 F.Supp.2d at 266 ("'a violation of a company's own policies supports an inference of scienter'"), but the record is devoid of any such violations.

Defendants' alleged motive to inflate the stock price and use the inflated price to purchase Pro-Duct and Digene at more attractive prices is unconvincing.  See, e.g., In Re Galileo Corporation Shareholders Litigation, 127 F.Supp.2d at 270 ("the mere statement that an acquisition occurred after Galileo's stock

prices increased is insufficient even to create an inference that
the two events were necessarily related, not to mention
insufficient to create a strong inference either of an intent to
deceive or of recklessness").  Sullivan and Bowen's involvement
in discussing sales strategies, knowledge of daily activities,
positions in the company, setting and encouraging unrealistic
sales quotas, general access to internal information and/or focus
upon the company's stock price (¶¶ 39-41, 46-47, 144, 147-151 &
153-154) are also equally unconvincing.  See Carney v. Cambridge
Technology Partners, Inc., 135 F.Supp.2d at 254 (rejecting
"knowledge derived by Sims and Toscanini from unspecified plans,
budgets, forecasts, reports, conversations, connections, meetings
and 'other' information to which these defendants had access
because of their positions with CTP" as adequate to plead
scienter); Fitzer v. Security Dynamics Technologies, Inc., 119
F.Supp.2d at 25 (declining to "speculate that because former
employees in the corporation knew of changes in the sales
profiles, the corporate executives must also have known about the
changes and fraudulently concealed them"); Lirette v. Shiva
Corporation, 27 F.Supp.2d at 283 ("[a]ttempts to plead scienter
by general allusions to unspecified internal corporate
information are insufficient to withstand a motion to dismiss");
In Re Viewlogic Systems Securities Litigation, 1996 U.S.Dist.
Lexis 22371 at * 37-39 (D.Mass. March 13, 1996); see also
Maldonado v. Dominguez, 137 F.3d 1, 9-10 (1st Cir. 1998).

In sum, there is a marked void of the necessary strong

inference of scienter.  Finally, lacking a predicate violation of

section 10(b) of the Securities Exchange Act of 1934 or of Rule

10b-5, 17 C.F.R. § 240.10b-5, the section 20(a) claim is also

subject to dismissal.  See Suna v. Bailey, 107 F.3d at 72; In Re

Parametric Technology Corporation Securities Litigation, 300

F.Supp.2d at 224.

Defendants seek a dismissal with prejudice.  In a footnote,

however, plaintiffs summarily request leave to replead in the

event this court "determines that there are efficiencies in the

Complaint as to any of the named defendants."  (Docket Entry #

36, n. 26).  This court assumes plaintiffs meant to use the word

"deficiencies."  As discussed, there are numerous deficiencies.

Although this case is rapidly approaching the three year

mark, the PSLRA "stays all discovery, with certain narrow

exceptions, during the pendency of any motion to dismiss."  In Re

Cabletron, 311 F.3d at 33.  In analogous circumstances, the court

in Guerra v. Teradyne, Inc., 2004 WL 1467065 (D.Mass. Jan. 16,

2004), recommended a dismissal without prejudice given the

plaintiffs' footnote request for leave to replead.  Accordingly,

the recommendation will be to dismiss without prejudice subject

to allowing plaintiffs an opportunity to replead if there are

grounds for such an amendment consistent with the rulings made in

this opinion.[70]  See, e.g., Guerra v. Teradyne, Inc., 2004 WL

---

[70]  It is, of course, entirely in the province of the
district judge as to the amount of time he wishes to allow
plaintiffs to submit a motion to amend together with an attached
proposed consolidated second amended complaint.  In the event
plaintiffs chose to file a motion for leave to amend, this court

1467065 at * 28 (D.Mass. Jan. 16, 2004) (refusing to dismiss case with prejudice inasmuch as the plaintiffs asked to be given leave to replead in a footnote if the court dismissed the complaint).

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[71] that the motion to dismiss (Docket Entry # 30) be **ALLOWED** except to the extent that the dismissal be without prejudice subject to allowing plaintiffs an opportunity to replead consistent with the rulings made in this opinion.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

suggests that the proposed consolidated second amended complaint should clearly identify the newly added language and any omitted language.

[71]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  Any party may respond to another party's objections within ten days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.  United States v. Escoboza Vega, 678 F.2d 378-379 (1st Cir. 1982); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).